THE WAGNER FIRM
Avi Wagner (Cal Bar. No. 226688)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310-491-7949
Facsimile: 310-694-3967

*Liaison Counsel for Lead Plaintiff*
(Additional Counsel on signature page)

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL CHUPA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARMSTRONG FLOORING, INC., MICHEL VERMETTE, DONALD MAIER, LARRY McWILLIAMS, DOUGLAS BINGHAM, DOMINIC RICE, and RONALD FORD,<br><br>Defendants. | Case No. 2:19-cv-09840-CAS<br><br>Judge:   Hon. Christina A. Snyder<br>Courtroom 8D – 8th Floor<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## Table of Contents

I.      INTRODUCTION ..................................................................... 1

II.     JURISDICTION AND VENUE ................................................ 4

III.    PARTIES.................................................................................. 5

IV.     SUBSTANTIVE ALLEGATIONS ........................................... 6

    A.   Armstrong's Operations and Business Strategy......................... 6

    B.   Armstrong Sold Distributors More Armstrong Inventory Than Demand Supported................................................................... 9

    C.   Defendants Were Aware That Armstrong's Distributors Were Unable to Execute The Company's "go-to-market strategy," Which Negatively Impacted the Company's Sales of its Products ...........................11

    D.   The Company Failed to Service National Accounts, and Independent Retailers, which Negatively Impacted the Company's Financial Performance ..........................................12

V.      MATERIAL MISSTATEMENTS AND OMISSIONS ................13

    A.   Annual Report on SEC Form 10-K for Fiscal Year 2017 .........13

    B.   4Q 2017 and Fiscal Year end 2017 Earnings Conference Call .................14

    C.   1Q 2018 Earnings Conference Call .........................................15

    D.   2Q 2018 Earnings Conference Call .........................................19

    E.   3Q 2018 Earnings Release .......................................................20

    F.   3Q 2018 Earnings conference Call ..........................................21

VI.     DEFENDANTS PARTIAL REVELATIONS THAT ARMSTRONG'S GROWTH AND BUSINESS STRATEGY WERE ILLUSORY AND CONTINUED MATERIAL MISSTATEMENTS AND OMISSIONS ..........23

    A.   4Q 2018 and FY2018 Results...................................................23

    B.   Annual Report on SEC form 10-K for fiscal year 2018 ............25

    C.   1Q 2019 Results.......................................................................26

    D.   2Q 2019 Results.......................................................................29

    E.   3Q 2019 Results.......................................................................31

    F.   4Q 2019 and FY 2019 ............................................................33

VII.    ADDITIONAL SCIENTER ALLEGATIONS..............................35

Case No. 2:19-cv-09840-CAS
AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

A.   The Fraud Impacted Armstrong Flooring's Core Operations .....................36

B.   Individual Defendants' Responses to Analyst Questioning Demonstrates Scienter ............................................................................................................36

C.   The Defendants Were Motivated to Commit Fraud so that they Could Obtain RSU Grants that were Worth up to Double their Base Salary ........38

VIII.   LOSS CAUSATION ....................................................................................39

IX.   PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ................41

X.   CLASS ALLEGATIONS ...........................................................................42

COUNT I  VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS ..............................................................................................44

COUNT II  VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS ..........................................46

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lead Plaintiff Randy Marker ("Plaintiff") alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which Plaintiff alleges upon personal knowledge.   Plaintiff's information and belief are based upon Lead Counsel's investigation, which included a review and analysis of, *inter alia*: (i) regulatory filings made by Armstrong Flooring with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of Armstrong Flooring's conference calls including conference calls on which the Individual Defendants (defined below) participated; (iii) wire and press releases; (iv) analyst reports and advisories about the Company; and (v) information readily obtainable on the Internet.   Plaintiff believes that additional substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  INTRODUCTION

1.     Lead Plaintiff seeks to recover damages caused by Defendants' violations of the Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     This securities fraud class action is on behalf of all persons or entities who purchased the common stock of Defendant Armstrong Flooring Incorporated ("Armstrong Flooring" or "Armstrong" or the "Company") on the open market between March 6, 2018 and March 3, 2020 (the "Class Period"), and were damaged thereby.

3.     Armstrong Flooring is a publicly traded company that is listed on the New York Stock Exchange.

4.     Armstrong manufactures and sells flooring for residential and commercial use.   Armstrong generates revenue by selling its flooring to third-party distributors and to national accounts such as Home Depot and Lowes.   The majority

of Armstrong's revenue comes from sales to distributors related to residential flooring.

5.     At the beginning of the Class Period, Defendant Maier told investors that Armstrong was changing its residential business strategy to a "go-to-market strategy."

6.     The "go-to-market strategy" was a plan to abandon in-house marketing for Armstrong's residential products and instead depend on third-party distributors for marketing.   Armstrong told investors that the distributors would grow Armstrong's residential business and that Armstrong would use its residential marketing savings to invest in marketing its commercial and national account segments to further grow the Company.

7.     Throughout the Class Period, Defendants assured investors that the distributors were equipped to execute the "go-to-market strategy."   For example, Defendants stated that "the capabilities of our distributors are all very good. Some are excellent"; "our distributors are in a position to provide the merchandising support"; and that "we are on track to accelerate net sales growth."

8.     Defendants told investors that an "important" piece of the "go-to-market strategy" was to use savings from the "go-to-market strategy" to increase investment in commercial and national accounts, which "we believe will be an important contributor to our collective success"; and Defendants claimed "to allocate more of our marketing spend to commercial and national accounts."

9.     Defendants also told investors that its distributors bought Armstrong's products on an "as needed" basis and in response to local demand.

10.     In response to a 2018 potential escalation of the price of flooring materials from China due to tariffs (an increase in cost, which the Company passed on by increasing the price of their products), distributors over bought Armstrong products.

11.    Defendants were aware that this excessive buying was occurring and that the sales channel was being filled with inventory well over customer demand. In fact, Defendant Maier told investors that Defendants were aware that distributors were buying ahead of the tariffs, "but [he] would not want to quantify that further for you [investors]" and "prefer[ed] not to provide quantification."   Defendant McWilliams also stated that overbuying in 2018 elevated distributors' inventories and Defendants "expected this dynamic to impact first quarter [2019] performance and it did."

12.    Unbeknownst to investors, however, was that:  i) the distributors' 2018 buying flooded the sales channel and would limit sales for all of 2019; ii) distributors did not have the resources, nor was there the demand to market and sell down the excess inventory; and iii) while the residential sales strategy was failing, Armstrong also refused to invest resources into the commercial and national account segments of its business.  In fact, Armstrong later admitted that it only employed two people to service thousands of current and potential customers.

13.    Knowing that the distributors were ill-equipped to sell the large amount of Armstrong inventory purchased in 2018 (which would limit Armstrong's sales in 2019); that the "go-to-market strategy" was fatally flawed from the start; and that Armstrong was not putting sufficient resources into marketing to commercial and national accounts; Maier left Armstrong after the close of 2018 results.  Maier received a substantial bonus upon departure – especially when compared to his 2017 bonus compensation of zero because the Company did not meet 2017 financial benchmarks.

14.    After Maier left, the Company continued to keep up the misleading impression that the excess inventory in the channel from 2018 would be worked down in 2019, that the Company expected to grow in 2019, that the "go-to-market strategy" was a success, and that the Company was increasing marketing capabilities in the commercial and national account segments to further grow sales.

15.    In 2019, the Company made numerous partial disclosures admitting that the 2018 inventory was still a drag on sales and that the Company's earnings outlook for 2019 was cut by more than half.

16.    On March 3, 2020, the Company disclosed that the "go-to-market strategy" was a failure and that the distributors were not equipped to market and sell Armstrong's products.  Additionally, Armstrong admitted that it did not invest in marketing for its commercial and national account segments, which further crippled 2019 sales.

17.    As a result of the disclosures, investors suffered substantial damages as the stock price of Armstrong fell approximately 85% over the period of March 6, 2019 through March 3, 2020.

## II.   JURISDICTION AND VENUE

18.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 250.10b-5).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  The Company has offices and a manufacturing facility in this District.

