PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
ZACHARY M. FAIGEN (SBN 294716)
zack.faigen@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:   (213) 687-5600

ROBERT A. FUMERTON (*pro hac vice*)
robert.fumerton@skadden.com
CHRISTOPHER R. FREDMONSKI (*pro hac vice*)
christopher.fredmonski@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:   (212) 735-3000
Facsimile:   (212) 735-2000

Attorneys for Defendants Armstrong Flooring, Inc.,
Michel Vermette, Larry McWilliams and Dominic Rice

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL CHUPA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARMSTRONG FLOORING, INC., MICHEL VERMETTE, DONALD MAIER, LARRY McWILLIAMS, DOUGLAS BINGHAM, DOMINIC RICE, and RONALD FORD,<br><br>Defendants. | CASE NO.: 2:19-cv-09840 CAS (MRWx)<br><br>**(1) NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS;**<br><br>**(2) MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT THEREOF;**<br><br>**(3) REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE (filed under separate cover); and**<br><br>**(4) [PROPOSED] ORDER (lodged under separate cover).**<br><br>The Honorable Christina A. Snyder<br><br>Hearing Date:   December 7, 2020<br>Hearing Time:   10:00 a.m.<br>Courtroom:      8D |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on December 7, 2020 at 10:00 a.m., or the nearest available date on which counsel may be heard, before the Honorable Christina A. Snyder in Courtroom 8D of the above-referenced Court, located at 350 W. First Street, Los Angeles, CA 90012, Defendants Armstrong Flooring, Inc. ("Armstrong" or the "Company"), Michel Vermette, Larry McWilliams and Dominic Rice will, and hereby do, present for hearing by the Court this Motion to Dismiss the Amended Complaint for Violations of the Federal Securities Laws (the "Motion").[1]

The Motion seeks dismissal with prejudice of the Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint" or "AC") brought by Lead Plaintiff Randy Marker ("Plaintiff") for failure to state a claim upon which relief may be granted. The Motion is filed pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6), and 15 U.S.C. §§ 78u-4 *et seq.*, and is based on the accompanying Memorandum of Points and Authorities, all pleadings and papers filed in this action, all matters of which this Court may take judicial notice, including those set forth in the contemporaneously filed Request for Incorporation by Reference and Judicial Notice, and such additional papers and arguments as may be presented at or in connection with the hearing.

The Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on August 4, 2020.

DATED: August 17, 2020

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: _____*/s/ Peter B. Morrison*_____
              Peter B. Morrison

Attorneys for Defendants Armstrong Flooring, Inc.,
Michel Vermette, Larry McWilliams and Dominic Rice

---

[1] As used herein, "Defendants" refers collectively to all named Defendants. References to the "Individual Defendants" refer to Defendants Vermette, McWilliams, Rice, Bingham, Maier and Ford. In separate, concurrently filed motions to dismiss, Defendants Bingham, Maier and Ford join this Motion and incorporate the accompanying Memorandum and Points of Authorities by reference.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iii

I.  PRELIMINARY STATEMENT .................................................................1

II.  FACTUAL BACKGROUND...................................................................3

    A.  Armstrong's Business and the "Go-to-Market" Strategy. ...................3

    B.  The Government Implements Tariffs on Certain Imports from China. 5

    C.  Advanced Distributor Buying Impacts Armstrong's 2019 Performance.....................................................................................6

    D.  Armstrong's New Leadership Announces Strategic Changes. .............7

    E.  Plaintiff's Shifting Theories of Securities Fraud. ...............................8

III.  PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b)........8

    A.  Plaintiff Fails to Plead an Actionable Misstatement or Omission. .......9

        1.  Plaintiff Fails to Allege a Misrepresentation or Omission Concerning Distributor Inventory Levels. ...............................9

        2.  Plaintiff Fails to Allege a Misrepresentation or Omission Concerning the "Go-to-Market" Strategy................................14

    B.  Plaintiff Fails to Plead Scienter.......................................................19

        1.  Plaintiff's Boilerplate Scienter Theories Fail as a Matter of Law.....................................................................................20

        2.  Viewed Holistically, Plaintiff Fails to Adequately Plead Scienter................................................................................23

    C.  Plaintiff Fails to Plead Loss Causation. ............................................24

IV.  CONCLUSION....................................................................................25

MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amalgamated Bank v. Coca-Cola Co.*,
No. Civ.A. 1:05-CV-1226,
2006 WL 2818973 (N.D. Ga. Sept. 29, 2006), *aff'd sub nom.*
*Selbst v. Coca-Cola Co.*, 262 F. App'x 177 (11th Cir. 2008) ................................ 15

*Bolling v. Dendreon Corp.*,
No. C13-0872JLR,
2014 WL 2533323 (W.D. Wash. June 5, 2014) ..................................................... 22

*Brody v. Transitional Hospitals Corp.*,
280 F.3d 997 (9th Cir. 2002) .................................................................................. 19

*Browning v. Amyris, Inc.*,
Case No. 13-cv-02209-WHO,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ...................................................... 12

*In re Cisco Systems Inc. Securities Litigation*,
No. C 11-1568 SBA,
2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) ........................................................ 9

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*,
856 F.3d 605 (9th Cir. 2017) .................................................................................. 13

*City of Royal Oak Retirement System v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................. 15

*Communications Workers of America Plan for Employees' Pensions & Death Benefits v. CSK Auto Corp.*,
Nos. CV06-1503-PHX-DGC (Lead), CV06-1580-PHX-JWS,
2007 WL 951968 (D. Ariz. Mar. 28, 2007) .......................................................... 20

*Cunha v. Hansen Natural Corp.*,
EDCV 08-1249-GW(JCx),
2010 WL 11469534 (C.D. Cal. July 12, 2010) ...................................................... 15

*In re Cutera Securities Litigation*,
610 F.3d 1103 (9th Cir. 2010) ................................................................... 11, 12, 14

*DeMarco v. DepoTech Corp.*,
149 F. Supp. 2d 1212 (S.D. Cal. 2001) ................................................................. 24

*Di Donato v. Insys Therapeutics Inc.*,
No. CV-16-00302-PHX-NVW,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017) .......................................................... 25

*In re Downey Securities Litigation*,
No. CV 08-3261-JFW (RZx),
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) .............................................. 9, 20, 23

iii

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)...............................................................................................1, 8

*Gammel v. Hewlett-Packard Co.*,
    905 F. Supp. 2d 1052 (C.D. Cal. 2012).....................................................12, 21

*GIA-GMI, LLC v. Michener*,
    No. C 06-7949 SBA,
    2007 WL 2070280 (N.D. Cal. July 16, 2007) ..................................................10

*In re Hansen Natural Corp. Securities Litigation*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007)..............................................................12

*In re ICN Pharmaceuticals, Inc. Securities Litigation*,
    299 F. Supp. 2d 1055 (C.D. Cal. 2004)...........................................................7, 13

*In re Impac Mortgage Holdings, Inc. Securities Litigation*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008)................................................................2

*In re Infonet Services Corp. Securities Litigation*,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003)..............................................................20

*Iron Workers Local 580 Joint Funds v. Nvidia Corp.*,
    Case No. 18-cv-07669-HSG,
    2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ..................................................22

*Knox v. Yingli Green Energy Holding Co.*,
    242 F. Supp. 3d 950 (C.D. Cal. 2017)................................................................22

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ..................................................................20, 23

*Mahapatra v. Truecar, Inc.*,
    Case No. CV 15-3979-R,
    2015 WL 12552062 (C.D. Cal. Dec. 9, 2015)....................................................21

*McCasland v. FormFactor Inc.*,
    No. C 07-5545 SI,
    2008 WL 2951275 (N.D. Cal. July 25, 2008) .................................................9, 20

*McGee v. American Oriental Bioengineering, Inc.*,
    Case No. CV 12-5476 FMO (SHx),
    2014 WL 12586107 (C.D. Cal. Sept. 23, 2014)..................................................24

*Melot v. JAKKS Pacific, Inc.*,
    Case No. LA CV13-05388 JAK (SSx),
    2014 WL 12589334 (C.D. Cal. June 6, 2014)..................................................9, 25

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...............................................................2, 9, 10, 17

