SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
DAVID A. SCHWARZ, Cal. Bar No. 159376
dschwarz@sheppardmullin.com
JOHN M. LANDRY, Cal. Bar No. 194374
jlandry@sheppardmullin.com
CHUNG H. CHAN, Cal. Bar. No. 328854
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  213.620.1780
Facsimile:   213.620.1398

Attorneys for DONALD MAIER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL CHUPA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARMSTRONG FLOORING, INC., MICHEL VERMETTE, DONALD MAIER, LARRY McWILLIAMS, DOUGLAS BINGHAM, DOMINIC RICE, and RONALD FORD,<br><br>Defendants. | Case No. 2:19-cv-09840-CAS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DONALD MAIER'S MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>The Hon. Christina A. Snyder<br><br>Hearing Date:  December 7, 2020<br>Hearing Time:  10:00 a.m.<br>Courtroom:       8D<br><br>*[Notice of Motion and Joinder, Request for Judicial Notice filed concurrently herewith, [Proposed] Order Granting Motion to Dismiss and [Proposed] Order Granting Request for Judicial Notice lodged concurrently herewith]* |

-1-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION TO DISMISS AMENDED COMPLAINT

# **TABLE OF CONTENTS:**

TABLE OF AUTHORITIES ..................................................................................................3

I. INTRODUCTION ............................................................................................................5

II. STATEMENT OF FACTS ..............................................................................................9

    A.   The "Go-To-Market" Strategy...............................................................................9

    B.   The 2018 And 2019 Trump Administration Tariff Actions ..........................10

III. ARGUMENT...................................................................................................................13

    C.   The AC Fails To Allege Particularized Facts Showing A False Or
Misleading Statement By Mr. Maier ...................................................................13

    D.   The AC Fails To Adequately Allege That Any Statements Attributable To
Mr. Maier Were Made With Intent To Mislead Investors ....................................15

        1.   The AC Fails To Allege That Any Statement By Mr. Maier Was Rendered
False Or Misleading By The Impact "Excess Inventory" Would Have On
"Future Sales For 2019" ..................................................................................16

        2.   The AC Fails To Allege Any Statements By Mr. Maier As To AF's "Go-
To-Market" Strategy Were Knowingly False Or Misleading Or Made With
Intent To Defraud .........................................................................................20

        3.   The AC Fails To Show Mr. Maier Had Motive To Defraud Investors.....21

    E.   The AC Fails To State A Section 20(a) Claim Against Mr. Maier...............22

IV. CONCLUSION ...............................................................................................................23

SMRH:4833-3771-6168.2

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION TO DISMISS AMENDED COMPLAINT

## **TABLE OF AUTHORITIES**

Page(s)

Cases

*Cooper v. Pickett*

137 F.3d 616 (9th Cir. 1997) ...............................................................................15

*GIA-GMI, LLC v. Michener*

2007 WL 2070280 (N.D. Cal. July 16, 2007) .......................................................15

*Howard v. Everex Sys., Inc.*

228 F.3d 1057 (9th Cir. 2000) ..............................................................................22

*In re Read-Rite Corp. Sec. Litig.* (9th Cir. 2003) .................................................. 13, 20

*In re Rigel Pharm., Inc. Sec. Litig.*

697 F.3d 869 (9th Cir. 2012) ................................................................................21

*In re Vantive Corp. Sec. Litig.*

283 F.3d 1079, 1085-85 (9th Cir. 2002).......................................................... 14, 20

*Khoja v. Oxygen Therapeutics, Inc.*

899 F.3d 988 (9th Cir. 2018) ................................................................................15

*Lipton v. Pathogenesis Corp.*

284 F.3d 1027 (9th Cir. 2002) ..............................................................................18

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*

540 F.3d 1049 (9th Cir. 2008) ..............................................................................14

*Nguyen v. Endologix, Inc.*

962 F.3d 405 (9th Cir. 2020) .............................................................................8, 9

*Ronconi v. Larkin*

253 F.3d 423 (9th Cir. 2001) ...........................................................15, 17, 20, 21

*Royal Primo Corporation v. Whitewater West Industries, Ltd.*

2016 WL 1718196 (N.D. Cal., Apr. 29, 2016).......................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*

551 U.S. 308 (2007) ................................................................................13, 14, 15

-3-

*United States v. Corinthian Colleges*
    655 F.3d 984 (9th Cir. 2007) ................................................................................. 8
*Webb v. Solarcity Corp.*
    884 F.3d 844 (9th Cir. 2018) ............................................................................... 21
*Xu v. ChinaCache Int'l Holdings Ltd.*
    2016 WL 4370030 (C.D. Cal. Aug. 15, 2016) ..................................................... 15
*Zucco Partners, LLC v. Digimarc Corp.*
    552 F.3d 981 (9th Cir. 2009) ............................................................. 15, 18, 21, 22

<u>Statutes</u>
15 U.S.C. § 78u-4 ............................................................................................. 14, 15