21.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate

commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

22.     Lead Plaintiff Randy Marker, as set forth in the certification attached to this Amended Complaint, purchased Armstrong Flooring common stock on the open market during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.     Defendant Armstrong Flooring is incorporated under the laws of Delaware with its principal executive offices located in Lancaster, Pennsylvania. Armstrong Flooring's common stock trades on the New York Stock Exchange ("NYSE") under the symbol ("AFI").

24.     Defendant Donald Maier ("Maier") was the CEO of the Company from March 2016 to May 2, 2019.

25.     Defendant Larry McWilliams ("McWilliams") was the Interim CEO from May 3, 2019 through September 11, 2019.

26.     Defendant Michel Vermette ("Vermette") has been the Company's Chief Executive Officer ("CEO") since September 11, 2019.

27.     Defendant Douglas Bingham ("Bingham") has been the Company's Chief Financial Officer ("CFO") since January 4, 2019.

28.     Defendant Ronald Ford ("Ford") was the CFO from September 2017 through January 4, 2019.

29.     Defendant Dominic Rice ("Rice") was the Chief Product Officer during the Class Period.

30.     Defendants Maier, McWilliams, Vermette, Bingham, Ford, and Rice (collectively the "Individual Defendants"), because of their positions with the Company possessed the power and authority to control the contents of the

Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the material false and misleading statements and material omissions pleaded herein.

## IV.  SUBSTANTIVE ALLEGATIONS

### A.    Armstrong's Operations and Business Strategy

31.    Armstrong Flooring is a producer of flooring products for use primarily in the construction and renovation of residential, commercial, and institutional buildings. The Company designs, manufactures, sources, and sells resilient flooring products in North America and the Pacific Rim.

32.    Until November 15, 2018, Armstrong Flooring had two business segments, Resilient Flooring and Wood Flooring.

33.    Armstrong Floorings' Resilient Flooring segment designs, manufactures, sources, and sells a range of floor coverings for homes and commercial buildings under various brands. The products manufactured by this segment include vinyl sheet flooring, vinyl tile flooring, luxury vinyl tile ("LVT") flooring, laminate flooring products, vinyl tile products, vinyl sheet products, and linoleum products.

34.    On November 15, 2018, Armstrong Flooring sold the Wood Flooring business in an all cash transaction for $100 million to American Industrial Partners.

The new business was named AHF, LLC. As part of that transaction, former Armstrong employees who became employed at AHF, LLC were required to sign non-disclosure agreements that AHF, LLC's counsel advised prevents former Armstrong employees from cooperating with Lead Plaintiff's investigation into fraudulent acts observed while at Armstrong.

35.   The sale of the wood flooring business shifted Armstrong Flooring from a resilient and wood flooring company to an entirely resilient flooring business with a deeper focus on its LVT product lines. The Company claimed that this focus on resilient flooring would greatly benefit Armstrong's sales mix and generate more value for shareholders.

36.   Defendant Maier stated in an investor presentation announcing the sale of the Wood business on November 15, 2018, that separating the Resilient and Wood business was "the best way to empower both businesses to better realize core strengths." And that the transaction would give Armstrong "a much stronger position in [its] product and end-market mixes. The exclusive focus on Resilient would improve the profitability of [Armstrong's] strong portfolio of award-winning products."

37.   One of the reasons the Company touted the move to resilient flooring was because the majority of the Company's resilient products would be used for "renovation projects, which provides a less cyclical, more stable growth dynamic."

38.   Armstrong Flooring principally sells its products through independent wholesale distributors, who re-sell Armstrong's products to retailers, builders, contractors, installers and others.

39.   During the Class Period, approximately 80% of Armstrong's sales were to distributors.

40.   Armstrong represented to investors in its Annual Reports that Armstrong "produce[s] goods for inventory and sell on credit to our customers. Our distributors carry inventory as needed to meet local or rapid delivery requirements.

We sell the vast majority of our products to select, pre-approved customers using customary trade terms that allow for payment in the future. These practices are typical within the industry."

41.   On February 5, 2018, just prior to the Class Period, Armstrong announced that "Armstrong Flooring Advances Growth Strategy with Strengthened Distributor Partnerships."   The Company stated that it was "empowering its distributors with increased responsibility for marketing, merchandising and sales of its residential flooring products, and is focusing resources to drive growth with national retail and commercial customers."

42.   Maier claimed that "[s]hifting elements of our residential marketing and merchandising responsibilities to our distributors is intended to increase efficiency, move decision-making closer to the customer, and improve speed-to-market, … As distributors take on additional responsibilities, we plan to increase investments in national retail and commercial accounts, specifiers, architects, designers and contractors."

43.   During the Class Period, Armstrong referred to its growth strategy with strengthened distributor relationships as its "go-to market strategy." The "go-to-market strategy" made Armstrong nearly entirely reliant on the Company's distributors to market and sell Armstrong's products.   For example, the "go-to-market strategy" required distributors to make branding and marketing decisions concerning the sale of Armstrong's product.

44.   The Company repeatedly represented to the market that the "go-to-market strategy" would allow Armstrong to further focus on servicing their other national accounts and gain a strong competitive advantage.

45.   In the Third Quarter of 2018, Armstrong claimed that it had successfully implemented the "go-to-market strategy" and told investors that the strategy was working and providing positive results.

46.     These strengths that the Defendants claimed they received from the new go-to-market realignment and switch to a resilient only business were illusory and the financial health of the Company was rapidly deteriorating as a result.

## B.     Armstrong Sold Distributors More Armstrong Inventory Than Demand Supported

47.     Throughout the Class Period, the Company represented to investors that the Company's distributors "only carried inventory as needed to meet local or rapid delivery requirements."

48.     In 2018, Armstrong's net sales were increased by Defendants selling inventory into the retail channel that distributors did not need to meet demand.

49.     The inventory sold into the distribution channel hobbled Armstrong's ability to sell additional inventory to distributors throughout 2019 as the excess inventory needed to be worked down by the distributors by selling it to end users.

50.     Investors did not know that Armstrong cannibalized future sales by over selling inventory into the channel.  Indeed on a November 6, 2018 earnings call, Defendant Maier attributed increased sales into the Retail Channel to distributor orders that had been placed months before the U.S. announced tariffs. Specifically, Defendant Maier stated: "We've been bringing in additional inventory because of the demand for our new products. And obviously, those orders had been placed months and months before the announced tariffs."

51.     Defendant Maier admitted in 3Q2018 that Armstrong knew the quantity by which Armstrong was flooding the distribution channel would require over a year to sell down.  Maier stated in response to a question by Michael Wood of Nomurra Securities during the 3Q2018 Earnings about distributors pre-buying LVT due to tariffs that, "[s]o we do believe that our distributors appropriately took advantage of the fact that they could buy ahead of the 10% tariff, but would not want to quantify that further for you."

52.   Later in 2019, when confronted by analysts about distributors increased inventory levels, which were holding back additional sales, Defendants continually explained the inventory glut as the result of trade war tariffs.   For example, Defendant McWilliams in an August 6, 2019, earnings call noted in his initial remarks that the Company's customers were continuing to "reduce inventory from elevated levels in previous quarters. ***This destocking activity represented the tail end of demand pull-forward into 2018, ahead of the initial waves of tariffs on Chinese imports implemented late last year***."

53.   Defendant Bingham parroted Defendant McWilliams on that call and stated that "in the distributor channel, we believe that the customers ***have largely worked down unusually high levels of inventory purchased ahead of tariffs on Chinese import last year.***"

54.   On an August 6, 2019 conference call, Analysts pushed the Defendants to provide additional clarity regarding the inventory in the channel and how it affected all aspects of the company.   For example, a G Research, LLC analyst, Alvaro Lacayo, asked Defendant Bingham how much the inventory build effected the Company's revenue and how that would affect the Company's expectations for the second half of the year. Defendant Bingham responded that the Company observed continued inventory destocking throughout its first and second quarters of the year.

55.   Selling more of Armstrong's products into the distributors' warehouses allowed Defendants to make shareholders believe that the Company was growing and capable of meeting its financial projections.