*In re Nimble Storage, Inc. Securities Litigation*,
    756 F. App'x 779 (9th Cir. 2019).......................................................................15

iv

MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) .............................................................. 1, 2, 19, 20, 24

*Oklahoma Firefighters Pension & Retirement System v. Ixia*,
No. CV 13-08440 MMM (SHx),
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ...................................................... 21

*Oregon Public Employees Retirement Fund v. Apollo Group Inc.*,
774 F.3d 598 (9th Cir. 2014) ................................................................. 13, 14, 24, 25

*Patel v. Parnes*,
253 F.R.D. 531 (C.D. Cal. 2008) ............................................................................ 9

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco, Inc.*,
No. 09 Civ. 6966(JGK),
2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) ........................................................ 2

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ................................................................. 11, 12, 16, 21

*Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) .............................................................................. 14

*Rezvani v. Jones*,
Case No. 2:18-cv-06244-CAS (Ex),
2018 WL 6680568 (C.D. Cal. Dec. 17, 2018) ............................................... 13, 16, 17

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
697 F.3d 869 (9th Cir. 2012) .................................................................................. 9

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ..................................................................... *passim*

*In re Silicon Graphics Inc. Securities Litigation*,
183 F.3d 970 (9th Cir. 1999), *abrogated in part as stated in*
*South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) .................... 14, 18

*In re Syncor International Corp. Securities Litigation*,
239 Fed. App'x 318 (9th Cir. 2007) ..................................................................... 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................. 2, 3, 19

*Topping v. Deloitte Touche Tohmatsu CPA, Ltd.*,
95 F. Supp. 3d 607 (S.D.N.Y. 2015) ................................................................... 25

*In re Vantive Corp. Securities Litigation*,
283 F.3d 1079 (9th Cir. 2002), *abrogated in part as stated in*
*South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008) ............ 1, 9, 19, 21

*Wozniak v. Align Technology, Inc.*,
850 F. Supp. 2d 1029 (N.D. Cal. 2012)............................................................... 15

v

*In re XM Satellite Radio Holdings Securities Litigation*,
479 F. Supp. 2d 165 (D.D.C. 2007)..............................................................15

*Xu v. ChinaCache International Holdings Ltd.*,
No. 2:15-cv-7952-CAS (RAOx),
2016 WL 4370030 (C.D. Cal. Aug. 15, 2016) ....................................... 10, 11

*Xu v. ChinaCache International Holdings Ltd.*,
No. CV15-07952-CAS (RAOx),
2017 WL 114401 (C.D. Cal. Jan. 9, 2017).........................................*passim*

*Young v. Dreisbach*,
182 F. App'x 714 (9th Cir. 2006)..............................................................22

*Zucco Partners LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .....................................................21, 23, 24, 25

**Statutes**

15 U.S.C. § 78u-4(b)...................................................................................... 9

15 U.S.C. § 78u-5(c) ...............................................................................11, 12

**Rules**

Federal Rule of Civil Procedure 9(b)................................................................ 9

MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## I.    **<u>PRELIMINARY STATEMENT</u>**

This case represents nothing more than an impermissible attempt to plead fraud by hindsight based on a ***fully disclosed*** marketing strategy that, in the end, simply did not yield the positive results that Armstrong had initially hoped it would. Unfortunately for Plaintiff, the federal securities laws cannot be used as a form of investment "insurance against market losses." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). In fact, Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") ***specifically*** "to put an end to the practice of pleading 'fraud by hindsight.'" *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002).[2] Given this impermissible predicate, it is no surprise that Plaintiff has wholly failed to plead the foundational elements of a securities fraud claim. This action should be dismissed in its entirety with prejudice.

One of the telltale signs of fraud by hindsight is a theory of fraud that "does not make a whole lot of sense." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). Indeed, the Ninth Circuit's recent decision in *Endologix* is precisely the lens through which this Court should view the AC. In *Endologix*, the plaintiff alleged that the defendant company "made false and misleading statements about whether the FDA was likely to approve" its new product, even though "defendants knew the FDA would not approve [it]." *Id.* The Ninth Circuit reasoned, "why would defendants promise the market that the FDA would approve [the product] if defendants knew the FDA would eventually" reject it, and ***none*** of the "defendants had sought to profit from this scheme in the interim, such as by selling off their stock." *Id.* Where the theory of fraud "does not resonate in common experience," "the PSLRA neither allows nor requires [courts] to check [their] disbelief at the door." *Id.*

This holding applies with equal force here. Armstrong is a producer of flooring products. In February 2018, Armstrong embarked on a marketing strategy—called the "go-to-market" strategy—that shifted some of its in-house marketing responsibilities to its distributors. Ultimately, after a challenging year and a change in leadership, Armstrong determined that this strategy did not work as well as it originally hoped, and the Company

---

[2] All emphases are added and internal citations and quotations are omitted unless stated.

transitioned the marketing duties back in-house. The Company's stock price declined.

On this innocuous set of facts, Plaintiff brings a federal securities suit, claiming that Defendants *knew* the "go-to-market" strategy was "fatally flawed" from the start but embarked on the strategy anyway. Plaintiff further asserts that Defendants misled the market by not confessing that they knew the strategy was doomed to fail. The AC does not allege that any Defendant sold stock or sought to profit from this "scheme." Yet Plaintiff wants this Court to believe that three different CEOs, two different CFOs, and a Chief Product Officer all knowingly lied to the market for more than two years *without* seeking any benefit. Just as in *Endologix*, this "theory does not make a whole lot of sense." *Id.*

Far from a fraudulent scheme, Plaintiff's own allegations show the actual reasons the Company faced business challenges in 2019, including (i) its decision to shift certain marketing responsibilities to distributors that did not ultimately yield the desired results, and (ii) external forces beyond Armstrong's control that impacted the entire industry. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) ("[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible *opposing* inferences."). Starting in the third quarter of 2018, the Trump Administration imposed tariffs on various goods imported from China, including goods used in the manufacture of flooring products. (*See* AC ¶ 109.) Those tariffs distorted industry buying patterns, as distributors stocked up on inventory before prices increased. (*Id.* ¶ 10.) As a matter of law, facing business challenges does not give rise to a federal securities claim. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008). Nor does a business decision that failed to produce the desired results. *See In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1094 (C.D. Cal. 2008) ("corporate mismanagement that is not accompanied by deception" is inactionable).

Importantly, Armstrong disclosed all of this to the market—in real time, as it was happening, undermining any theory of fraud. *See, e.g.*, *Plumbers & Pipefitters Loc. Union No. 719 Pension Tr. Fund v. Conseco, Inc.*, 2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30, 2011) ("extensive disclosures" undermine an inference of fraud). Throughout the alleged

2

MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

class period, Armstrong made continuous and robust disclosures regarding (i) its marketing strategy and how the strategy was progressing, and (ii) how external factors such as tariffs, elevated distributor inventory levels and changing market conditions were impacting the business. (*See, e.g.*, AC ¶¶ 72, 79, 84, 90, 99, 113 (providing regular updates on the "go-to-market" strategy); *id.* ¶¶ 108, 109, 110, 117, 118, 143 (providing regular updates on tariffs, inventory levels and market conditions and their impact).)

The Court should dismiss this case for three separate and independent reasons. *First*, Plaintiff fails to plead a material misrepresentation or omission. Most of the alleged misrepresentations in the AC are either inactionable puffery or forward-looking statements protected by the PSLRA safe harbor. As to the few remaining statements, Plaintiff alleges no contemporaneous facts showing how or why those statements were false when made.

*Second*, Plaintiff fails to plead scienter. Plaintiff does not allege **any** specific contemporaneous statements or conditions showing that any Defendant knew a single alleged misrepresentation in the AC was false when made. Rather, Plaintiff asserts in conclusory fashion—without differentiating any Individual Defendant—that "Defendants" *collectively* knew that every alleged statement made during the two-year class period was false when made. Plaintiff also offers four boilerplate and conclusory scienter theories that courts routinely reject. Viewed holistically—including with the absence of a single class-period stock sale—the AC does not give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw." *Tellabs*, 551 U.S. at 310.