-4-
DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION TO DISMISS AMENDED COMPLAINT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Donald Maier, by and through his attorneys, hereby submits this Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof seeking to dismiss Plaintiff Randy Marker's Amended Complaint for Violations of the Federal Securities Laws filed on July 2, 2020 ("Amended Complaint" or "AC") with prejudice, and in support thereof states as follows:

## I. INTRODUCTION

This is Plaintiffs'[1] second attempt to articulate a coherent theory of securities liability concerning marketing strategies by Armstrong Flooring, Inc. ("AF" or the "Company") or marketplace events affecting a portion of its business, which is the manufacture and distribution of residential and commercial flooring products. Plaintiffs initially theorized that AF engaged in "channel stuffing to artificially boost sales." (ECF No. 1 ¶7 [November 15, 2019 Complaint].)  These allegations, made from whole cloth, are contradicted by the disclosures and SEC filings cited in the complaint.  Having abandoned the "channel stuffing" theory[2], the AC alleges that defendants knew that the Company's "go-to-market" strategy was "fatally flawed from the start," thus rendering every statement made about that strategy over the two year class period false when made.  Instead of claiming that AF booked phantom sales to artificially inflate revenue, Plaintiffs now allege that investors were victims of ***overbuying*** for certain product lines due to distributor demand in advance of tariffs that went into effect in late September 2018 and June 1, 2019.

---

[1] Although Randy Marker was appointed as Lead Plaintiff, the AC is captioned "Michael Chupa, Individually and on behalf of all others similarly situated." Chupa filed the original complaint. (*See* AC, p. 1.)

[2] Although the AC abandons the "channel stuffing" theory altogether, the insinuation that AF manipulated sales by pushing unwanted product into the channel lingers. Hence, the AC characterizes AF as having "cannibalized future sales by over selling inventory into the channel" and having "flood[ed] the distribution channel." (*See* AC ¶¶ 12, 50, 51.)  The AC, however, does not and cannot plead any facts supporting this.

-5-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS AMENDED COMPLAINT

Setting aside that Plaintiffs' clashing theories are textbook examples of impermissible "fraud by hindsight" group pleading, the gravamen of the AC has little, if any, to do with Don Maier.  It fails to allege that a single statement by Mr. Maier was false or misleading, let alone that they were false when made or made with intent to deceive, or why – given that Mr. Maier didn't sell a single share of AF stock during his tenure as CEO – he was motivated to implement a fatally flawed marketing strategy without telling investors that defendants knew from the get-go that it would never work.

*First*, the linchpin allegation of the AC – that defendants knew that the "go-to-market" strategy was flawed from the outset – hinges on a March 3, 2020 statement by Michel Vermette, the second CEO hired by AF after Mr. Maier's resignation. During an earnings call, Mr. Vermette stated that shortly after he joined the Company, AF undertook a six-month "thorough[] review[]" of the Company's "business and strategic direction." (Declaration of Zachary M. Faigen i/s/o AF's Request for Judicial Notice ["AF RJN"], Ex. 12 at 5 [Mar. 3, 2020 Earnings Call].)  AF concluded that the "go to market" strategy had put distributors "in roles that [AF] [is] better suited for such as branding, marketing and also connectivity with large accounts."  (AC ¶128.) Mr. Maier did not participate in that six month review; he left the company on May 2, 2019, ten months *before* his successor announced that the Company would no longer pursue this strategy.

*Second*, apart from the Trump Administration's inconsistent signals as to whether or when it would impose additional tariffs on flooring products,[3] it is implausible that Mr. Maier had any clairvoyance as to the U.S. Trade Representative's negotiations playbook, or that he knew the impact of yet to-be-imposed tariff

---

[3] *See, e.g.,* Wary of Trump's Flip-Flops, China Prepares for Worst on Trade, Bloomberg (Aug. 27, 2019, 5:04 AM), https://www.bloomberg.com/news/articles/2019-08-27/wary-of-trump-s-flip-flops-china-prepares-for-worst-on-trade.

-6-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION TO DISMISS AMENDED COMPLAINT

increases on AF's customers or competitors who supplied AF distributors with products similar to those AF sourced from China. Mr. Maier left AF on May 2, 2019 – *before* the Trump Administration's announcement to raise tariffs to 25 percent for goods imported after June 1, 2019.