56.   This excess inventory in the retail channel would cost the Company sales in future quarters and ultimately force Armstrong Flooring to slash its projections in half in 2019.

C.   **Defendants Were Aware That Armstrong's Distributors Were Unable to Execute The Company's "go-to-market strategy," Which Negatively Impacted the Company's Sales of its Products**

57.   Defendants knew or recklessly disregarded that Armstrong's distributors were incapable of executing on the "go-to-market strategy" and did not have the capabilities to manage the marketing roles that were thrust upon them by the Company.

58.   Maier assured shareholders that the "capabilities of [Armstrong's] distributors are all very good.  Some of them are excellent." Maier also made it clear that the "go-to-market strategy" was something that the Company had been working on with its distributors for the past "two and a half to three years."

59.   Defendants portrayed the "go-to market strategy" as a fix for the problems facing the Company, including increased competition domestically and abroad.  The "go-to-market strategy" was portrayed as a way to sell higher growth products, which would allow the Company to substantially increase its profits.

60.   During the August 7, 2018 earnings call, Defendant Maier stated that Armstrong Flooring was "making good progress for distributors to begin providing their own merchandising in Q3, with the full transition to be completed by year-end 2018.  This shift in responsibility will come with higher margins for [Armstrong Flooring's] distributors which will give them further incentive to expand their share of wallet with us while [Armstrong Flooring's] distributors will have more flexibility to serve the unique needs of [Armstrong Flooring's] important residential customers in their markets."

61.   After the "go-to-market strategy" was fully implemented, the Company continued to push the false narrative that the new go-to-market strategy was working when in fact it was not.

62.   On a May 7, 2019, earnings call Defendant Rice was asked by an Instinet analyst, Mason Irwin Marion, whether the Company was seeing positive or negative results from giving distributors more influence over its advertising.  Rice

responded: "We pivoted last year and provided our distributor partners with greater responsibility for the merchandising and sale of our residential products, especially into the independent retail channel as they are best positioned on a local and regional basis to execute effectively with those individual retailers. ***That transition has gone very smoothly, and we're very satisfied with the progress we're making there.***" (Emphasis added).

63.    Defendants knew or recklessly disregarded that the Company's distributors incapable of handling the roles that were thrust upon them and with these increased responsibilities were unable to effectively manage the other responsibilities of a distributor as sales declined because distributors could not distribute Armstrong's products to end users.

### D.    The Company Failed to Service National Accounts, and Independent Retailers, which Negatively Impacted the Company's Financial Performance

64.    Throughout the Class Period the Defendants repeatedly stated that the new go-to market realignment strategy would allow them to substantially increase the Company's resources towards its commercial and national accounts.

65.    On a May 8, 2018 earnings call, Defendant Maier stated that the Company "expect[s] distributors will begin providing their own merchandising in Q3, with the full transition completed by the end of the year. ***We are excited by the opportunity this gives us to focus more on commercial and national accounts, which we believe will be an important contributor to our collective success***." (Emphasis added).

66.    Just two short months later the Defendants would again tell the market that they were allocating substantial resources to their national accounts. For example, on an August 7, 2018 call Defendant Maier stated that the Company was "excited to focus more of our marketing spend on commercial and national accounts where we believe we can better leverage [Armstrong Flooring's] scale."

67.     On a March 5, 2019, earnings call, just two months prior to Defendant Maier's resignation, Maier claimed that the Company was allocating more resources towards servicing its commercial and national accounts.  Specifically, Defendant Maier stated: "Several actions have shifted our business towards commercial in recent years, including the purchase of additional VCT, assets in 2017 and a realignment of our sales and marketing efforts to focus more heavily on commercial and national accounts in 2018."

68.     The Defendants kept pushing this false narrative even after Defendant Maier left the Company. On an earnings call that took place on May 7, 2019, Defendant McWilliams stated that the Company's "2018 go-to-market *pivot to focus on commercial and national accounts* [was] progressing well and aligned with the weighting of [Armstrong Flooring's] portfolio towards the commercial end market." (Emphasis added).

69.     At the end of the Class Period, Defendants admitted they did not put additional resources into commercial and national accounts.  Armstrong had two people calling on hundreds of large builders and contractors – one person calling on commercial national accounts and one person calling on 13,000 independent retailers.

## V.   MATERIAL MISSTATEMENTS AND OMISSIONS

### A.     Annual Report on SEC Form 10-K for Fiscal Year 2017

70.     On March 6, 2018, the Company filed its 2017 Annual Report on Form 10-K with the SEC. The 2017 Form 10-K was signed by Defendants Maier and Ford.  The 2017 Form 10-K stated:

We produce goods for inventory and sell on credit to our customers. *Our distributors carry inventory as needed to meet local or rapid delivery requirements, which varies across our Resilient Flooring and*

***Wood Flooring segments.*** We sell the vast majority of our products to select, pre-approved customers using customary trade terms that allow for payment in the future. These practices are typical within the industry.  (Emphasis added).

71.    The above statement was materially false and misleading because the Company's distributors were not carrying inventory as needed to meet local or rapid delivery requirements, but were instead taking on substantially more inventory than they could sell in a year's time.  *See ¶¶* 7-10; 57-63; 93-132.

**B.    4Q 2017 and Fiscal Year end 2017 Earnings Conference Call**

72.    On March 6, 2018 Defendants Maier, Bingham and Ford took part in a conference in a fourth quarter 2017 ("4Q2017")  and Fiscal Year 2017 earnings call with investors. On that call, Defendant Maier in his opening remarks stated:

> ***Second, in February, we announced the plan to enhance our service to independent retailers by empowering distributors with increased responsibilities for marketing and merchandising of our residential flooring products. This will push the decision-making closer to the customer and allow a faster response to local needs. As distributors take on additional responsibilities in residential channels, we will be able to reduce some of our spending in these activities. We plan to use some of the savings to increase our investment in national retail and commercial accounts, specifiers, architects, designers and contractors.*** (Emphasis added).

73.    The above statements were materially false and misleading when made because Defendants knew or recklessly disregarded that the "go-to-market strategy" was fatally flawed and the distributors were not great partners and they could not grow Armstrong.   *See  ¶¶* 7-10; 47-56; 57-63; 64-69; 93-132. The distributors did

not and could not take on the added responsibilities of marketing and merchandising for Armstrong. *See id*. Additionally, Defendants did not increase their investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts.  *See* ¶¶ 8; 64-69; 127-32 Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

### C.    1Q 2018 Earnings Conference Call

74.    On May 8, 2018, the Defendants participated in a conference call with analysts and the investing public to discuss the Company's first quarter 2018 ("1Q2018") earnings.

75.    In his opening remarks Defendant Maier stated that:

As expected, first quarter net sales overall were slightly lower due to higher distributor inventory levels at the end of 2017 and continued challenges in some of our legacy categories. ***However***, ***our strategic initiatives are on track to accelerate net sales growth in the second half of the year***. We are confident in these growth prospects, and we have actions underway on price, productivity and other cost saving measures to offset intensifying inflationary pressure evident across the entire industry. (Emphasis added).

76.    Defendant Maier also stated:

In distribution, we are committed to gaining additional share of wallet and aligning ourselves with partners who are best positioned to support our growth strategy. ***We are making good progress on our previously***

*announced change in our distributor partnerships, including a shift in our direct marketing and merchandising efforts for our residential products.* We expect distributors will begin providing their own merchandising in Q3, with the full transition completed by the end of the year. *We are excited by the opportunity this gives us to focus more on commercial and national accounts, which we believe will be an important contributor to our collective success.* (Emphasis added).

77.     The above statements were materially false and misleading when made because Defendants knew or recklessly disregarded that the "go-to-market strategy" was not on track to generate growth, but fatally flawed and the distributors could not grow Armstrong. *See* ¶¶ 7-10; 47-56; 57-63; 64-69; 93-132.  The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong. *See id.*  Additionally, Defendants did not increase its investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts. *See* ¶¶ 8; 64-69; 127-32. Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

78.     Later on the 1Q2018 earnings call, analyst Michael Robert Wood of Nomura Securities pushed the Defendants to provide an update on the go-to-market realignment within the Company.  Specifically he asked:

Great. And just finally, if I could ask one on your shift to the marketing with your distribution base. I'm just curious if you can give an update on how that's going so far, and what you're doing just to make sure

you're protecting or safeguarding your brand? And how that progress has been on that initiative?