*Third*, Plaintiff fails to plead loss causation as a matter of law. Plaintiff did not purchase Armstrong stock until after the first two alleged corrective disclosures, and none of the alleged corrective disclosures "corrected" or "revealed" anything to the market.

For these reasons and those below, the Court should dismiss the AC with prejudice.

## II.   FACTUAL BACKGROUND

### A.   Armstrong's Business and the "Go-to-Market" Strategy.

Armstrong produces flooring products for use primarily in constructing residential, commercial and institutional buildings. (AC ¶ 31.) Armstrong principally sells its products

3

through independent distributors, who resell the Company's products to retailers, builders, contractors, installers and others. (*Id.* ¶¶ 38-39.) Armstrong also sells its products directly to major home builders, retail buying groups, and national home centers, such as Home Depot and Lowes. (*See id.* ¶ 4; Ex. 1 at 4.)[3] Approximately 40% of Armstrong's total net sales in North America are attributable to its residential flooring products. (Ex. 1 at 4.)

On February 5, 2018, Armstrong announced that it would begin "[s]hifting elements of [its] residential marketing and merchandising responsibilities to [its] distributors." (AC ¶ 42.) Armstrong believed that this so-called "go-to-market" strategy would "enhance [its] service to independent retailers" by "push[ing] the decision-making closer to the customer and allow[ing] a faster response to local needs." (*Id.* ¶ 72.) Armstrong "plan[ned] to use some of the savings" that it hoped to realize from this strategy "to increase [its] investment in national retail and commercial accounts." (*Id.*)

Following the first quarter of 2018, Defendant Maier, Armstrong's then-CEO, stated that Armstrong remained "confident in [its] ability to deliver on [its] strategic priorities in the medium term." (Ex. 2 at 6; *see* AC ¶ 75.) These "strategic priorities" included, among other things, executing the "go-to-market" strategy and "providing an even more competitive lineup of winning products." (Ex. 2 at 6.) With respect to the "go-to-market" strategy, Maier stated that Armstrong was "making good progress" and "expect[ed] [that] distributors [would] begin providing their own merchandising in Q3, with the full transition completed by the end of the year." (AC ¶ 76.) Maier further stated that Armstrong was "excited by the opportunity" to "focus more" on its commercial and national accounts. (*Id.*)

After the second quarter of 2018, Maier stated on an earnings call that the "go-to-market" rollout was "still on track" (AC ¶ 84), but noted that Armstrong did not expect to see any "positive impacts" until the "back-end [of 2018], if not 2019." (Ex. 3 at 13.) During that same earnings call, Maier "discuss[ed] preliminary thoughts on the potential impact on [the] business from the recently proposed tariffs on flooring" products imported from

---

[3] Numbered exhibits are attached to the Declaration of Zachary M. Faigen in support of the Request for Incorporation by Reference and Judicial Notice, filed herewith.

4

China. (*Id.* at 7.) At that time, Armstrong did not know whether the tariffs announced by the Trump Administration would be implemented and how such tariffs ultimately would affect the business. Maier cautioned that Armstrong would "continue to monitor trade developments and provide updates as appropriate." (*Id.* at 7.)

**B.    The Government Implements Tariffs on Certain Imports from China.**

During the third quarter of 2018, the U.S. government announced a 10% tariff on certain flooring products imported to the U.S. from China, effective September 24, 2018, with an increase to 25% effective January 1, 2019. (*See* Ex. 4 at 23; AC ¶ 10.) Armstrong informed distributors that it would be implementing price increases effective in the fourth quarter of 2018 to offset the impact of the tariffs, and that it "expect[ed] to implement additional price increases in the first quarter of 2019" in connection with the tariff step-up. (Ex. 4 at 23.) Armstrong disclosed this to investors in its November 6, 2018 Form 10-Q, and specifically warned: "***Higher than normal inventory levels at distributors could impact sales in the fourth quarter, as could continued uncertainty around tariffs from products imported from China***." (*Id.* at 22-23.)

During an earnings call that day, in response to analyst questions, Maier attributed part of the third quarter sales growth to increased distributor purchasing ahead of the tariff-related price increases: "We do believe that as the announced tariffs came out at the end of Q3 that that did drive some buying behavior towards the end of the quarter." (Ex. 5 at 8.) Maier cautioned that, in light of "the announced tariffs increase to 25% on January 1, . . . it would be reasonable to anticipate a similar sort of surge in the fourth quarter" because distributors would look to buy at the lower prices. (*Id.*) "[F]or competitive, sensitive reasons," Maier declined to quantify the portion of Armstrong's third quarter sales that he believed were attributable to tariff-related buying, as opposed to increased consumer demand. (AC ¶ 143.) However, Maier again noted that "***distributors appropriately took advantage of the fact that they could buy ahead of the 10% tariff***." (*Id.*)

Maier also stated that the "go-to-market" strategy—one of "**5** strategic priorities"—was "underway," and that Armstrong "continue[d] to expect the full transition to be

5

completed by year-end 2018." (Ex. 5 at 4-5.) Maier noted that Armstrong had "beg[un] to allocate more of [its] marketing spend to commercial and national accounts." (AC ¶ 90.)

On March 5, 2019, Armstrong reported its fourth quarter and full-year 2018 results. The Company reported lower net sales as compared to the fourth quarter 2017, noting that "[l]ower volumes . . . were impacted by elevated inventory levels in the distributor channel due to significant customer purchases in the third quarter 2018 ahead of . . . higher anticipated U.S. tariffs." (*Id.* ¶ 93; *see also* Ex. 8 at 6-7.) Armstrong stated that, "[f]or the full year 2019, [it] *expects* adjusted EBITDA to be in the range of $58 million to $66 million," and projected that growth would be "*heavily weighted to the second half as the overall market improves and elevated inventory levels in the channel are worked down.*" (Ex. 6 at 2.) On news of Armstrong's lower sales, its stock price fell $0.67. (AC ¶ 94.)

During a March 9, 2019 earnings call, Maier stated that Armstrong had completed its "go-to-market pivot," which "allowed [it] to allocate more of [its] marketing and sales efforts on commercial and national accounts." (AC ¶ 99.)

**C.     Advanced Distributor Buying Impacts Armstrong's 2019 Performance.**

On May 2, 2019, Maier stepped down as Armstrong's CEO. (*Id.* ¶ 24.) On May 3, Armstrong announced its first quarter results. Net sales decreased 13.8% compared to first quarter 2018, caused in part by "elevated inventory levels in the channel." (*Id.* ¶¶ 103-04.) During an earnings call, Defendant McWilliams, Armstrong's interim CEO (*id.* ¶¶ 24-25), explained that "first quarter results were challenged by several dynamics," including "[d]emand pull forward into 2018 that has kept distributor inventory at elevated levels since year-end," and "softer end market demand along with wet weather conditions in many parts of the United States." (*Id.* ¶ 108.) Bingham stated that Armstrong "continue[d] to expect full year EBITDA to be heavily weighted towards the second half of 2019 as the market strengthens and *elevated inventory levels in the channel are worked down*." (*Id.* ¶ 110.) Armstrong lowered its full-year 2019 adjusted EBITDA projection to $50-58 million. (*Id.* ¶ 104.) On this news, Armstrong's stock price fell $1.75 to $13.14 per share. (*Id.* ¶ 105.) On August 6, 2019, Armstrong released its second quarter 2019 results, reporting a

6

11.7% decrease in net sales compared to the second quarter of 2018. (Ex. 9 at 1.) Armstrong stated that "[i]nventory levels in the distributor channel [had] decreased sequentially compared to the first quarter 2019 *but remained moderately elevated at the end of the quarter*." (*Id.*) For this and other reasons, including "overall soft end-market demand" (*id.*), Armstrong again lowered its full-year 2019 outlook for adjusted EBITDA, this time to $46-54 million. (AC ¶ 115.) During an earnings call, Bingham reiterated that "*the general uncertainty around the ultimate outcome of U.S.-China trade negotiations has continued to influence normal seasonal buying patterns*." (Ex. 10 at 5.)

On September 11, 2019, Defendant Vermette was appointed Armstrong's CEO, and immediately began a "thorough review" of Armstrong's business. (AC ¶¶ 26, 127.)