*Third*, Plaintiff fails to take into account opposing inferences or real-world events, such as the effect of the threats of tariffs on industry buying patterns, which Mr. Maier and the Company discussed in disclosures throughout Mr. Maier's tenure. These include disclosures stating that:

- the initial 10 percent tariffs imposed as of September 24, 2018 would result in price increases for products sourced from China (AC ¶ 93 [Mar. 5, 2019 Form 8-K]);

- the Company anticipated additional price increases based on the Trump Administration's decision to raise these tariffs to 25 percent as of January 1, 2019, an increase which did not materialize as anticipated;

- distributors "appropriately took advantage of the fact that they could buy ahead of the 10% tariff;" (AC ¶143 [Nov. 6, 2018 Earnings Call]);

- "[h]igher than normal inventory levels at distributors could impact sales in the first quarter of 2019, as could continued uncertainty around tariffs from products imported from China," (AF RJN, Ex. 7 at 19 [Mar. 5, 2019 Form 10-K]); and

- for full year 2019, AF "expects" that projected growth in sales would be "heavily weighted to the second half as the overall market improves and elevated inventory levels in the channel are worked down." (AF RJN, Ex. 6 at 2 [Mar. 5, 2019 Form 8-K].)

In spite of this, Plaintiff claims without basis that Mr. Maier not only "knew" how much inventory its distributors stockpiled ahead of the tariff increases (including, presumably, products bought from AF's competitors), but that he "knew" that this "flooding" of the "distribution channel would require over a year to sell down." (AC

-7-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION TO DISMISS AMENDED COMPLAINT

¶ 51.) Plaintiff claims that Mr. Maier's "admission" may be inferred by this statement: "So we do believe that our distributors appropriately took advantage of the fact that they could buy ahead of the 10% tariff, but would not want to quantify that further for you." (AC ¶ 51.)

Assuming Mr. Maier had some idea as to how much China-sourced products were on the shelves of its distributors as of Q3 2018 (including similar flooring products sold by AF's competitors), it goes beyond bootstrapping to infer defendants were "aware" that *future* end-user demand would not be sufficient "to sell down the excess inventory" through 2019. (*See e.g.*, AC ¶¶ 11, 12.) AF did not control its distributors' future selling and purchasing behaviors, their choices of products, or whether they purchased from AF or one of its competitors. It is more plausible that Mr. Maier declined to speculate as to distributor inventory levels 15 months into the future. The theory that Mr. Maier could predict exactly how much product its customers would buy from AF more than one year after the first round of tariff increases went into effect ignores the complex realities of how distributors, retailers, and big box stores source different flooring products from different companies and countries, and alter their supply chain strategies in response to changing or uncertain global economic conditions.

While plausibility "is more commonly associated with the base-level 'non-fraud' pleading standards," it "is no less relevant in the context of the heightened pleading standards of Rule 9(b) and the PSLRA." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). Generally, an amended complaint should contain "additional allegations that are 'consistent with the challenged pleading' and that do not contradict the allegations." *United States v. Corinthian Colleges,* 655 F.3d 984, 995 (9th Cir. 2007). A court may consider the earlier-pled allegations as part of a "context-specific" plausibility inquiry based on its "judicial experience and common sense" to assess plausibility. *See Royal Primo Corporation v. Whitewater West Industries, Ltd.*, 2016 WL 1718196, at *3-*4 (N.D. Cal., Apr. 29, 2016); *see also*

-8-

*Nguyen*, 962 F.3d at 408 (finding implausibility where allegation has "no basis in logic or common experience").

If Plaintiffs cannot decide which of their opposing theories to believe, this Court may exercise its common sense in declining to give credence to either theory. Plaintiffs' two contradictory theories undermine the strength of the inference of wrongdoing as to either one. Moreover, the claim that defendants knew that AF's "go-to-market" strategy would fail before it was implemented "does not resonate in common experience." *Nguyen,* 962 F.3d at 408. While at this point in the proceedings the court may not strike contradictory allegations, "the PSLRA neither allows nor requires [courts] to check [their] disbelief at the door." *Id.* As to Mr. Maier, Plaintiff has not alleged and cannot allege a plausible theory of fraud, falsity, and scienter. These deficiencies cannot be cured, even if Plaintiffs are afforded a third bite at the apple.

## II.    STATEMENT OF FACTS

### A. The "Go-To-Market" Strategy

Donald Maier became CEO of AF in March of 2016. (AC ¶ 24.) On February 5, 2018, AF announced that it would begin "[s]hifting elements of [its] residential marketing and merchandising responsibilities to [its] distributors." (AC ¶ 42.) The Company believed that this "go-to-market" strategy would "enhance [its] service to independent retailers"—as opposed to big box retailers or chain, such as Home Depot and Lowes—by "push[ing] the decision-making closer to the customer and allow[ing] a faster response to local needs." (*Id.* ¶ 72.) The Company believed that this would allow it to use savings obtained by reducing its residential marketing spend "to increase [its] investment in national retail and commercial accounts, specifiers, architects, designers and contractors." (*Id.* ¶ 42.)