79.    Defendant Maier responded:

Yes, *so I would say we are on track as we had planned*. And that includes really not having the full turnover of these responsibilities taking place until the end of this year with a number of items ramping up in Q3 of this year. So we are still managing and maintaining all of those activities while this transition takes place. So there's no risks at the current time*. We've been working very closely with our distributors who, by the way, are very excited, and this is something that they really been seeking as it gives them, I think, a competitive advantage in the marketplace as well, and so good progress there. And we have all of the things that you would expect to manage this moving forward, including rigorous brand standards to make sure that the branding is consistent across all regions. Performance criteria, to make sure that the investments are being made in the marketplace and the natural remedies that you would expect should we get misaligned in a particular case.* So we feel very good about it. I think our distributors feel very good about it, and we continue to work collaboratively with them, looking to have the keys turned over to them at the end of the year. *And I guess, one other piece as well that's important here is, at the same time, we're increasing our focus on our commercial business and the specifications there are as well as the national retailers, which is where, I think, we can bring real value to our distributors by increasing our investments and focus there.* (Emphasis added).

80.     The above statements were materially false and misleading when made because Defendants knew or recklessly disregarded that the "go-to-market strategy" was fatally flawed and the distributors were not great partners and they could not grow Armstrong.  *See*  ¶¶ 7-10; 47-56; 57-63; 64-69; 93-132.  The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong.  *See id.*  Additionally, Defendants did not increase its investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts.  *See* ¶¶ 8; 64-69; 127-32.  Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

81.     On the 1Q2018 earnings call, John Allen Baugh an analyst from Stifel Nicolaus & Co., asked about the capabilities of the distributors proceeding with the "go-to-market strategy":

> And then my last question is on the distributor change. Is there, I guess, the few contacts we've made, it sounds like the larger distributors are excited about this change but some of the smaller ones might struggle a little to take on some of the processes you were doing for them. And I guess my simple question is, there might be some pluses and minuses that nets to a plus. But are there any distributors who are pushing back? And if so, how do you deal with that?

82.     Defendant Maier responded:

> Yes. So no distributors are pushing back. We, as I indicated in my comments, are working through a lot of the details with them as we

speak. And we have a couple of quarters here to get ourselves fully ready for the transition. ***I would say that the capabilities of our distributors are all very good. Some of them are excellent. And so we're working to get everybody to that excellent capability standpoint.*** (Emphasis added).

83.    The above statements were materially false and misleading when made because Defendants knew or recklessly disregarded that the "go-to-market strategy" was fatally flawed and the distributors could not grow Armstrong. *See* ¶¶ 7-10; 47-56; 57-63; 93-132.   The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong. *See id.*

**D.    2Q 2018 Earnings Conference Call**

84.    On August 7, 2018, the Company held a conference call to discuss its Second Quarter 2018 ("2Q2018") results. On that call the Defendants made material misstatements and omissions.  In his opening remarks Defendant Maier stated:

In distribution, we are focused on gaining additional share of wallet and aligning ourselves with partners who are best positioned to support our growth strategy. Earlier in the year, we announced a change in our distributor partnerships, including a shift in direct marketing and merchandising efforts for our residential products, which is still on track to better serve customers at a lower cost. ***We are making good progress for distributors to begin providing their own merchandising in Q3, with the full transition to be completed by year-end in 2018. This shift in responsibility will come with higher margins for our distributors, which will give them further incentive to expand their share of wallet with us while our distributors will have more flexibility to serve the unique needs of our important residential***

*customers in their markets. **We are excited to focus more of our marketing spend on commercial and national accounts where we believe we can better leverage our scale.** (Emphasis added).*

85.     The above statements were materially false and misleading when made because Defendants knew or recklessly disregarded that the "go-to-market strategy" was fatally flawed and the distributors could not grow Armstrong. *See* ¶¶ 7-10; 47-56; 57-63; 64-69; 93-132. The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong. *See id.* Additionally, Defendants did not increase its investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts. *See* ¶¶ 8, 64-69; 127-32.  Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

**E.     3Q 2018 Earnings Release**

86.     On November 6, 2018 the Defendants filed a Form 8-K with the SEC. The Company attached a press release to that filing as an exhibit which announced the Company's financial results for the third quarter of 2018 ("3Q2018").

87.     In the third quarter 2018 earnings release Defendant Maier is cited as commenting that:

*Third quarter net sales improved led by 7% growth in our Resilient segment, which more than offset lower Wood segment sales. **We generated significant volume growth in Luxury Vinyl Tile ("LVT") as well as higher selling prices across many product categories, reflecting our 2018 pricing actions in response to inflationary pressure. On this momentum, Adjusted EBITDA improved by 17% and margin by 140 basis points year-over-year,***

*augmented by productivity gains and cost saving actions. These results are a reflection of continued execution of our strategic priorities. We are seeing more consistent progress in our top and bottom line performance. We plan to continue investing in growth categories, pricing in line with inflation and targeting cost efficiencies to further improve our margin and returns in 2018 and beyond.* (Emphasis added).

88.    The above statements were materially false and misleading when made because Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019, that the "go-to-market strategy" was fatally flawed, and that the distributors could not grow Armstrong.  *See* ¶¶ 7-10; 47-56; 57-63; 64-69; 93-132.  The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong.  *See id.* Additionally, Defendants did not increase their investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts.  *See* ¶¶ 8; 64-69; 127-32.  Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts

**F.    3Q 2018 Earnings conference Call**

89.    On November 6, 2018 the Company held an earnings call with investors and analysts regarding its earnings and performance in 3Q2018.

90.    Defendant Maier, in his opening remarks, stated:

In distribution, we are focused on gaining additional share of wallet in aligning ourselves with partners *who are best positioned to support our growth strategy*. As previously announced, *in the third quarter, we*

*began to allocate more of our marketing spend to commercial and national accounts,* where we believe we can better leverage our scale. Our commercial exposure is almost entirely in Resilient, so the benefits of that shift will be more pronounced in that segment. *In turn, in residential, we have empowered our distributor partners to directly market and merchandise our residential products to better serve local customers at a lower cost and higher margin.* The shift is underway with distributors working on merchandising to support sales of our residential products, and we continue to expect the full transition to be completed by year-end 2018. (Emphasis added).

91. The above statements were materially false and misleading when made because Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019, that the "go-to-market strategy" was fatally flawed, and that the distributors could not grow Armstrong. *See* ¶¶ 7-10; 47-56; 57-63; 64-69; 93-132. The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong. *See id.* Additionally, Defendants did not increase its investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts. *See* ¶¶ 8; 64-69; 127-32. Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts

## VI.   DEFENDANTS PARTIAL REVELATIONS THAT ARMSTRONG'S GROWTH AND BUSINESS STRATEGY WERE ILLUSORY AND CONTINUED MATERIAL MISSTATEMENTS AND OMISSIONS

92.   Defendants revealed to investors that Armstrong's growth and "go-to-market strategy" were illusory through a series of partial disclosures.

### A. 4Q 2018 and FY2018 Results

93.   On March 5, 2019, the Company announced its fourth quarter 2018 ("4Q2018") and Full Year ("FY2018") results.  In the press release filed with Form 8-K, the Company reported that in 4Q2018, net sales decreased 3.5% as compared to 4Q2017.  The Company stated that "[t]he decrease in net sales was primarily due to lower volumes, partly offset by improved mix and overall higher selling prices in response to inflationary pressure. Lower volumes in the fourth quarter of 2018 were impacted by elevated inventory levels in the distributor channel due to significant customer purchases in the third quarter of 2018 ahead of price increases implemented in October 2018 in response to higher anticipated U.S. tariffs."

94.   On this news, the Company's stock price fell $0.67 per share or approximately 4.5% to close at $13.90 per share on March 5, 2019.