On November 5, 2019, Armstrong issued its third quarter 2019 results. Net sales decreased 20.7% from the third quarter of 2018. (*Id.* ¶ 120.) Armstrong stated that the decrease "was primarily due to unfavorable volumes and mix," citing continued tariff-related impacts on distributor inventory levels, "along with what the Company believe[d] to be weaker performance by several distributors in 2019." (*Id.*) Armstrong again lowered its full-year 2019 outlook for adjusted EBITDA to $20-25 million. (*See id.* ¶ 121.) During an earnings call, Bingham stated that Armstrong was surprised by the "sequential reduction in inventory in the distribution channel" in the third quarter. (*Id.* ¶ 124.) After Armstrong's disappointing earnings release, its stock declined from $6.60 to $3.70. (*Id.* ¶ 125.)

Ten days later, purported shareholder Michael Chupa filed this action, alleging that Armstrong "had engaged in channel stuffing to artificially boost sales." (ECF No. 1 ¶ 7.)[4]

### D.    Armstrong's New Leadership Announces Strategic Changes.

On March 3, 2020, Vermette announced that, "[f]ollowing a comprehensive review of the business," Armstrong had "established a multi-year strategic roadmap to transform and modernize its operations to become a leaner, faster growing and more profitable

---

[4] "Channel stuffing is the oversupply of distributors in one quarter to artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1061 (C.D. Cal. 2004). "Channel stuffing claims are disfavored in this Circuit" as they are generally based on "speculation made in hindsight." *Id.*

7

business." (Ex. 11 at 2.) During an earnings call, Vermette stated that Armstrong would, among other things, invest "in underserved sales segments" (Ex. 12 at 5), noting that Armstrong's review revealed that it "had 2 people calling on hundreds of large builders and contractors," "one person calling on commercial national accounts" and "one person dedicated to calling 13,000 independent retailers." (AC ¶ 127.) The review revealed "significant complexities in [its] processes that are fit for a much larger company versus a company our size." (Ex. 12 at 6.)[5] The review also revealed that the "go-to-market" strategy had put distributors in "roles that [Armstrong] [is] better suited for such as branding, marketing and also connectivity with large counts." (AC ¶ 128.)

### E.    Plaintiff's Shifting Theories of Securities Fraud.

Apparently recognizing the baseless nature of the "channel stuffing" theory propagated in the original complaint, Plaintiff abandoned this theory in the AC. Plaintiff now hinges his claims on the March 3, 2020 earnings call—which occurred five months after the original complaint was filed—and asserts the novel theory that every Defendant knew that the "go-to-market" strategy was "fatally flawed from the start," such that every statement made about that strategy during the two-year class period was false when made. (AC ¶ 13.) Plaintiff also alleges that Defendants misled investors concerning the effect that the Trump Administration's tariffs would have on sales in 2019. (*See id.* ¶¶ 10-12.)

### III.    <u>PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b)</u>

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, Plaintiff must allege, among other things, (i) a material misrepresentation or omission, (ii) scienter and (iii) loss causation. *Dura Pharms.*, 544 U.S. at 341-42. A Section 10(b) claim is "subject to the demanding pleading requirements of the [PSLRA]," which "strengthened the already-heightened pleading requirements of Federal Rule of Civil Procedure 9(b)." *Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *4 (C.D. Cal. Jan. 9, 2017) (Snyder, J.) ("*ChinaCache II*"); *see*

---

[5] Armstrong used to be part of a larger company. It became an independent company in 2016 when Armstrong World Industries spun off its resilient and wood flooring businesses. (Ex. 1 at 2.) Then, in 2018, Armstrong sold off its wood flooring business. (AC ¶¶ 32-34.)

8

15 U.S.C. § 78u-4(b); Fed. R. Civ. P. 9(b). The AC fails to state an actionable claim, and should be dismissed for three separate and independent reasons.

### A.  **Plaintiff Fails to Plead an Actionable Misstatement or Omission.**

"The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler*, 540 F.3d at 1070. Plaintiff must specify with particularity "each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012); *Vantive*, 283 F.3d at 1084-85.[6]

#### 1.  **Plaintiff Fails to Allege a Misrepresentation or Omission Concerning Distributor Inventory Levels.**

(a)  Statements Regarding Distributor Buying Behavior.

Plaintiff does not allege any actionable misrepresentation or omission concerning distributor buying behavior. Plaintiff first alleges that Armstrong falsely stated in its 2017 and 2018 Forms 10-K that "[o]ur distributors carry inventory as needed to meet local or rapid delivery requirements." (AC ¶¶ 70, 101.) Plaintiff claims those statements were false because the distributors were actually "excessive[ly] buying" inventory and "flood[ing] the sales channel" in a way that would "limit sales for all of 2019." (*Id.* ¶¶ 11-12.) But Armstrong filed its 2017 Form 10-K in March 2018, six months ***before*** Plaintiff alleges that distributors began increasing their inventory stock ahead of the tariff-related price increases. (*See* Ex. 4 at 23.) Thus, Armstrong's 2017 Form 10-K could not have been misleading for failing to disclose increased inventory buying that had not yet occurred.

Further, the information Plaintiff claims Armstrong concealed was actually

---

[6] As a threshold issue, the Court should dismiss the AC because it uses improper "puzzle pleading." Courts routinely dismiss securities fraud complaints that employ this pleading tactic. *See, e.g.*, *Melot v. JAKKS Pac., Inc.*, 2014 WL 12589334, at *5 (C.D. Cal. June 6, 2014); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *3-4 (C.D. Cal. Aug. 21, 2009); *Patel v. Parnes*, 253 F.R.D. 531, 553-54 (C.D. Cal. 2008). Here, the AC purports to challenge more than twenty "lengthy block quotes" copied and pasted from SEC filings, press releases and earnings call transcripts "without any specification as to whether Plaintiff[] [is] alleging that the entire or simply part of the statement is false or misleading." *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *6 (N.D. Cal. Mar. 29, 2013). (*See* AC ¶¶ 70, 72, 75-76, 78-79, 81-82, 84, 87, 90, 96, 99, 101, 108-10, 112-13, 117-18, 120-21, 126.) Each "set of block quotes" is then juxtaposed against "the same series of generic conclusions . . . without differentiation or specificity" concerning how or why any specific alleged statement is misleading. *McCasland v. FormFactor Inc.*, 2008 WL 2951275, at *7 (N.D. Cal. July 25, 2008).

9

disclosed in the very documents Plaintiff cites. In the 2017 Form 10-K, Armstrong disclosed risks associated with distributor inventory management and trade policies, and stated: "[O]ur channel partners raise or lower their inventory levels according to their expectations of market demand and consumer preferences, which directly affects our sales." (Ex. 1 at 20; *see also* Ex. 7 at 19 (same).) A year later in the 2018 Form 10-K, Armstrong specifically disclosed "[h]igher than normal inventory levels at distributors" due to tariffs implemented in the third quarter of 2018 and warned that such inventory levels "could impact sales in the first quarter of 2019, as could continued uncertainty around tariffs from products imported from China." (Ex. 7 at 19.) "Plaintiff cannot sidestep the heightened pleading requirements for fraud by simply mischaracterizing [the] documents" on which he relies. *GIA-GMI, LLC v. Michener*, 2007 WL 2070280, at *9 (N.D. Cal. July 16, 2007); *see also Xu v. ChinaCache Int'l Holdings Ltd.*, 2016 WL 4370030, at *6 (C.D. Cal. Aug. 15, 2016) (Snyder, J.) ("*ChinaCache I*") (statements "could not create a false impression" when "plucked from among contradictory statements").

(b) <u>Statements Regarding Distributor Inventory Levels</u>.

Plaintiff next claims that eleven block-quoted statements were false or misleading because "Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019." (AC ¶¶ 88, 91, 98, 100, 111, 114, 119; *see also id.* ¶¶ 97, 126.) As a threshold matter, four of the eleven block quotes do not even mention distributor inventory levels. (*See* AC ¶¶ 87, 90, 99, 113.) Three others do not mention future sales for 2019. (*See id.* ¶¶ 108-09, 124.) Plaintiff does not explain—much less with the requisite particularity—"how and why" the block-quoted statements were false when made. *Metzler*, 540 F.3d at 1070.