During quarterly earnings calls in 2018 and through the first quarter of 2019, AF provided updates on the roll-out of the strategy. (AC ¶¶ 84, 90, 99.) For example, Mr. Maier stated on May 8, 2018 that AF remained "confident in [its] ability to deliver

-9-

on [its] strategic priorities in the medium term," (AF RJN, Ex. 2 at 6 [May 8, 2018 Earnings Call]; AC ¶ 75), and that the "go-to-market" strategy would enable AF to "provid[e] an even more competitive lineup of winning products," (AF RJN, Ex. 2 at 6.)  On that same call, Mr. Maier stated that AF was "making good progress" in rolling out its strategy, and "expect[ed] [that] distributors [would] begin providing their own merchandising in Q3, with the full transition completed by the end of the year." (AC ¶ 76.) Mr. Maier reiterated these expectations on earnings calls in August 7, 2018 and November 6, 2018.  (AC ¶ 84, 90.)  On March 5, 2019, Mr. Maier reported that the Company "completed our go-to-market pivot," and that it "anticipate[d] that our increased exposure to commercial . . . will amplify the benefits of this strategy." (AC ¶ 99.)  These statements were almost entirely forward-looking in nature.

## B. The 2018 And 2019 Trump Administration Tariff Actions

In 2018 and 2019, the Trump Administration announced a series of tariff actions relating to the importation of certain flooring products sourced from China, in particular the Luxury Vinyl Tiles ("LVT") products, a product made by various U.S. producers of commercial and residential flooring both domestically and overseas.

On June 20, 2018 the Office of the United States Trade Representative ("U.S.T.R.") announced potential tariff actions on Chinese imports. (Donald Maier's Request for Judicial Notice ("RJN"), Ex. 1. [Jun. 20, 2018 U.S.T.R Announcement].) The U.S.T.R. finalized a 10 percent tariff to take effect on September 24, 2018, and announced plans to increase the tariff to 25 percent by the end of the year.  (RJN, Ex. 2 [Sep. 21, 2018 U.S.T.R. Announcement].)  On December 19, 2018, the U.S.T.R. backtracked, and announced that the proposed 25 percent tariff action would be postponed to March 2, 2019.  (RJN, Ex. 3 [Dec. 19, 2018 U.S.T.R Announcement].) The U.S.T.R. again postponed the tariff increase, announcing on March 5, 2019 that "[t]he rate of additional duty will remain at 10 percent with respect to products covered by the September 2018 action until further notice."  (RJN, Ex. 4 [Mar. 5, 2019 Tariff Announcement])  On May 10, 2019, the U.S.T.R. again reversed course

-10-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION TO DISMISS AMENDED COMPLAINT

and re-implemented plans for a 25 percent tariff, effective June 1, 2019. (RJN, Ex. 5 [May 10, 2019 U.S.T.R. Announcement].)

AF had been monitoring this volatile situation since the prospect of tariffs on China-sourced goods was first raised in mid-2018, as reflected in its public statements. (*See* AF RJN, Ex. 3 at 7 [Aug. 7, 2018 Earnings Call Transcript]; Ex. 4 at 23 [Nov. 6, 2018 Form 10-Q]; AC ¶¶ 11, 143.) During the second quarter of 2018, AF "discuss[ed] preliminary thoughts on the potential impact on [the] business from the recently proposed tariffs on flooring" products imported from China. (AF RJN, Ex. 3 at 7.) As of August 2018, the Company remained uncertain whether the tariffs would be implemented, or their effects on the Company, its customers, or the flooring industry. While AF is "primarily a domestic manufacturer," and "expect[ed] that the tariffs would impact [it] less than most of [its] competitors," (*Id.* at 4, 7), AF stressed that "[a]ctual outcomes may differ materially from those expected or implied" and sounded a cautionary note as the Company would "continue to monitor trade developments and provide updates as appropriate." (*Id.* at 7.)

On its third quarter 2018 earnings call, AF discussed the Trump Administration's 10 percent tariff on flooring products from China (effective on September 24, 2018) and its announced increase to 25 percent effective January 1, 2019. (*See* AF RJN, Ex. 5 at 6, 8 [Nov. 6, 2018 Earnings Call]; AC ¶ 10.) These actions had a number of consequences for AF and the flooring industry, including price increases and pre-buying in advance of the effective date of the tariff.

AF informed distributors on its November 6, 2018 Form 10-Q that it would be implementing price increases effective in the fourth quarter of 2018 to offset the impact of the tariffs, and that it "expect[ed] to implement additional price increases in the first quarter of 2019" in connection with the tariff step up. (AF RJN, Ex. 4 at 23.) AF specifically warned investors that: "***Higher than normal inventory levels at distributors could impact sales in the fourth quarter, as could continued uncertainty around tariffs from products imported from China***." (*Id.* at 22-23 [emphasis

-11-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS AMENDED COMPLAINT

added].)

During that November 6 call, Mr. Maier stated that "as the announced tariffs came out at the end of Q3 . . . that did drive some buying behavior towards the end of the quarter." (AF RJN, Ex. 5 at 8.) He also cautioned that, in light of "the announced tariffs increase to 25% on January 1. . . it would be reasonable to anticipate a similar sort of surge in the fourth quarter" because distributors would look to buy at the lower prices. (*Id.*) "[F]or competitive, sensitive reasons," Mr. Maier declined to quantify the portion of the Company's third quarter pre-buys attributable to the tariffs. (AC ¶ 143.) While expressing AF's "belie[f] that our distributors appropriately took advantage of the fact that they could buy ahead of the 10% tariff," Mr. Maier also stated that he "would not want to quantify that further." (AC ¶ 143.)