95.   The March 5, 2019 price drop was buoyed by the Company's continued misleading statements made in the 4Q2018 and FY2018 release and earnings call.

96.   The 4Q2018 release misled investors by stating that: "the Company expects adjusted EBITDA …growth heavily weighted to the second half as the overall market improves and elevated inventory levels in the channel are worked down."

97.   The 4Q2018 and FY2018 release misled investors by stating that the Company expected EBITDA in 2019 to be more that EBITDA in 2018 as a result of expected higher net sales, even though Defendants knew or recklessly disregarded that in 2018 inventory levels in the channel had increased to levels that would

require over a year to sell down to levels that matched demand, stifling Armstrong's growth for 2019; and the material omission that the "go-to-market strategy" was a failure and that the Company needed to be restructured in order to sell its products.

98.    The above statements in ¶¶96-7 were materially false and misleading when made because Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019, that the "go-to-market strategy" was fatally flawed, and that the distributors could not grow Armstrong. *See* ¶¶ 7-10; 47-56; 57-63; 103-132.  The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong.  *See id.* Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

99.    In the 4Q2018 and FY2018 earnings conference call, on March 5, 2019,   Defendant Maier continued to mislead investors stating:

In distribution, in 2018 we completed our go-to-market pivot, ***which has allowed us to allocate more of our marketing and sales efforts on commercial and national accounts, where we believe we can better leverage our scale. We anticipate that our increased exposure to commercial through our exclusive focus on Resilient will amplify the benefits of this strategy. On the residential side, the transition has been smooth, and our distributors are in a position to provide the merchandising support for their retail customers, customized to their local needs.*** Not only will this increase the efficiency of our sales ecosystem, but it will also better serve local customers. We look forward to gaining additional share of wallet and aligning ourselves

with partners who are best positioned to support our growth strategy. The shift in distribution is directly aligned with our strategic objective to leverage our strong position in commercial, which represents a significant portion of our LVT products and the majority of our traditional categories. **Our team is dedicated to improving our performance in commercial categories through innovation and cost efficiencies to more effectively grow our market presence.** (Emphasis added).

100.   The above statements were materially false and misleading when made because Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019, that the "go-to-market strategy" was fatally flawed, and that the distributors could not grow Armstrong.  *See* ¶¶ 7-10; 47-56; 57-63; 64-69; 101-132.  The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong.  *See id.* Additionally, Defendants did not increase its investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts.  *See* ¶¶ 8; 64-69; 127-132.  Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

**B. Annual Report on SEC form 10-K for fiscal year 2018**

101.   On March 5, 2019, the Company filed the 2018 10-K with the SEC. The 2018 10-K was signed by Defendants Maier and Ford.  The 2018 10-K stated:

We produce goods for inventory and sell on credit to our customers. ***Our distributors carry inventory as needed to meet local or rapid***

*delivery requirements, which varies across our Resilient Flooring and Wood Flooring segments.* We sell the vast majority of our products to select, pre-approved customers using customary trade terms that allow for payment in the future. These practices are typical within the industry.  (Emphasis added).

102.   The above statements were materially false and misleading because the Company's distributors were not carrying inventory as needed to meet local or rapid delivery requirements but were instead taking on substantially more inventory than they could sell in a year's time. *See* ¶¶ 7-10; 47-56; 57-63; 103-132.

### C. 1Q 2019 Results

103.   On May 3, 2019, the Company announced its first quarter of 2019 ("1Q2019")  results.  In the press release, the Company reported that in 1Q2019, net sales volumes decreased 13.8% compared to 1Q2018.

104.   On May 3, 2019, the Company lowered its Full Year 2019 outlook of adjusted EBITDA to be in the range of $50 million to $58 million from its full year 2019 guidance, first announced the quarter earlier in March 2019 of adjusted EBITDA in the range of $58 million to $66 million.  The Company also revealed that it knew there was "elevated inventory levels in the channel" that it expected to be worked down in 2019.

105.   On this news, the Company's stock price fell $1.75, or nearly 12%, to close at $13.14 per share on May 3, 2019.

106.   The May 3, 2019 price drop was buoyed by the Company's continued misleading statements made in the 1Q2019 release and earnings call.

107.   On May 7, 2019, the Company held a conference call to discuss its financial results for the first quarter of 2019.

108.   During the 1Q2019 earnings call Defendant McWilliams stated:

Now on to the results for the quarter. Our team has been focused on executing key growth initiatives during 2019. That said, the first quarter results were challenged by several dynamics. ***Demand pull forward into 2018 has kept distributor inventory at elevated levels since year-end. This was in part due to the timing of customer purchases in response to the uncertainty in U.S. tariff policy.*** We expected this dynamic to impact the first quarter performance and it did. Results were further negatively affected by softer end market demand along with wet weather conditions in many parts of the United States. (Emphasis added).

109. Defendant Bingham described this situation when he stated:

Our first quarter volumes were affected by distributor destocking and soft end market conditions along with wet weather in many regions of the U.S. These dynamics were particularly acute in our residential categories. This was partially offset by overall higher selling prices in response to inflationary pressure. Changes in currency exchange rates had an unfavorable impact of 120 basis points year-over-year. ***In the distributor channel, which represents 3 quarters of our sales, customers continued to work down inventory levels from unusually high levels at year-end.***

As we explained last quarter, ***many distributor stocked up inventory in the third quarter 2018 ahead of U.S. tariffs on Chinese imports implemented on October 1.*** The subsequent delay and general uncertainty around further tariffs have created a temporary departure from normal seasonal buying pattern since that time. While inflation in reported results is likely to continue to be higher year-over-year, we have experienced a moderation in input cost increases on a sequential

basis compared to the fourth quarter, which is encouraging.  (Emphasis added).

110.   Defendant Bingham stated:

*Additionally, activity in our end markets, particularly in residential have improved in recent months, which is encouraging*. With this in mind, we continue to expect full year EBITDA to be heavily weighted towards the second half of 2019 as the market strengthens and *elevated inventory levels in the channel are worked down.* On the P&L, our effective tax rate could change significantly quarter-to-quarter. We continue to expect our tax rate to be approximately 25% in 2019. (Emphasis added).

111.   The above statements in ¶¶ 108-10 were materially false and misleading when made because Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019, that the "go-to-market strategy" was fatally flawed, and that the distributors could not grow Armstrong.  *See*  ¶¶7-10; 47-56; 57-63; 115-132.  The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong.  *See id.*  Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

112.   During the 1Q2019 Earnings Call, Mason Irwin Marion, an Instinet analyst, asked the Defendants about the impact they had seen from giving distributors more influence over advertising and marketing decisions:

This is Mason Marion on for Mike. Can you talk about the impact either positive or negative you're seeing from giving distributors more influence control over your advertising?

113.   Defendant Rice responded:

It's Dominic Rice here. I'll take that question. Thank you for it. Yes. We pivoted last year and provided our distributor partners with greater responsibility for the merchandising and sale of our residential products, especially into the independent retail channel as they are best positioned on a local and regional basis to execute effectively with those individual retailers. ***That transition has gone very smoothly, and we're very satisfied with the progress we're making there.*** (Emphasis added).

114.   The above statements in ¶¶ 112-3 were materially false and misleading when made because Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019, that the "go-to-market strategy" was fatally flawed, and that the distributors could not grow Armstrong. *See*  ¶¶7-10; 47-56; 57-63; 115-132.  The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong.  *See Id.* Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

### D. 2Q 2019 Results

115.   On August 6, 2019, the Company again lowered its Full Year 2019 outlook of adjusted EBITDA to be in the range of $46 million to $54 million from

its full year 2019 guidance, first announced the quarter earlier in May 2019 of adjusted EBITDA in the range of $50 million to $58 million."

116.   On August 6, 2019 the Company held a conference call to discuss its financial results for the second quarter of 2019.

117.   In his opening remarks Defendant McWilliams stated that:

> During the second quarter, our customers continued to reduce inventory from elevated levels in previous quarters. This destocking activity represented the tail end of demand pull-forward into 2018, ahead of the initial wave of tariffs on Chinese imports implemented late last year. We believe we ended the quarter with channel inventory at more sustainable levels. That said, the destocking activity, combined with softer end market demand, adversely impacted second quarter sales, particularly in our residential categories. In this environment, the team did a good job of delivering stronger adjusted EBITDA margin and free cash flow in the second quarter.