Two of the remaining four block-quoted statements are predictions about what *may* occur in the future, when elevated distributor inventory levels *might* be worked down, and how those elevated levels *might* impact Armstrong's growth in 2019:

- "[T]he Company *expects* adjusted EBITDA . . . growth heavily weighted to the second half [of the year] as the overall market improves and elevated inventory levels in the channel are worked down." (AC ¶ 96.)

10

- "[W]e continue to *expect* full year EBITDA to be heavily weighted towards the second half of 2019 as the market strengthens and elevated inventory levels in the channel are worked down." (*Id.* ¶ 110.)

As a matter of law, the PSLRA's safe harbor provision statutorily protects these forward-looking statements, rendering them inactionable. *See* 15 U.S.C. § 78u-5(c)(1). The safe harbor shields from liability "forward-looking statements," including "any statement regarding financial projections," "plans and objectives of management for future operations" or assumptions underlying the foregoing. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). The safe harbor applies if the forward-looking statement is identified as such and is "accompanied by meaningful cautionary statements" and "important factors that could cause actual results to differ." *Id.*

Here, Armstrong's expectations for 2019 sales growth are paradigmatic forward-looking statements. *See id.* ("growth and revenue projections are forward-looking on their face"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (an "earnings projection is by definition a forward-looking statement"). Armstrong's expectations for when elevated distributor inventory levels would be worked down to "sustainable levels" are similarly forward-looking. *See, e.g.*, *ChinaCache II*, 2017 WL 114401, at *5-6 (statement that company "expected" system migration "to be fully functional by end of first quarter" protected by safe harbor); *ChinaCache I*, 2016 WL 4370030, at *7 (statement that Company was "on track" to complete system migration "by the end of the first quarter" was protected even though "sound[ing] in the present tense").

These statements also were "accompanied by an appropriate label and cautionary language." *ChinaCache I*, 2016 WL 4370030, at *7. At the outset of every earnings call alleged in the AC, Armstrong (i) cautioned investors that "we will be making forward-looking statements that involve risks and uncertainties" and that "[a]ctual outcomes may differ materially from those expected or implied," and (ii) directed investors to the Company's SEC filings "[f]or a more detailed discussion of the risks and uncertainties that may affect Armstrong." (*E.g.*, Ex. 5 at 4; Ex. 8 at 4.) Armstrong's contemporaneous SEC

11

filings explained in detail that statements using phrases such as "expect," "plan," "project" and "believe" are forward-looking, and further directed investors to an extensive list of risk factors. (*E.g.*, Ex. 4 at 1; Ex. 7 at 1.) Armstrong's earnings releases contained similar robust disclosures. (*E.g.*, Ex. 6 at 3.) Courts have approved similar language identifying forward-looking statements. *See Intuitive Surgical*, 759 F.3d at 1059-60; *Cutera*, 610 F.3d at 1111.

While "the law does not require specification of the particular factor that ultimately renders the forward-looking statement incorrect," *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012), such specification is present here. Plaintiff alleges that elevated distributor inventory levels "limit[ed] sales for all of 2019." (AC ¶ 12.) Armstrong specifically warned that this could occur, cautioning in multiple SEC filings that "[h]igher than normal inventory levels at distributors" and "continued uncertainty around tariffs" could affect sales. (Ex. 4 at 22; Ex. 7 at 19.) Such disclosures "go straight to the heart of the [plaintiff's] complaints." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *14 (N.D. Cal. Mar. 24, 2014). Thus, there is sufficient cautionary language to invoke the safe harbor. *See Intuitive Surgical*, 759 F.3d at 1059-60; *Cutera*, 610 F.3d at 1111.[7]

In addition, Plaintiff's assertion that Armstrong's expectations for sales growth in 2019 were false because Armstrong **knew** that elevated distributor inventory levels would "limit sales for all of 2019" (AC ¶ 12) fails for the separate and independent reason that Plaintiff does not allege **any** contemporaneous facts that contradict Armstrong's expectations. *See In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153 (C.D. Cal. 2007) (plaintiff must "allege, at a minimum, the 'who, what, when, where, and how' of his fraud allegation"). For example, in its March 5, 2019 earnings release, Armstrong stated that it "expects adjusted EBITDA . . . growth heavily weighted to the second half" of 2019. (AC ¶ 96.) Plaintiff asserts that Armstrong's statement that it expected any "growth" in 2019 was false and misleading because "Defendants knew or recklessly

---

[7] Even if the Court finds that meaningful cautionary language did not accompany the alleged forward-looking statements (it did), the statements are still protected by the safe harbor unless Plaintiff pleads facts demonstrating that the statements were made with "actual knowledge" of their falsity. 15 U.S.C. § 78u-5(c)(1); *Cutera*, 610 F.3d at 1113. Plaintiff has not done so. (*See infra* § III(B).)

12

disregarded that in 2018 inventory levels in the channel had increased to levels that would require over a year to sell down to levels that matched demand." (*Id.* ¶ 97; *see also id.* ¶ 14 (Armstrong falsely stated that it "expected to grow in 2019").) But the AC does not allege a single contemporaneous fact suggesting that distributor inventory levels would take longer than a year to work down, such that growth would be impossible in 2019. *See Rezvani v. Jones*, 2018 WL 6680568, at *7 (C.D. Cal. Dec. 17, 2018) (Snyder, J.) (forward-looking statements inactionable without allegations of "actual knowledge" of falsity).

The AC also does not contain any contemporaneous facts to contradict the AC's final two block-quoted statements concerning distributor inventory levels, which reflect Armstrong's stated "***belie[f]***" as of August 6, 2019 that elevated levels had largely returned to normal. (AC ¶¶ 117-18.) As the AC itself states, completely ***consistent*** with Armstrong's belief, ***no one*** "expect[ed] a kind of sequential reduction in inventory in the distribution channel" that would last longer than the first two quarters of 2019. (AC ¶ 124.)[8] Simply put, that distributor inventory levels allegedly took longer to work down than Armstrong predicted does not make those predictions false, and certainly does not give rise to a securities fraud claim. *See ICN Pharms.*, 299 F. Supp. at 1061 (no claim when plaintiff "ple[d] no specific facts to support a conclusion that . . . their claim [was] not speculation made in hindsight"); *accord Ronconi v. Larkin*, 253 F.3d 423, 430 n.12 (9th Cir. 2001).

Resolving any doubt that Plaintiff cannot allege a material misrepresentation or omission regarding distributor inventory levels, Plaintiff's allegations contradict "readily available" public filings. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). Armstrong continually disclosed in real time (i) the government's imposition of tariffs, (ii) the risk the tariffs and related price increases could have on distributor buying behavior, (iii) the increased distributor buying that actually resulted, and (iv) Armstrong's good-faith, forward-looking projections as to how elevated inventory

---

[8] Plaintiff also does not allege, much less with the requisite particularity, that Armstrong did not hold the belief that channel inventory had reach more sustainable levels after the second quarter of 2019. (AC ¶¶ 117-18); *see City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017).

13

levels would impact its results. (*See* Ex. 3 at 7; Ex. 4 at 22-23; Ex. 5 at 8; Ex. 6 at 2; Ex. 7 at 19; Ex. 8 at 6-7; Ex. 9 at 1; Ex. 10 at 4.) Plaintiff pleads no facts showing that any alleged statement "conveyed a false or misleading impression" "***when read in light of all of the information then available*** to the market." *ChinaCache II*, 2017 WL 114401, at *5.

### 2. Plaintiff Fails to Allege a Misrepresentation or Omission Concerning the "Go-to-Market" Strategy.

Plaintiff further alleges that, in February 2018, "Defendants" (some of whom were not even at the Company) hatched a scheme to pursue a "go-to-market" strategy that they ***knew*** was "fatally flawed" from the start. (AC ¶ 156.) Plaintiff claims that "Defendants" designed a strategy to give the Company's distributors more responsibility for marketing even though they always knew the distributors "could ***not*** take on the added responsibilities of marketing" Armstrong's residential products. (*Id.*) Plaintiff also alleges that while "Defendants" publicly stated that the Company would "increase its investment in servicing national retail or commercial accounts," it did not and never planned to do so. (*Id.*)

Plaintiff does not plead a single particularized fact to support his conclusory allegations. Instead, Plaintiff attempts to plead "fraud by hindsight," and hold Armstrong and its executives liable because a business strategy was not ultimately as successful as the Company had hoped. "[F]raud by hindsight" is not actionable under the federal securities laws. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 988 (9th Cir. 1999).