In its Form 10-Q for 3Q 2018, AF disclosed that pre-buying could impact 2019 sales and result in "[h]igher than normal inventory levels" and "continued uncertainty around tariffs." (AF RJN, Ex. 4 at 22-23.) When AF disclosed its financial results for 4Q 2018 and full year of 2018, it further disclosed what was already obvious to the market: pre-buying in 2018 affected later sales. In AF's 4Q2018 and FY 2019 Form 8-K, AF disclosed "Lower volumes in the fourth quarter of 2018 were impacted by elevated inventory levels in the distributor channel due to significant customer purchases in the third quarter of 2018 ahead of price increases implemented in October 2018 in response to higher anticipated U.S. tariffs." (AC ¶ 93.)

On AF's March 9, 2019 earnings call, CFO Doug Bingham stated that "[the tariffs] had a large impact on customer buying behavior," including "significant customer purchases pulled forward in the third quarter of 2018" that caused "elevated inventory levels in the distributor channel during the fourth quarter." (AF RJN, Ex. 8 at 6-7 [Mar. 9, 2019 Earnings Call].) Mr. Maier stated that "[AF] saw softer end markets then through the fourth quarter," and pre-bought inventory "didn't sell through at the rates we had anticipated in Q4." (*Id.* at 10.) This created "a bit of a hangover as [AF] entered into Q1 [2019]." (*Id.*) AF disclosed that it "anticipate[d]

-12-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS AMENDED COMPLAINT

full year EBITDA growth to be heavily weighted towards the second half of 2019 as the market strengthens and elevated inventory levels in the channel are worked down." (AC ¶ 96.) On May 2, 2019, Mr. Maier resigned as CEO. (AC ¶ 24.)

The uncertain impact of additional tariffs on distributor buying behavior lingered well after Mr. Maier resigned. (*See* AF RJN, Ex. 10 at 4 [August 6, 2019 earnings call]) ("U.S. decision to raise tariffs on Chinese flooring imports from 10% to 25%" caused AF to take "additional price actions" on its products in May 2019.) As of August 6, 2019, AF advised investors that "the general uncertainty around the ultimate outcome of U.S.-China trade negotiations… continued to influence normal seasonal buying patterns." (*Id.*)

## III.   ARGUMENT

Mr. Maier will not repeat the discussion in the Company's motion to dismiss, which explains why, as to each of the eleven block quotes set forth in the complaint, the AF fails to allege falsity. (Armstrong Flooring, Inc.'s Memorandum of Points and Authorities i/s/o Motion to Dismiss Amended Complaint ["AF Motion"] at 9-19.) Because the falsity and scienter analyses become a "single inquiry," and "because falsity and scienter are generally inferred from the same set of facts," *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), Mr. Maier will not repeat the Company's discussion as to why these alleged misstatements (or omissions) fail to meet the exacting burden of pleading scienter. (AF Motion at 19-24.) Mr. Maier hereby incorporates AF's Memorandum of Points and Authorities In Support Of Its Motion to Dismiss to the extent it applies to him, but sets out further arguments below.

### C. The AC Fails To Allege Particularized Facts Showing A False Or Misleading Statement By Mr. Maier

The vast majority of challenged statements by Mr. Maier are statements of corporate optimism and forward-looking, particularly those he made on quarterly

-13-

earnings calls.  (*See*, *e.g.*, AC ¶¶ 75, 79, 82.)  But vague, optimistic statements that are not objectively verifiable are not actionable. (*See* AF's Memorandum of Points and Authorities i/s/o Its Motion to Dismiss ["AF Motion"] at 14-15.)  Forward-looking statements are also protected by the PSLRA's safe harbor, 15 U.S.C. § 78u-5(c). (*Id.* at 10-14, 15-18.)  Most significantly, the AC fails to adequately plead falsity and scienter.  (*Id.* at 9-19, 19-24.)

To the extent that the AC purports to challenge any actual statement of present fact, the AC also fails to show falsity. "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).  Plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  Falsity must be pled with "particularity." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002), *abrogated on other grounds by Tellabs,* 551 U.S. 308.

The AC fails to show that any alleged statement attributable to Mr. Maier was false when made. The complaint's treatment of AF's 2017 and 2018 Form 10-Ks illustrates these pleading defects.  For example, the AC alleges that a statement in AF's 2017 Form 10-K (describing distributors as "carry[ing] inventory as needed to meet local or rapid delivery requirements" (AC ¶¶ 70, 101), was "false and misleading" because distributors were "taking on substantially more inventory than they could sell in a year's time." (AC ¶¶ 71, 102.)  The 2017 Form 10-K was filed on March 6, 2018, months before the tariff issue arose. The AC identifies no instance before that date when the alleged "excess inventory" at issue existed.  In fact, the AC does not allege it existed before the third quarter of 2018.  (AC ¶¶ 10, 11, 12, 109.)