118.   Defendant Bingham's opening remarks would contain similar misstatements to Defendant McWilliams

> In the distributor channel, we believe the customers have largely worked down unusually high levels of inventory purchased ahead of tariffs on Chinese imports last year.

119.   The above statements in ¶¶ 117-8 were materially false and misleading when made because Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019, that the "go-to-market strategy" was fatally flawed, and that the distributors could not grow Armstrong. *See* ¶¶7-10; 47-56; 57-63; 120-132. The distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong. *See id.*

Defendants also knowingly or recklessly omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

### E. 3Q 2019 Results

120. On November 5, 2019, the Company reported its third quarter 2019 ("3Q2019") results in its Form 8-K. In the press release to investors, the Company revealed that "in the third quarter of 2019, net sales decreased 20.7%. The decrease in net sales was primarily due to unfavorable volumes and mix. Lower volumes in the third quarter of 2019 primarily reflected an unfavorable comparison in 2018 due to significant customer purchases in the distribution channel in anticipation of U.S. tariffs along with what the Company believes to be weaker performance by several distributors in 2019. Volume was below expectations due to further inventory reductions combined with share loss in some categories within the distribution channel, and mix was driven by lower relative LVT sales as a result of distributor stocking activity in the prior year quarter.

121. On November 5, 2019, the Company again lowered its Full Year 2019 outlook of adjusted EBITDA to be in the range of $20 million to $25 million from its full year 2019 guidance, first announced the quarter earlier in August 2019 of adjusted EBITDA in the range of $46 million to $54 million. The Company claimed the downward revision was "primarily attributable to recent sales trends and cost pressures."

122. The negative net sales comparisons and the reduction in FY2019 outlook announced on November 5, 2019 partly revealed that the Company was not growing and that Defendants had pushed more inventory into the channel than was needed by the distributors. The November 5, 2019 disclosures, however, omitted

that the Company's "go-to-market strategy" was a failure and that the Company needed to be restructured in order to sell its products.

123.   That same day, the Company held a conference call to discuss these results, and, in an exchange with an analyst, Defendant Vermette attributed the lowered guidance to inventory reductions by distributors.

124.   Still analysts questioned whether the trends had been present when the Company previously provided guidance:

> Analyst Alvaro Lacayo of Morgan Group Holding: [T]he last time you gave guidance you were five weeks into the quarter.  I realize things obviously [don't] work out as expected, but the magnitude is fairly large, so I want to go into how, what kind of assumptions do you make when you provide forward guidance given that you had been through the second quarter you were five weeks through the third quarter and you're cutting guidance by a significant amount[.]
>
> Defendant Bingham: I think what we've seen is that there were larger distributor movements on inventory.  So we were expecting that it was a tough comp with the activity that happened last year but we weren't necessarily expecting a kind of sequential reduction in inventory in the distribution channel and we did see that in the third quarter.
>
> In addition, the performance of our distributors, we believe that they were doing fairly well in the first part of the year and as we've had further conversations and then we'll work it.  It's clear that there is some challenges with some of our distributors that have caused us to revisit our outlook.
>
> Analyst Alvaro Lacayo of Morgan Group Holding: So, during the first five weeks of the third quarter there were not reducing inventory or

what change just because you would think, five weeks then you have some color into those trends.

Defendant Bingham: Yeah.  We saw more of the movements as we got into September.

125.   On this news, the Company's stock price fell $2.90 per share or nearly 44% to close at $3.70 per share on November 5, 2019.

126.   The November 5, 2019 price drop was buoyed by the Company's continued misleading statements including the claim that "recent sales trends" were the primary drag on earnings, even though Defendants knew or recklessly disregarded that in 2018 inventory levels in the channel had increased to levels that would require over a year to sell down to levels that matched demand, stifling Armstrong's growth for 2019; and the material omission that the "go-to-market strategy" was a failure and that the Company needed to be restructured in order to sell its products.   Defendants also knowingly or recklessly omitted that the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts.

**F.  4Q 2019 and FY 2019**

127.   Finally, on the last day of the Class Period, March 3, 2020, Defendants Vermette and Bingham revealed in an earnings call that they had just completed a "thorough review" of their business and for the past year it had been suffering from pervasive operational inefficiencies, which had caused the Company to substantially underperform throughout the past year.  Defendant Vermette noted that:

We had 2 people calling on hundreds of large builders and contractors. We had one person calling on commercial national accounts. We had one person dedicated to calling 13,000 independent retailers. We are in process of augmenting these resources and we expect to have quick payback on these SG&A investments. We have discontinued 20% of

our SKUs since October 1. We are consolidating our commercial VCT from 3 to 2 plants and our felt sheet from 2 to 1 plant. We initiated a monetization process for noncore assets such as South Gate. We kicked off major productivity and quality improvements effort in our plans.

128.   Defendant Vermette also finally admitted that the Company's go-to-market approach was a failure and distributors weren't executing:

Our go-to-market approach has put a lot of responsibility in our distributors and has given them roles that we are better suited for such as branding, marketing and also connectivity with large counts. Overall, we have been very cost-focused at the expense of missing profitable opportunities. That's partly attributable to our slow decision-making, where the approach has been very cautious versus taking required actions.

129.   Defendant Vermette would expand on the distributor's failings on the call when he stated that the Company's actions had "placed responsibility in distributors where they are not correctly equipped to represent [Armstrong]."

130.   Armstrong announced that it would install a new strategic framework to modernize the business by creating a more customer-oriented operating model that will allow Armstrong to match its supply with customer demand.

131.   A Nomura Securities Analyst, Michael Robert Wood, attempted to get some additional insight into the distributor issues that ended the Company's go-to market strategy.  Defendant Vermette responded that their distributors "do realize in some areas, we – they were not participating and not participating in our prior go-to-market strategy."

132.   On this news, the Company's stock price fell $0.46 per share, or nearly 19%, to close at $1.98 per share on March 3, 2020.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

133.   As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading.

134.   Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Armstrong Flooring's distributor capabilities, inventory channels, and service of its commercial and national accounts.

135.   Defendants knew or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

136.   Defendants, because of their positions within the Company, made or controlled the contents of the Company's public statements during the Class Period. The Individual Defendants were provided with or had access to the information alleged herein to be false or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading.  As a result, the Individual Defendants were responsible for the

accuracy of Armstrong Flooring's corporate statements and are therefore responsible and liable for the representations contained therein.

### A.    The Fraud Impacted Armstrong Flooring's Core Operations

137.   Defendants' false and misleading statements and omissions concerned Armstrong Flooring's core operations, the residential channel.

138.   The residential channel made up more than 2/3 of the Company's sales. As a substantial driver of revenue it was of key importance for the Defendants to monitor this channel for reporting purposes.

139.   One of the reasons that the Defendants implemented the new go-to-market strategy was to increase their revenue in the residential channel.

140.   Defendant Maier attempted to sell the new go-to-market strategy by claiming that in response to an analyst question that this new go-to market realignment would allow the Company to "double down our focus and attention on the areas that we can really add value to our distributors, driving that commercial business for them, where we have a significant capability with our dedicated sales force."

### B.    Individual Defendants' Responses to Analyst Questioning Demonstrates Scienter

141.   The Individual Defendants were repeatedly asked specific questions from analysts about the capabilities of the Company's distributors regarding their abilities:  (i) to execute on the go-to-market strategy; and (ii) manage the inventory in the residential channel.   The Individual Defendants confidently responded to these questions by repeatedly affirming that the Company's distributors were capable of both executing on the new go-to-market realignment and managing the channel inventory in the residential channel while they were simultaneously failing at both. Thus, the Individual Defendants were well aware of the issues relating to their distributors capabilities and failed to disclose those issues to shareholders.