### (a) Armstrong's Puffery Is Inactionable.

"To be misleading, a statement must be capable of objective verification." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). "[S]tatements are not actionable if they are generalized, vague and unspecific assertions, constituting mere 'puffery' upon which" no reasonable investor would rely. *ChinaCache II*, 2017 WL 114401, at *8; *accord Apollo Grp.*, 774 F.3d at 606; *Cutera*, 610 F.3d at 1111. Plaintiff challenges three categories of inactionable puffery.

*First*, Plaintiff challenges statements concerning the capabilities of Armstrong's distributors, including that they are "very good" and "excellent," and that Armstrong was

14

"focused on" and "look[ed] forward" to "aligning . . . with partners who are best positioned to support [its] growth strategy." (AC ¶¶ 81-82, 90, 99.) None of these statements is capable of objective verification. *See, e.g.*, *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (statement that "Verizon and AT&T are strong partners" was puffery); *Cunha v. Hansen Nat. Corp.*, 2010 WL 11469534, at *16 (C.D. Cal. July 12, 2010) (statement that "we're getting good *solid* distribution, we're working with professional distributors" was puffery (emphasis in original)).

*Second*, Plaintiff challenges statements concerning the benefits Armstrong hoped the "go-to-market" strategy would achieve, including reduced marketing spend, "cost efficiencies" and "higher margins for our distributors." (AC ¶¶ 72, 84, 87, 99, 113.) But "whether marketing expenditures are 'cost effective,' 'sound,' 'smart,' or 'efficient' . . . can 'neither be quantified nor specified in any way.'" *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 180 (D.D.C. 2007); *see also, e.g.*, *Amalgamated Bank v. Coca-Cola Co.*, 2006 WL 2818973, at *7-8 (N.D. Ga. Sept. 29, 2006) (statements characterizing "marketing programs in a positive manner" were "non-actionable puffery").

*Third*, Plaintiff challenges statements concerning the progress of the "go-to-market" transition, including: (i) the transition is "on track" and "[t]he shift is underway;" (ii) Armstrong is "making good progress" and "satisfied with the progress;" (iii) the transition "has been smooth" and "has gone very smoothly;" and (iv) "our distributors are very excited." (AC ¶¶ 75-76, 79, 84, 90.) Courts routinely hold that such statements are inactionable as a matter of law. *See, e.g.*, *ChinaCache II*, 2017 WL 114401, at *6 (statement that company was "on track" to complete system migration is puffery); *In re Nimble Storage, Inc. Sec. Litig.*, 756 F. App'x 779, 780 (9th Cir. 2019) ("we are making really good progress"); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) ("we are very pleased with our progress to date on key strategic initiatives").

(b)    Armstrong's Forward-Looking Statements Are Protected by the PSLRA's Safe Harbor Provision.

Plaintiff also challenges statements that Armstrong believed its "strategic

15

MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

initiatives"—one of which was the "go-to-market" strategy—would "accelerate net sales growth" and help the Company better serve its end consumers. (AC ¶ 75; *see id.* ¶¶ 72, 76, 79, 84, 87, 90, 97, 99, 108-10, 118.) Plaintiff claims that these statements were misleading because, while Armstrong "portrayed [the 'go-to-market strategy'] as a way to sell higher growth products, which would allow the Company to substantially increase its profits," it ultimately determined (with the benefit of new management) that there were better strategic opportunities available. (AC ¶¶ 59, 160.)

The "Ninth Circuit has been clear that, '[h]onest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness.'" *Rezvani*, 2018 WL 6680568, at *7 (quoting *Ronconi*, 253 F.3d at 432). "The PSLRA's safe harbor is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *Id.*

Here, Armstrong made optimistic statements concerning its expectations for the "go-to-market" strategy, including its hope to "reduce some of [its] [marketing] spending," "accelerate net sales growth," increase its "share of wallet," and "focus more" on its "commercial and national accounts." (AC ¶¶ 72, 75-76, 79, 84, 87, 90, 96, 99, 110.) As shown *supra* § III(B)(1), these statements about the "plans and objectives of management for future operations" are forward-looking, were identified as such in earnings calls and SEC filings, and were accompanied by "meaningful cautionary statements." *Intuitive Surgical*, 759 F.3d at 1058; *see ChinaCache II*, 2017 WL 114401, at *5-6 (statements that system migration would "be the foundation for [the company's] future business growth" and would cause "revenue growth momentum to return" were forward-looking statements). Specifically, Armstrong disclosed to investors numerous business risks, including:

- "loss, reduction, or fluctuation of sales to" Armstrong's distributors;
- "[d]ownturns in construction activity;"
- that Armstrong's "cost saving initiatives may not achieve expected savings in our operating costs or improved operating results;" and
- international trade risks associated with "currency exchange fluctuations, trade regulations, tariffs, import duties, logistics costs, delays and other related risks."

16

(*E.g.*, Ex. 7 at 6-12.) Ultimately, some of these risks negatively impacted Armstrong's performance in 2019, including, among other things, a "decline in sales . . . attributable to increased channel stocking in 2018 as a result of anticipated tariff increases," "distributor challenges and share loss" and "higher input cost inflation pressure related to tariffs." (Ex. 12 at 4.) But this does not remove Armstrong's forward-looking statements from the protections of the PSLRA's safe harbor. *See Rezvani*, 2018 WL 6680568, at *7.

(c)   <u>Plaintiff Fails to Plead Contemporaneous Falsity</u>.

Plaintiff identifies only three non-forward-looking, non-puffery statements concerning the "go-to-market" strategy (AC ¶¶ 90, 99), and contends each statement was misleading because (i) the "go-to-market" strategy was "fatally flawed" and (ii) Armstrong "did not increase [its] investment in servicing national retail or commercial accounts." (*Id.* ¶¶ 91, 100.) Plaintiff falls far short of the PSLRA's exacting requirements for falsity.

*First*, Plaintiff alleges that Armstrong falsely stated that distributors began "working on merchandising to support sales of [Armstrong's] residential products" in the third quarter of 2018, and that Armstrong "completed [the] go-to-market pivot" in the fourth quarter of 2018. (AC ¶¶ 90, 99.) Plaintiff asserts that distributors in fact "did not . . . take on the added responsibilities of marketing and merchandising for Armstrong." (*See, e.g.*, *id.* ¶¶ 91, 100.) But Plaintiff does not allege any "specific 'contemporaneous statements or conditions'" showing that the distributors did not take on those responsibilities in the third quarter 2018 or complete the "go-to-market pivot" the next quarter. *Ronconi*, 253 F.3d at 432. Plaintiff's conclusory assertions are insufficient. *See Metzler*, 540 F.3d at 1070-71.

*Second*, Plaintiff alleges that Armstrong falsely stated that it "began to allocate more of [its] marketing spend to commercial and national accounts" in the third quarter of 2018 and "allocate[d] more of [its] marketing and sales efforts on commercial and national accounts" in the fourth quarter of 2018. (AC ¶¶ 90, 99.) Plaintiff alleges that these statements were false because Armstrong "did not increase [its] investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts." (AC ¶¶ 91, 100.)