Plaintiff levels the same attack on similar language in AF's 2018 Form 10-K (dated March 5, 2019).  Viewed in its entirety, that filing expressly disclosed "[h]igher than normal inventory levels at distributors," and disclosed that such elevated inventory levels ***could impact sales in the first quarter of 2019, as could continued***

-14-

***uncertainty around tariffs from products imported from China.*"** (AF RJN, Ex. 7 at 19) (emphasis added). Moreover, the Company had repeatedly advised investors since the first tariff went into effect that inventory levels would, as expected, increase in anticipation of price increases.

"Plaintiff cannot sidestep the heightened pleading requirements for fraud by simply mischaracterizing [the documents on which it relies.]" *GIA-GMI, LLC v. Michener*, 2007 WL 2070280, at \*9 (N.D. Cal. July 16, 2007); *see also Xu v. ChinaCache Int'l Holdings Ltd.*, 2016 WL 4370030, at \*6 (C.D. Cal. Aug. 15, 2016) (Snyder, J.) (alleged misstatements "could not create a false impression" when they were "plucked from among contradictory statements"). Nor may Plaintiff 'select[] only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja v. Oxygen Therapeutics, Inc.,* 899 F.3d 988, 1002 (9th Cir. 2018). In ruling on this motion, the Court "may consider the full texts of documents which the complaint quotes only in part." *Cooper v. Pickett,* 137 F.3d 616, 623 (9th Cir. 1997).

### D. The AC Fails To Adequately Allege That Any Statements Attributable To Mr. Maier Were Made With Intent To Mislead Investors

To satisfy the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 319. While this inference "need not be irrefutable," it "must be more than merely 'reasonable' or 'permissible'— it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324. The complaint must show a false or misleading statement made either "intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009); *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). The AC pleads no particularized allegations that Mr. Maier acted with scienter.

-15-

**1. <u>The AC Fails To Allege That Any Statement By Mr. Maier Was Rendered False Or Misleading By The Impact "Excess Inventory" Would Have On "Future Sales For 2019"</u>**

Plaintiffs contends that certain statements made during Mr. Maier's tenure were rendered misleading because defendants failed to disclose what the impact of "excess inventory" would be in the future. According to the AC, these statements misled investors because defendants, including Mr. Maier, "knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019." (AC ¶¶ 88, 91, 97, 100, 111.)

This conclusory allegation falls short. The AC asserts only that a statement Mr. Maier made in response to an analyst's question on the November 6, 2018 earnings call shows he "knew the quantity by which [AF] was flooding the distribution channel" as of that time. (*See* AC ¶ 51.) The actual question posed by Michael Wood of Nomura Securities was: "Can you give a sense of how large effectively the prebuy was in LVT, Whether or not you stocked up inventories well in anticipation? And are you hearing of the China LVT supply chain adjusting to maybe moving to other countries in Asia in order to avoid tariff impact?" (AF RJN, Ex. 5 at 8.) Mr. Maier responded, in relevant part:

> So I prefer not to provide any quantification of [AF's prebuy from manufacturers] -- for competitive, sensitive reasons. We've been bringing in additional inventory because of the demand for our new products. And obviously, those orders [from China-based manufacturers] had been placed months and months before the announced tariffs. So we do believe that our distributors appropriately took advantage of the fact that they could buy ahead of the 10% tariff, but would not want to quantify that further for you. The -- as it relates to the supply chain, yes, there are other options external to China and a

-16-

number of the -- of our suppliers and others in China have announced their plans to broaden their base beyond China to alleviate the impact of the tariffs.  (AC ¶¶ 51, 143.)

Contrary to the inference the AC attempts to draw, Mr. Maier's response makes two things reasonably clear: First, he declined to disclose AF's *internal* order and purchases made before the tariffs went into effect.  Second, he did not "admit" he knew the amount of inventory *stockpiled* by distributors (including ex-China inventory from AF's competitors); he declined to give the analyst any "sense" as to the quantity of product purchased by distributors, in part because there were other sources external to China that could alleviate the impact of the tariffs.  (AC ¶¶ 51, 143.)

But even assuming Mr. Maier knew how much pre-bought product AF's distributors had stockpiled for future quarters, the AC does not identify the quantity at issue nor explain how that information, or any other data to which Mr. Maier had access, enabled him to estimate and predict that the quantity "would limit future sales for 2019" and "require over a year to sell down." Nor is there any allegation suggesting that Mr. Maier omitted disclosing such information in order to  mislead investors. Even if he had opined as to what the future might hold, such forward-looking statements are not actionable.  Indeed, had he attempted to quantify the effect of *distributor* pre-buying on 2019 sales, Plaintiffs no doubt would allege he misled investors had his forecasting turned out to be incorrect.