142.   After the "go-to-market strategy" was fully implemented, during a May 7, 2019, earnings call an Instinet analyst, Mason Irwin Marion, asked whether the Company was seeing positive or negative results from giving distributors more influence over its advertising.  Defendant Rice responded: "we pivoted last year and provided our distributor partners with greater responsibility for the merchandising and sale of our residential products, especially into the independent retail channel as they are best positioned on a local and regional basis to execute effectively with those individual retailers. That transition has gone very smoothly, and we're very satisfied with the progress we're making there."

143.   Defendant Maier admitted he knew the quantity of overbuying by the distributors in 2018 stating during the third quarter 2018 earnings call that:

> So I prefer not to provide any quantification of -- for competitive, sensitive reasons. We've been bringing in additional inventory because of the demand for our new products. And obviously, those orders had been placed months and months before the announced tariffs. So we do believe that our distributors appropriately took advantage of the fact that they could buy ahead of the 10% tariff, but would not want to quantify that further for you. The -- as it relates to the supply chain, yes, there are other options external to China and a number of the -- of our suppliers and others in China have announced their plans to broaden their base beyond China to alleviate the impact of the tariffs. We've really been focused on 2 things in addition to taking the appropriate pricing actions which is leveraging the domestic capabilities that we have on LVT out of our 3 manufacturing facilities here in the U.S., and as well all of our other Resilient products, the relative value of those products has gotten -- has improved given the execution of the tariff and price increases associated with it. So we're --

we have a full blitz taking place on all of our sheet and tile products beyond our LVT offering that are all produced here domestically and not susceptible to the tariffs.

144.   Defendant McWilliams admitted during the 1Q 2019 earnings call that Defendants knew the 2018 overbuying would be a material drag on 2019 sales stating: "Now on to the results for the quarter. Our team has been focused on executing key growth initiatives during 2019. That said, the first quarter results were challenged by several dynamics. Demand pull forward into 2018 has kept distributor inventory at elevated levels since year-end. This was in part due to the timing of customer purchases in response to the uncertainty in U.S. tariff policy. We expected this dynamic to impact the first quarter performance and it did."

C.     **The Defendants Were Motivated to Commit Fraud so that they Could Obtain RSU Grants that were Worth up to Double their Base Salary**

145.   Prior to the Class Period, in January of 2018, the Company granted special retention time-based restricted stock units ("RSUs") to its Named Executive Officers ("NEOs").  The RSU grants were intended to retain their talent during the shift caused by the go-to-market realignment.  The Company specifically noted that "as [Armstrong Flooring] shifts [their] residential marketing and merchandizing responsibilities to our distributors while focusing our resources to drive growth with national retail and commercial customers."

146.   On April 24, 2020, the Company filed a Proxy Statement Pursuant to Section 14(a) with the SEC.  In that filing the Company revealed that the Individual Defendants received substantial grants of RSUs.  Specifically, Defendants Maier and Rice received a grant *equal to two times their base salary.* Defendant Ford received a substantially smaller RSU grant.

147.   This substantial award provided motive for the Defendants to continue to mislead the market as they could obtain that award as long as the Company continued to push forward the go-to-market realignment.

148.   Defendant Maier was particularly motivated to mislead the market because in 2017 the board cut Defendant Maier's salary by more than 60% as a result of poor performance.  As a result, Defendant Maier received no cash bonus and much less potential stock as compensation.

149.    In 2018, Defendant Maier spearheaded the fatally flawed go-to-market strategy, knew sales were inflated due to overselling inventory to distributors, and knew that there was insufficient investment in commercial and national accounts.

150.   According to the proxy statement filed with the SEC on April 24, 2019, Defendant Maier received compensation in 2018 valued at $4.3 million which almost doubled the compensation he had received during 2017.

151.   Shortly after he received this 2018 bonus Maier left the Company with $2.9 million in severance pay and was eligible to receive a pro-rated 2019 bonus.

## VIII.  LOSS CAUSATION

152.   During the Class Period, as detailed herein, Armstrong Flooring securities were artificially inflated due to Defendants' materially false and misleading public statements and omissions.  As the truth was revealed to investors, the price of Armstrong Flooring securities fell as the prior artificial inflation came out of the stock price.

153.   As a result of their purchases of Armstrong Flooring securities during the Class Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

154.   The decline in price of Armstrong Flooring securities after the corrective disclosures on March 5, 2019, May 3, 2019, November 5, 2019, and

1  March 3, 2020 were the direct and proximate results of the Defendants'
2  misrepresentations being revealed to investors and the market.

3      155.   The decline in the price of Armstrong Flooring securities was also the
4  direct and proximate result of the materialization of the concealed investment risks
5  concerning Armstrong Flooring.

6      156.   Defendants' materially false and misleading statements relate to inter
7  alia: that the oversell of inventory to distributors would limit future sales for 2019,
8  that the "go-to-market strategy" was fatally flawed, and that the distributors could
9  not grow Armstrong.  The distributors did not and could not take on the added
10 responsibilities of marketing and merchandising for Armstrong.   Additionally,
11 Defendants did not increase its investment in servicing national retail or commercial
12 accounts and only assigned one sales person to each division to coordinate with
13 hundreds of accounts.  Defendants also knowingly or recklessly omitted that: (i) the
14 Company's distributors were not in a position to provide merchandising support and
15 were inadequate to take on this new role, and (ii) the Company was not adequately
16 or actively servicing its commercial and national accounts as they had allocated
17 insufficient resources to those accounts.

18     157.   The first partial corrective disclosure occurred on March 5, 2019, when
19 the Company revealed that there were substantially elevated inventory levels in the
20 distributor channel which contributed to the Company's decrease in net sales. On
21 this news, the Company's stock price fell $0.67 per share or approximately 4.5% to
22 close at $13.90 per share on March 5, 2019.

23     158.   The second partial disclosure occurred on May 3, 2019, when the
24 Company announced revealed that there continued to be "elevated inventory levels
25 in the channel" that it expected to be worked down in 2019. On this news, the
26 Company's stock price fell $1.75, or nearly 12%, to close at $13.14 per share on
27 May 3, 2019.

28

159.   The third partial disclosure occurred on November 5, 2019, when the Company revealed to the market that the Company was not growing and that Defendants had pushed more inventory into the channel than was needed by the distributors.   The November 5, 2019 disclosures, however, omitted that the Company's "go-to-market strategy" was a failure and that the Company needed to be restructured in order to sell its products.   On this news, the Company's stock price fell $2.90 per share or nearly 44% to close at $3.70 per share on November 5, 2019.

160.   The final disclosure occurred on March 3, 2020.   On that date Defendants Vermette and Bingham revealed that they completed a "thorough review" of their business and for the past year it had been suffering from pervasive operational inefficiencies which caused the Company to substantially underperform throughout the previous year.   Defendant Vermette finally admitted that the Company's go-to-market realignment had failed due to distributor issues and that Armstrong's whole business would have to be transformed. On this news, the Company's stock price fell $0.46 per share, or nearly 19%, to close at $1.98 per share on March 3, 2020

## IX.   PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

161.   At all relevant times, the market for Armstrong Flooring securities was an efficient market for the following reasons, among other: (i) the securities were listed and actively traded on the NYSE, a highly efficient market; (ii) as an issuer of securities, Armstrong Flooring filed periodic public reports on Form 10-K and 10-Q with the SEC; (iii) Armstrong Flooring regularly issued press releases that were carried by the national news wires, were publicly available and entered the public marketplace; and (iv) Armstrong Flooring was followed by multiple securities analysts who participated in public conference calls with Defendants and issued reports concerning the Company to the market.

162.   As a result, the market for the securities promptly digested current info regarding Armstrong Flooring from all publicly available sources and reflected such information in Armstrong Flooring's stock price.

163.   Under these circumstances, all purchasers of Armstrong Flooring securities during the Class Period suffered similar injury through their purchases at artificially inflated prices and a presumption of reliance applies.

164.   Further, to the extent that the Defendants concealed or improperly failed to disclose material fats with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X.   CLASS ALLEGATIONS

165.   This is a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class of all persons who purchased Armstrong Flooring common stock on the open market during the Class Period and were damaged thereby.

166.   Excluded from the Class are (i) Armstrong Flooring, and its officers, directors, employees, affiliates, legal representatives, predecessors, successors and assigns, and any entity in which any of them have a controlling interest or are a parent; and (ii) Defendants, their immediate families, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any entity in which any of them has a controlling interest.