17

In support of these allegations, Plaintiff does not point to any contemporaneous facts showing that Armstrong's statements were false when made. *See Ronconi*, 253 F.3d at 432; *ChinaCache II*, 2017 WL 114401, at *5. Instead, Plaintiff relies on Vermette's conclusion in **March 2020**, following his "thorough review" of Armstrong's business, that certain "operational inefficiencies" could be improved and that he wanted to invest even more in certain sales segments because Armstrong "had 2 people calling on hundreds of large builders and contractors," "one person calling on commercial national accounts" and "one person dedicated to calling 13,000 independent retailers." (AC ¶ 127; *see* Ex. 12 at 5-9.) That a business review revealed that additional changes might be beneficial in the future does not show that any statement in the past was false when made. Likewise, that Armstrong had four sales people calling on various types of accounts in March 2020 says nothing about whether Armstrong increased its overall investment in servicing national retail or commercial accounts *during the class period*—the actual subject of the challenged statements. Indeed, Plaintiff does not allege any facts showing that Armstrong did not increase the number of sales people *at the time the statements were made*. In short, Plaintiff's allegations boil down to the conclusory assertion that because Vermette identified operational inefficiencies in March 2020, Armstrong's prior statements must have been false when made. That is insufficient to plead falsity as a matter of law. *See Ronconi*, 253 F.3d at 432-33 (allegations "not necessarily inconsistent" with an alleged misstatement do not establish falsity); *accord Silicon Graphics*, 183 F.3d at 988.[9]

*Finally*, Plaintiff alleges that Armstrong's November 5, 2019 earnings release misled investors by attributing "recent sales trends" and its "downward revision" in EBITDA guidance "primarily" to "recent sales trends and cost pressures." (AC ¶¶ 120-21, 126.) Plaintiff claims Armstrong "omitted that the Company's 'go-to-market strategy' was a

---

[9] Plaintiff also challenges statements that Armstrong "plan[ned] to . . . increase [its] investment in national retail and commercial accounts" and was "excited to focus more of [its] marketing spend on commercial and national accounts," asserting that Armstrong "did not increase [its] investment in servicing national retail or commercial accounts." (AC ¶¶ 72-73, 79-80; *id.* ¶¶ 76-77, 84-85.) To the extent those statements are even actionable, Plaintiff does not allege any contemporaneous facts suggesting Armstrong did not "plan" to increase its investment in, or "focus more" on, national retail and commercial accounts.

18

failure and that the Company needed to be restructured in order to sell its products." (AC ¶¶ 122, 126, 159.) Plaintiff "must allege falsity in light of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *ChinaCache II*, 2017 WL 114401, at *5. Here, Plaintiff does not plead *any* facts to suggest that "sales trends and cost pressures" were not the "primary drag on earnings" in the third quarter of 2019.[10]

### B.  Plaintiff Fails to Plead Scienter.

Plaintiff's claims also fail because Plaintiff cannot plead scienter. Plaintiff "must state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *Vantive*, 283 F.3d at 1085 (emphasis in original). This "is an exacting pleading obligation." *Endologix*, 962 F.3d at 414. Plaintiff must allege "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432. In making this determination, "the court must take into account plausible *opposing* inferences." *Tellabs*, 551 U.S. at 310. A complaint will survive dismissal only if "the inference of scienter" is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Far from pleading scienter in "great detail," the AC does not allege *any* "specific contemporaneous statements or conditions" showing that any Defendant knew, or was

---

[10] Plaintiff also alleges that nearly every challenged statement during the two-year class period was misleading by *omission* because Defendants "omitted that: (i) the Company's distributors were not in a position to provide merchandising support and were inadequate to take on this new role, and (ii) the Company was not adequately or actively servicing its commercial and national accounts as they had allocated insufficient resources to those accounts." (AC ¶¶ 73, 77, 80, 85, 88, 91, 98, 100, 111, 114, 119.) Again, Plaintiff alleges no particularized facts to support the alleged omissions, such as those showing that distributors were not in a position to provide merchandizing support or that Armstrong was not adequately servicing its commercial and national accounts at the time the challenged statements were made. Moreover, to be actionable, an omission must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Here, none of the alleged misstatements claim that Armstrong's distributors were adequate to take on more marketing responsibilities or that Armstrong was adequately servicing its commercial and national accounts. A statement is not misleading if it neither "state[s] nor implie[s] anything regarding" the subject matter of the purported omission. *Id.*

19

deliberately reckless as to whether, the statements at issue were false "when made." *Ronconi*, 253 F.3d at 432. Instead, Plaintiff relies on conclusory assertions regarding the Defendants' ***collective*** mental states. (AC ¶¶ 73, 77, 80, 83, 85, 88, 91, 98, 100, 111, 114, 119, 126.) Conclusory allegations of scienter are insufficient as a matter of law. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002).

### 1.    Plaintiff's Boilerplate Scienter Theories Fail as a Matter of Law.

Plaintiff proffers four generic theories for why "Defendants" acted with scienter. None satisfies the "exacting" pleading standard of the PSLRA. *Endologix*, 962 F.3d at 414.

(a)    <u>Defendants' "Positions" at Armstrong Do Not Show Scienter</u>.

Plaintiff claims that, "[b]ecause of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded" that the statements challenged in the AC "were materially false and misleading." (AC ¶ 136.) That conclusory assertion does not give rise to an inference of scienter for at least three reasons.

*First*, Plaintiff does not differentiate between the Individual Defendants or plead facts showing what information each Defendant knew and when. Collective scienter pleading is not permitted. *See, e.g.*, *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1105 (C.D. Cal. 2003) (no scienter where "Plaintiffs make little effort to distinguish each Defendant's individual knowledge of the facts and circumstances surrounding the alleged misstatements"); *McCasland*, 2008 WL 2951275, at *10 (no scienter where plaintiff "too often refers to defendants . . . collectively" and fails to "specif[y] the facts that individual defendants knew (or must have known)").

*Second*, courts throughout the Ninth Circuit routinely dismiss boilerplate scienter allegations based on defendants' positions within the company. *See Downey* 2009 WL 2767670, at *12 (allegations regarding "the Individual Defendants' high-level positions," "their access to non-public information, and their meeting attendance" are "insufficient" to raise inference of scienter); *Commc'ns Workers of Am. Plan for Emps.' Pensions & Death Benefits v. CSK Auto Corp.*, 2007 WL 951968, at *4 (D. Ariz. Mar. 28, 2007) (same).

*Third*, while Plaintiff claims that "Defendants" had "access to material non-public

20

information" (AC ¶ 136), Plaintiff does not allege (i) what non-public information any Individual Defendant reviewed, (ii) when they reviewed it or (iii) how such information showed that the statements challenged in the AC were false when made. "The Ninth Circuit has repeatedly rejected vague allegations of access to unspecified information." *Mahapatra v. Truecar, Inc.*, 2015 WL 12552062, at *2 (C.D. Cal. Dec. 9, 2015) (collecting cases).

(b)   <u>Plaintiff's "Core Operations" Theory Is Deficient</u>.

Plaintiff next alleges that "Defendants" made statements about the "go-to-market" strategy with scienter because the statements purportedly concern Armstrong's "core operations, the residential channel." (AC ¶ 137.) Cases where a "core operations inference" will be "sufficient under the PSLRA" are "exceedingly rare." *Gammel*, 905 F. Supp. 2d at 1077. To establish scienter under such a theory, Plaintiff must: (1) allege particularized facts showing that "the defendant had actual access to the disputed information;" and (2) show that "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009). Plaintiff has done neither.

*First*, Plaintiff does not allege a single fact showing that ***any*** Defendant knew (or even had information suggesting) that the "go-to-market" strategy was "fatally flawed" at the time the alleged statements were made. Plaintiff glosses over the fact that each of the Individual Defendants (other than Rice) worked at Armstrong for only a portion of the class period. (AC ¶¶ 24-29.) Plaintiff's failure to allege with particularity what any Individual Defendant knew about the "go-to-market" strategy and when is fatal to a "core operations" theory. *See Vantive*, 283 F.3d at 1087; *ChinaCache II*, 2017 WL 114401, at *12.

*Second*, this is not the "rare circumstance[]" where it is "absurd" to suggest management must not have known the truth that the "go-to-market" strategy was destined to fail. *Intuitive Surgical*, 759 F.3d at 1062. "Courts applying the [core operations] doctrine have generally required that the operation in question constitute nearly all of a company's business before finding scienter." *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *30 (C.D. Cal. Apr. 14, 2015). Here, the very public documents on which

21

Plaintiff relies show that Armstrong's *entire* North American residential business comprised only 40% of its net sales. (*See, e.g.*, Ex. 7 at 3.)[11] Moreover, the "Ninth Circuit cases relying on the 'absurd to suggest' doctrine are usually based on concrete numbers, not majestic generalities." *Knox v. Yingli Green Energy Holding Co.*, 242 F. Supp. 3d 950, 967 (C.D. Cal. 2017). Here, the alleged misstatements do not concern concrete numbers, but rather general optimistic expectations for the "go-to-market" strategy. Absent particularized facts (not found here) showing that any Defendant made such a statement with knowledge that the stated expectations would not be realized, such "generalities" cannot support an inference of scienter. *See Ronconi*, 253 F.3d at 430.