In other words, "[t]he complaint does not plead facts that show that company insiders knew what the complaint says 'would' occur in what was then the future." *See Ronconi*, 253 F.3d at 430.  What is needed (but missing) are "allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Id.* at 432.  Only then does the complaint "rais[e] a strong inference that the statements were intentionally false, misleading or made with deliberate recklessness." *Id.*

-17-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS AMENDED COMPLAINT

The scienter allegations here also resemble those found wanting in *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002). There, plaintiffs challenged a pharmaceutical company's CEO's statement that "sales were continuing to ramp up" as false because the data to which he had access indicated "flat patient demand." *Id.* at 1035. Plaintiffs claimed the CEO knew or was reckless in not knowing and failed to disclose that patient demand was flat. But, as the Ninth Circuit concluded, the complaint failed to "detail with particularity the content of such data . . . . [and] merely allege[d] that PathoGenesis tracked patient demand using data provided by IMS and that this data *supposedly indicated* that patient demand was flat." *Id.* at 1036 (emphasis added). It held that this failed to show even the minimal deliberate or conscious recklessness. *Id.* (noting rule that "negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA"); *see also Zucco*, 552 F.3d at 1000-1001 (holding that allegations that senior management closely reviewed accounting numbers and that top executives had several meetings to discuss quarterly inventory numbers "d[id] not support the inference that management was *in a position to know* that such data was being manipulated") (emphasis added).

The AC alleges that Mr. Maier also sought to conceal that AF "cannibalized future sales by over selling inventory into the channel" by allegedly "attribut[ing] increased sales into the Retail Channel to distributor orders that had been placed months before the U.S. announced tariffs." (AC ¶ 50.) This claim is based on this statement made during the November 6, 2018 earnings call: "'We've been bringing in additional inventory because of the demand for our new products. And obviously, those orders had been placed months and months before the announced tariffs.'" (AC ¶¶ 50, 143.)

As an initial matter, there is no factual support that AF purposefully "cannibalized future sales by over selling inventory into the channel." It is not even clear what, exactly, Plaintiff means by the term "cannibalize," other than to insinuate

-18-

that AF deliberately sought to inflate current quarter revenue. Nor does the AC explain what it means by the phrase "over selling inventory," particularly given that a foreseeable and appropriate consequence of anticipated tariffs is to buy product before the price increases, a point even Plaintiff concedes. Mr. Maier's statement, "we've been bringing in additional inventory," explicitly references AC's *own* flooring production based on the market's "demand" for AF's "new" and innovative flooring products. His statement on AF's own inventory says nothing about distributor buying activity, or "distributor orders." His statement that AF's "orders had been placed months and months before the announced tariffs" (AC ¶ 50) reflects the fact that sourcing and delivering Chinese product requires significant lead time, rather than compelling the conclusion that these orders were placed in reaction to demand based on anticipated tariffs. In any event, the AC sets forth no particularized allegations showing that that orders had been "placed months before the U.S. announced tariffs" was anything but true. The allegation that Mr. Maier made the statement for the purpose of concealing something has no factual basis.[4]

---

[4] The AC also attempts to show Mr. Maier's scienter using a statement allegedly made by defendant McWilliams, acting as interim CEO, on May 3, 2019 (the day after Mr. Maier allegedly left AF), in which he discussed the effect of "distributor inventory" on sales and added, "We expected this dynamic to impact the first quarter performance and it did." (AC ¶ 144.) Per the AC, by this statement, "Defendant McWilliams admitted during the 1Q 2019 earnings call that Defendants knew the 2018 overbuying would be a material drag on 2019 sales." (AC ¶ 144.) But this statement is not probative of Mr. Maier's scienter as Mr. Maier did not make the statement and the AC does not identify to whom the pronoun "we" refers. Even assuming it included Mr. Maier, the statement does not indicate *when* Mr. Maier formed his expectation and nothing suggests he formed it before November 6, 2018 or March 5, 2019 rather than after March 5, 2019 (the last date any misstatement is attributed to Mr. Maier).

-19-

**2.  The AC Fails To Allege Any Statements By Mr. Maier As To AF's "Go-To-Market" Strategy Were Knowingly False Or Misleading Or Made With Intent To Defraud**

The vast majority of statements (or omissions) attributed to Mr. Maier concerning AF's "go-to-market" and investment in commercial and national accounts are vague statements of opinion or corporate optimism that are not actionable.  There are also no allegations showing any statement was false or misleading when made.  (*See* AF Motion at pp. 14-19.)

Yet, according to the AC, Mr. Maier knew or recklessly disregarded that the "go-to-market" strategy was fatally flawed from the start, that distributors were incapable of taking on marketing and merchandizing responsibilities, and, as a result, there was no possibility of generating costs saving to invest in national retail and commercial accounts.  (AC ¶¶ 73, 77, 83, 85, 91, 100.)  At no point, however, does the AC even try to satisfy the PSLRA by alleging "'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi*, 253 F.3d at 432.