167.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Armstrong Flooring common stock traded on the NYSE under the ticker symbol "AFI." While the exact number of Class members is unknown to the Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of Class members located throughout the United States.  Record owners

and other members of the Class may be identified from records maintained by Armstrong Flooring or its transfer agents and may be notified of this action by mail or other appropriate means, using a form of notice similar to that customarily used in securities class actions.

168.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting any individual member of the Class.  The questions of law and fact common to the Class include: (i) whether the Defendants violated the Exchange Act; (ii) whether the Defendants issued false or misleading statements; and (iii) the extent to which members of the Class have sustained damages and the proper measure of any such damages.

169.   Lead Plaintiff's claims are typical of the claims of other Class members, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws as complained of herein.

170.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in Class and securities litigation. Lead Plaintiff has no interest that is in conflict with, or otherwise antagonistic to the interests of other Class members.

171.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

172.   There will be no difficulty in managing this action as a class action.

# COUNT I

## VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

173.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

174.    During the Class Period, Defendants carried out a plan, scheme or course of conduct which intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) caused Lead Plaintiff and other Class members to purchase Armstrong Flooring securities at artificially inflated prices.

175.    In furtherance of this unlawful plan, scheme or course of conduct Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices and a course of business, which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Armstrong Flooring securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

176.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein, which included the making of, or participation in the making of, untrue statements of material facts or omitting to state material facts necessary in order to make the statements about Armstrong Flooring and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

177.   Each of the Individual Defendants' primary liability, and control person liability, arises from the following fats: (i) the Individual Defendants were high-level executives or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities as senior officers or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's periodic disclosures to investors; (iii) the Individual Defendants were advised of, and had access to, other members of the Company's management team and internal financial information about Armstrong Flooring; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

178.   Defendants had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Defendants' material misrepresentations or omissions were done knowingly or recklessly and for the purpose and effect of concealing material problems with Armstrong Flooring's business from the investing public and sup porting the artificially inflated price of its securities.   As demonstrated by the allegations above, Defendants, if they did not have actual knowledge of the misrepresentations or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

179.   As a result of the dissemination of the materially false or misleading information or failure to disclose material facts, as set forth above, the market price of Armstrong Flooring's securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's securities was artificially inflated and relying directly or indirectly on the false and misleading

statements made by Defendants, or upon the integrity of the market in which the securities trade, or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and other members of the Class purchased Armstrong Flooring securities at artificially high prices and were damaged thereby.

180.   At the time of Defendants' misrepresentations or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.   Had Lead Plaintiff and other members of the Class and the marketplace known the truth regarding Armstrong Flooring, which was not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased Armstrong Flooring securities, or, would not have done so at artificially inflated prices which they paid.

181.   As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Armstrong Flooring securities during the Class Period.

182.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

183.   Lead Plaintiff repeats and realleges each and every allegation contained above as if set forth fully herein.

184.   The Individual Defendants acted as controlling persons of Armstrong Flooring within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in or awareness of the Company's operations or intimate knowledge of

the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to, and did, directly or indirectly, influence or control the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of these statements or cause the statements to be corrected.

185.   Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the conduct giving rise to the securities violations as alleged herein, and exercised the same.

186.   As set forth above, Defendants violated Section 10(b) and Rule 10b-5 by their acts or omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

187.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of securities during the Class Period.

188.   By virtue of the foregoing the Individual Defendants violated Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

A.   Determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

1   B.  Awarding damages in favor of Lead Plaintiff and other Class members

2 against Defendants, jointly and severally, for all damages sustained as a result of

3 Defendants' violations of the Securities Exchange Act of 1934, in an amount to be

4 proven at trial, including interest thereon;

5   C.  Awarding Lead Plaintiff and the Class their reasonable costs and

6 expenses incurred in this action, including counsel fees and expert fees; and

7   D.  Awarding such other and further relief as the Court may deem just and

8 proper.

9

10          **JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

Dated:  July 2, 2020                    Respectfully submitted,

4

5                                        THE WAGNER FIRM

6                                        By    */s/Avi Wagner*

7                                        _____
                                         Avi Wagner (Cal Bar. No. 226688)
8                                        1925 Century Park East, Suite 2100
                                         Los Angeles, CA 90067
9                                        Telephone: 310-491-7949
                                         Facsimile: 310-694-3967

10

11                                       **BERNSTEIN LIEBHARD LLP**
                                         Stanley D. Bernstein (*pro hac vice*
12                                       forthcoming)
                                         Michael S. Bigin (*pro hac vice* forthcoming)
13                                       Laurence J. Hasson (admitted *pro hac vice*)
                                         Matthew E. Guarnero (*pro hac vice*
14                                       forthcoming)
                                         10 East 40th Street
15                                       New York, NY 10016
                                         Telephone: (212) 779-1414
16                                       Facsimile: (212) 779-3218
                                         Email: bernstein@bernlieb.com
17                                       bigin@bernlieb.com
                                         lhasson@bernlieb.com
18                                       mguarnero@bernlieb.com

19

20

21

22                                       *Counsel for Lead Plaintiff and Lead Counsel
                                         for Proposed Class*

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

RANDY MARKER ("Plaintiff"), declares the following as to the claims asserted under the federal securities laws:

1.      Plaintiff has reviewed a complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint.  Plaintiff retains Bernstein Liebhard LLP and such counsel they deem appropriate to associate with to pursue such action.

2.      Plaintiff did not purchase or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff, individually or as part of a group, is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.  Plaintiff understands that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon the execution of this Certification.

4.      Plaintiff's transactions in ARMSTRONG FLOORING, INC. securities during the relevant period as specified in the complaint are set forth in "Attachment A" to this Certification.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except as ordered and approved by the court, any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: June 24, 2020 _____.

DocuSigned by:

*Randy Marker*

5D1E2D0C1E6541B...

RANDY MARKER

DocuSign Envelope ID: 8C9548DC-5889-4589-A837-9F6A6A58A528

**Attachment A**
RANDY MARKER
Transactions in ARMSTRONG FLOORING, INC.

| TRANSACTION TYPE | DATE | SHARES | PRICE ($) |
|---|---|---|---|
| Purchase | 05/07/19 | 600 | 12.9500 |
| Purchase | 05/08/19 | 800 | 11.8500 |
| Purchase | 05/08/19 | 300 | 11.8300 |
| Purchase | 05/08/19 | 600 | 11.8100 |
| Purchase | 05/15/19 | 300 | 10.7200 |
| Sale | 05/17/19 | 1,000 | 11.5180 |
| Purchase | 07/10/19 | 1,000 | 9.8151 |
| Purchase | 07/15/19 | 600 | 9.3846 |
| Purchase | 07/17/19 | 400 | 8.8599 |
| Purchase | 08/01/19 | 1,000 | 8.0699 |
| Purchase | 08/05/19 | 1,000 | 7.2400 |
| Purchase | 08/23/19 | 1,000 | 6.6300 |
| Sale | 09/19/19 | 1,000 | 7.0400 |
| Purchase | 09/23/19 | 1,200 | 6.7800 |
| Purchase | 10/30/19 | 338 | 5.8700 |
| Sale | 11/01/19 | 600 | 6.3700 |
| Sale | 11/04/19 | 1,338 | 6.6400 |
| Sale | 11/05/19 | 500 | 3.9600 |

DocuSign Envelope ID: 8C9548DC-5869-4589-A837-9F6A6A58A528

| | | | |
|---|---|---|---|
| Sale | 11/05/19 | 1,000 | 4.0300 |
| Purchase | 11/19/19 | 2,000 | 3.6400 |
| Sale | 11/22/19 | 2,000 | 3.8200 |
| Sale | 12/24/19 | 1,700 | 4.3400 |
| Sale | 03/11/20 | 1,000 | 2.1200 |
| Sale | 03/13/20 | 1,000 | 2.2000 |

## <u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On July 2, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 2, 2020, at Los Angeles, California.


<u>*s/ Avi Wagner*</u>
Avi Wagner