(c)   Responses to Analyst Questions Do Not Demonstrate Scienter.

Plaintiff also alleges that "Defendants" acted with scienter based on answers given by three Individual Defendants to analyst questions "about the capabilities of the Company's distributors regarding their abilities: (i) to execute on the go-to-market strategy; and (ii) manage the inventory in the residential channel." (AC ¶ 141.) Plaintiff alleges in conclusory fashion that "Defendants" were "well aware of the issues relating to their distributors [sic] capabilities and failed to disclose those issues to shareholders." (*Id.*)

"[I]t does not demonstrate scienter to point out that analysts asked questions about a topic." *Bolling v. Dendreon Corp.*, 2014 WL 2533323, at *14 (W.D. Wash. June 5, 2014). Rather, Plaintiff must plead particularized facts showing that "Defendants knew" their responses to analyst questions were false or misleading. *Id.*; *see also Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936, at *12 (N.D. Cal. Mar. 16, 2020) ("Plaintiff must allege facts that reflect some degree of intentional or conscious misconduct," even when analysts ask questions on the subject). Here, as explained above (*supra* § III(A)), Plaintiff pleads no facts showing that any Defendant knew its distributors would be unable to execute the "go-to-market" strategy at the time Defendants responded

---

[11] Plaintiff alleges that "[t]he residential channel made up more than 2/3 of the Company's sales" (*id.* ¶ 138), but the documents on which the Amended Complaint relies—which are incorporated by reference and subject to judicial notice—contradict this allegation. (*See, e.g.*, Ex. 7.) "[T]he court need not accept as true allegations that contradict matters properly subject to judicial notice." *Young v. Dreisbach,* 182 F. App'x 714, 717 (9th Cir. 2006).

22

to analysts' questions. Indeed, Plaintiff fails to plead Defendants had access to any information that contradicted the alleged misstatements concerning distributor capabilities. Plaintiff's conclusory assertion that Defendants "should have said more" in response to analyst questions is insufficient as a matter of law. *See Lipton*, 284 F.3d at 1036.

(d)    Defendants' Receipt of RSUs Does Not Show Scienter.

Finally, Plaintiff alleges that "Defendants" were motivated to commit securities fraud because three of the six Individual Defendants received a grant of "time-based restricted stock units ('RSUs')" in January 2018. (AC ¶¶ 145-46.) "Stock-based bonuses are common and have limited probative value as to scienter." *In re Syncor Int'l Corp. Sec. Litig.*, 239 Fed. App'x 318, 321 (9th Cir. 2007). Moreover, to plead scienter based on an executive's compensation, the complaint must "provide specifically . . . the correlation between [the Defendants'] compensation and" the subject of the alleged misstatements. *Zucco Partners*, 552 F.3d at 1005; *see Downey*, 2009 WL 2767670, at *13 (same).

Here, Plaintiff does not plead any facts demonstrating such correlation. As Plaintiff concedes, the RSU grants were "time-based" and "intended to retain [Armstrong's] talent;" they were not dependent on Armstrong continuing to pursue the "go-to-market" strategy or manage inventory levels in any particular manner. (AC ¶ 145; *see* Ex. 13 at 22.) Thus, the RSUs merely incentivized "Defendants" to remain at Armstrong, and nothing more. The AC is devoid of factual allegations suggesting that the RSUs provided *any* Defendant an incentive to seek to inflate Armstrong's stock price. Indeed, Plaintiff does not (and cannot) allege that *any* Individual Defendant sold any Armstrong stock during the entire two-year class period. The absence of stock sales alone negates any inference of scienter. *See, e.g.*, *Downey*, 2009 WL 2767670, at *14 (collecting cases).

**2.    Viewed Holistically, Plaintiff Fails to Adequately Plead Scienter.**

While none of Plaintiff's individual allegations gives rise to an inference of scienter, the Court still must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco Partners*, 552 F.3d at 992. None exists here.

23

Even taking the allegations together, an inference of intentional or reckless fraud "is not as cogent or compelling as a plausible alternative inference," *id.* at 1007—that Defendants (i) honestly believed their business strategy would work, (ii) disclosed that strategy, as well as their good-faith expectations for business growth, to the market, but (iii) the "go-to-market" strategy did not prove as successful as Armstrong had hoped. *See id.* at 1007. The securities laws do not demand clairvoyance. *See, e.g.*, *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1231 (S.D. Cal. 2001) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.").

Meanwhile, the inference that Plaintiff suggests lacks "any basis in logic or common experience." *Endologix*, 962 F.3d at 408. Under Plaintiff's theory, Armstrong's top executives devised a plan in early 2018 to mislead the market about the destined failure of its planned "go-to-market strategy." (*See* AC ¶ 149.) In early 2019, new leadership took over and decided to continue to sell investors on a knowingly doomed-to-fail business strategy. Then, in September 2019, a new CEO took over, began a "thorough review" of Armstrong's business, and decided to continue the alleged fraud for another sixth months while Armstrong developed a new business strategy, before finally "revealing" that "Defendants" knew all along that the "go-to-market" strategy was a failure from the very beginning. Meanwhile, not a single Individual Defendant sold any Armstrong stock during the class period or otherwise sought to benefit in any way from this purported two-year fraud. "Given the absence of other indicia of scienter, the lack of an alleged motive is particularly significant." *McGee v. Am. Oriental Bioengineering, Inc.*, 2014 WL 12586107, at *15 (C.D. Cal. Sept. 23, 2014). Here, there is not even a plausible inference of scienter, much less a cogent one. *See Zucco Partners*, 552 F.3d at 991. "[T]he PSLRA neither allows nor requires [the Courts] to check [its] disbelief at the door." *Endologix*, 962 F.3d at 415.

## C.   **Plaintiff Fails to Plead Loss Causation.**

The AC should also be dismissed for the separate and independent reason that Plaintiff fails to plead loss causation *i.e.*, a "causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered." *Apollo Grp.*,

24

774 F.3d at 608. Plaintiff claims to have suffered damages in connection with four corrective disclosures, the first two of which allegedly occurred on March 5 and May 3, 2019. (AC ¶¶ 152-60.) But Plaintiff did not purchase any Armstrong stock until May 7, 2019 (*see id.* at 54), and thus cannot plead loss causation in connection with these disclosures as a matter of law. *See, e.g.*, *Di Donato v. Insys Therapeutics Inc.*, 2017 WL 3268797, at *18 (D. Ariz. Aug. 1, 2017); *accord Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 618 (S.D.N.Y. 2015). Plaintiff also alleges Armstrong partially "revealed" elevated distributor inventory levels to the market on November 5, 2019. (AC ¶ 159.) But, as discussed above (*supra* § III(A)(2)), Armstrong disclosed to investors starting in ***November 2018*** that distributors had bought ahead of the tariff-related price increases, and thus there was nothing to "reveal" or "correct" as a matter of law. *Apollo Grp.*, 774 F.3d at 608. Finally, Plaintiff fails to allege with the requisite particularity that the alleged stock drop on March 3, 2020 was caused by the purported "revelation" that the "go-to-market" strategy was a failure, as opposed to the numerous other more plausible reasons for the stock price decline that are apparent from the AC. *See Melot*, 2014 WL 12589334, at *17 (collecting cases).[12]

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the AC should be dismissed with prejudice.

DATED:        August 17, 2020

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


By:        */s/ Peter B. Morrison*
                Peter B. Morrison

Attorneys for Defendants Armstrong Flooring, Inc., Michel Vermette, Larry McWilliams and Dominic Rice

---

[12] Because Plaintiff fails to state a claim under Section 10(b), his Section 20(a) claim also fails. *See Zucco Partners*, 552 F.3d at 990.