At most, the AC points to statements made by defendant Vermette on March 3, 2020 — nearly one year after Maier left AF — which the AC characterizes as revealing that the "go-to-market strategy" had not achieved the benefits anticipated and that investment by AF in its commercial and national account was, as of that date, minimal.  (AC ¶¶ 127, 128, 129, 131.)  This is pure "fraud by hindsight" pleading — the very practice Congress enacted the PSLRA to curb.  *Vantive*, 283 F.3d at 1084-85.  Vermette's statements do not pertain to conditions existing at any time other than as of March 3, 2020, and so are not relevant to the state of affairs existing before March 5, 2019 (the date of the last statement attributed to Mr. Maier in the AC).  *See Read-Rite.* 335 F.3d at 848 (9th Cir. 2003) ("It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood")

-20-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS AMENDED COMPLAINT

(citing *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999)). This was the situation in *Ronconi,* which held that "Honest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." *Ronconi,* 253 F.3d at 432.

### 3. The AC Fails To Show Mr. Maier Had Motive To Defraud Investors

The AC also seeks to show Mr. Maier's scienter by alleging motive. It does not allege he sold any AF stock during the alleged class period. It merely points to his alleged executive compensation. (AC ¶¶ 145-51.) The Ninth Circuit has held repeatedly that the absence of stock sales by insiders "supports the opposite inference" that the defendants acted without scienter. *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012); *accord Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018).

Executive compensation does not ordinarily suggest scienter. Only "[o]ccasionally" may it "be compelling enough." *Zucco*, 552 F.3d at 1004. And this happens only when the complaint shows "[a] strong correlation" between the subject matter of the alleged misstatement (*e.g.*, financial performance) and the individual defendant's compensation. *Id.* Hence, the compensation must not only be tied to or conditioned upon some relevant performance metric relating to the alleged misstatement, it must be based "principally" on it. *Zucco*, 552 F.3d at 1004 (internal citations omitted).

Here, the AC claims a "special retention time-based [RSU]" grant to certain executives, including Mr. Maier, shows a motive to commit fraud. (AC ¶ 145 (emphasis added).) But the AC itself concedes that the grant was only "intended to retain their talent" during "the shift caused by the go-to-market realignment." (AC ¶ 145.) No particularized allegation shows AF conditioned the RSU grant on anything other than Mr. Maier remaining an AF executive for a specific period of time, and so fails to show the RSU grant was correlated to the subject of any alleged fraud.

-21-

Although the AC alleges Mr. Maier could obtain the RSU award "as long as the Company continued to push forward the go-to-market realignment" (AC ¶ 147), the AC offers no particularized factual support for it.

The AC also alleges Mr. Maier "received compensation in 2018 valued at $4.3 million which almost doubled the compensation he had received during 2017" (AC ¶ 150.)  Again, however, the AC does not link it to any performance condition or metric relevant to the subject matter of any alleged misstatement or omission.  Plaintiff's allegation that Mr. Maier "was particularly motivated to mislead the market because… the board cut [his] salary by more than 60%" also fails because no linkage between the RSU and the success of the "go-to-market strategy" is made.  (AC ¶ 148.) The allegation that Mr. Maier received severance pay and pro-rated 2019 bonus upon leaving AF is likewise untethered.  (*See* AC ¶ 151.)

Plaintiffs' insinuation of wrongdoing by alleging "Maier left [AF] after the close of 2018 results" is unsupported by the alleged facts. (AC ¶¶ 13, 151). Further, evidence of resignation, without more, fails to show scienter.  *See Zucco,* 552 F.3d at 1002.

Taken collectively, none of the scienter allegations against Mr. Maier give rise to a strong inference of scienter.

### E.  The AC Fails To State A Section 20(a) Claim Against Mr. Maier

Count II purports to assert a Section 20(a) claim against Mr. Maier.  However, to state this claim, Plaintiff must first plead "a primary violation of federal securities laws." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Because Plaintiff fails to do so, the Section 20(a) claim also fails.

///

///

///

-22-

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS AMENDED COMPLAINT

## IV.   CONCLUSION

For the foregoing reasons, this Court should grant defendant Donald Maier's motion to dismiss the AC, without leave to amend.

Dated:  August 17, 2020

By        */s/David A. Schwarz*
             DAVID A. SCHWARZ
             JOHN M. LANDRY
             CHUNG H. CHAN

          Attorneys for DONALD MAIER

SMRH:4833-3771-6168.2

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION TO DISMISS AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action.  On August 17, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 17, 2020, at Torrance, California.

/s/Elisabeth Walters
Elisabeth Walters

-24-

SMRH:4833-3771-6168.2

DEFENDANT MAIER'S MEMORANDUM OF POINTS AND AUTHORITIES ISO
MOTION TO DISMISS AMENDED COMPLAINT