THE WAGNER FIRM
Avi Wagner (Cal Bar. No. 226688)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: 310-491-7949
Facsimile: 310-694-3967

*Liaison Counsel for Lead Plaintiff*
(Additional Counsel on signature page)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MICHAEL CHUPA, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARMSTRONG FLOORING, INC., MICHEL VERMETTE, DONALD MAIER, LARRY McWILLIAMS, DOUGLAS BINGHAM, DOMINIC RICE, and RONALD FORD,<br><br>Defendants. | Case No. 2:19-cv-09840-CAS<br><br>Judge:  Hon. Christina A. Snyder<br>Courtroom 8D – 8th Floor<br><br>**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Date: December 7, 2020<br>Time: 10 a.m.<br>Judge: Hon. Christina A. Snyder<br>Dept.: 8D |

# Table of Contents

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS .......................................................................................... 4

ARGUMENT .............................................................................................................. 6

I.    The Complaint Pleads Actionable Misstatements and Omissions ............... 7

    A.  Defendants' Misleading Statements about the Go-To-Market Strategy Are Actionable............................................................................ 7

    B.  Defendants Misled Investors Regarding Armstrong Flooring's Distributor Inventory Levels and Buying Behavior ...................................... 10

    C.  Defendants' Argument That the Alleged Statements Constitute Puffery Fails ...................................................................................... 11

    D.  The Safe Harbor Does Not Insulate Defendants from Liability ................. 13

        1.  Alleged Misstatements That Are Not Forward-Looking Are Outside the Safe Harbor Protection .......................................... 14

        2.  Defendants' Risk Language is Not Meaningful ..................................... 15

        3.  The Defendants Made Their Statements With Actual Knowledge of Their Falsity............................................................ 16

II.   The Allegations Support a Strong Inference of Scienter ........................... 17

    A.  Individual Defendants Knew the Underlying Facts Showing the Alleged Statements Were False and Misleading ...................................... 18

    B.  The Complaint Shows Corporate Scienter ................................................. 19

    C.  Defendants' Had a Motive and Opportunity to Commit Fraud .................. 21

    D.  Circumstances Surrounding Lead Plaintiff's Investigation Indicate Scienter ..................................................................................... 22

III.  The Complaint Adequately Pleads Loss Causation ................................... 23

IV.  The Complaint Sufficiently Alleges That the Individual Defendants Violated Section 20(a) ............................................................................... 25

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdo v. Fitzsimmons*,
   No. 17-CV-00851-EDL, 2017 WL 6994539 (N.D. Cal. Nov. 3, 2017) ................7

*Adam v. Silicon Valley Bancshares*,
   No. C 93-20399 RMW (EAI), 1994 WL 374314 (N.D. Cal. Apr. 18, 1994) 24, 25

*Amalgamated Bank v. Coca-Cola Co.*,
   No. CIV.A. 1:05-CV-1226, 2006 WL 2818973 (N.D. Ga. Sept. 29, 2006),
   *aff'd sub nom. Selbst v. Coca-Cola C*o., 262 F. App'x 177 (11th Cir. 2008).......12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................6, 11, 21

*Brendon v. Allegiant Travel Co.*,
   412 F. Supp. 3d 1244 (D. Nev. 2019) ...........................................................11, 21

*Bruce v. Suntech Power Holdings Co. Ltd.*,
   64 F. Supp. 3d 1365, 1377 (N.D. Cal. 2014).......................................................25

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018)..................................................................8

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012).................................................................12

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019)...........................................................21, 22

*Flynn v. Sientra, Inc.*,
   No. CV 15-07548 SJO (RAOx), 2016 WL 3360676 (C.D. Cal. June 9, 2016).....7

*Henning v. Orient Paper, Inc.*,
   No. CV 10-5887-VBF (AJWx), 2011 WL 2909322 (C.D. Cal. July 20, 2011) ....7

*In re Capstone Turbine Corp. Sec. Litig.*,
   No. CV 15-8914-DMG (RAOx), 2018 WL 836274 (C.D. Cal. Feb. 9, 2018) ....17

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
   No. CV 11-2768 PSG (SSx), 2012 WL 12893520 (C.D. Cal. Feb. 16, 2012).....24

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ...................................................................................14

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ..................................................................................24

*In re Energy Recovery Inc. Sec. Litig.*,
No. 15-CV-00265-EMC, 2016 WL 324150 (N.D. Cal. Jan. 27, 2016) ...............15

*In re Extreme Networks, Inc. Sec. Litig.*,
No. 15-CV-04883-BLF, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ..............9

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ....................................................................................6

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ...........................15

*In re ITT Educ. Servs., Sec. Litig.*,
34 F. Supp. 3d 298 (S.D.N.Y. 2014) .......................................................................13

*In re JDS Uniphase Corp. Sec. Litig.*,
238 F. Supp. 2d 1127 (N.D. Cal. 2002).................................................................23

*In re Nimble Storage, Inc. Sec. Litig.*,
756 F. App'x 779 (9th Cir. 2019) ............................................................................12

*In re Nuko Info. Sys., Inc. Sec. Litig.*,
199 F.R.D. 338 (N.D. Cal. 2000) ............................................................................21

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..........................................................................14, 15

*In re STEC Inc. Sec. Litig.*,
No. SACV 09-1304-JVS(MLGx), 2011 WL 2669217 (C.D. Cal. June 17, 2011)
.........................................................................................................................13, 16

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
No. MDL 2672 CRB (JSC), 2017 WL 3058563 (N.D. Cal. July 19, 2017)........19

*In re XM Satellite Radio Holdings Sec. Litig.*,
479 F. Supp. 2d 165 (D.D.C. 2007).......................................................................12

*Kirola v. City & Cty. of San Francisco*,
860 F.3d 1164 (9th Cir. 2017) ................................................................................25

LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS'
MOTIONS TO DISMISS

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ................................................................................................6

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
  No. CV15-1156-PHX-DGC, 2018 WL 6181241 (D. Ariz. Nov. 27, 2018) ........16

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018), *cert. denied,* 139 S. Ct. 2741 (2019) ...................23

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014)....................................................................12

*Murphy v. Precision Castparts Corp.*,
  No. 3:16-CV-00521-SB, 2017 WL 3084274 (D. Or. June 27, 2017),
  *report and recommendation adopted*,
  No. 3:16-CV-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22, 2017) .................10

*New Orleans Employees Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011)..............................................................................20

*Nguyen v. Radient Pharm. Corp.*,
  946 F. Supp. 2d 1025 (C.D. Cal. 2013)..................................................................24

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
  No. CV 13-08440 MMM (SHx), 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) 21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ...............................................................................14

*Resh v. China Agritech, Inc.*,
  No. 2:14-CV-05083-RGK-PJW, 2019 WL 1055240 (C.D. Cal. Jan. 8, 2019)....17

*Rezvani v. Jones*,
  No. 2:18-CV-06244-CAS (Ex), 2018 WL 6680568 (C.D. Cal. Dec. 17, 2018)..16

*Roberts v. Zuora, Inc.*,
  No. 19-CV-03422-SI, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ...................9

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ...................................................................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................6, 17, 21

Case No. 2:19-cv-09840-CAS
LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS'
MOTIONS TO DISMISS

*Thomas v. Magnachip Semiconductor Corp.*,
 167 F. Supp. 3d 1029 (N.D. Cal. 2016)...............................................................22

*Todd v. STAAR Surgical Co.*,
 No. CV-14-05263-MWF-RZ, 2016 WL 6699284 (C.D. Cal. Apr. 12, 2016).... 13

*Xu v. Chinacache Int'l Holdings Ltd.*,
 No. 2:15-07952-CAS (RAOx),
 2016 WL 4370030 (C.D. Cal. Aug. 15, 2016) ............................................. 12, 13

*Xu v. ChinaCache Int'l Holdings Ltd.*,
 No. CV15-07952-CAS (RAOx), 2017 WL 114401 (C.D. Cal. Jan. 9, 2017) .....13

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A) ....................................................................................17

15 U.S.C. § 78u-4(b)(3)(B).....................................................................................23

15 U.S.C. § 78u-5(c)(1) ..........................................................................................16

15 U.S.C. § 78u-5(c)(1)(A)(i)..................................................................................13

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................................6

Case No. 2:19-cv-09840-CAS
LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS'
MOTIONS TO DISMISS

Lead Plaintiff Randy Marker submits this omnibus memorandum of law in opposition to the motions to dismiss the Amended Complaint (ECF No. 57) ("Complaint")[1] filed by all Defendants: Armstrong Flooring, Inc. ("Armstrong Flooring"), Michel Vermette, Larry McWilliams, and Dominic Rice (ECF No. 67); Defendant Ronald Ford (ECF No. 70); Defendant Donald Maier (ECF No. 72); and, Defendant Douglas Bingham (ECF No. 81).

## INTRODUCTION

Defendants told investors they would grow Armstrong Flooring by employing a Go-To-Market Strategy, representing that the plan was to cut costs by foisting marketing responsibilities for their residential products upon third-party distributors and investing in servicing commercial and national accounts. Their representations concealed undisclosed fatal flaws from day one.

During the Class Period, Defendants told investors the Go-To-Market Strategy was proceeding well. Indeed, the 2018 financial outlook seemed promising, as was reflected in the inflated stock prices paid by investors. Defendants, however, knew that their distributors were not equipped to become a marketing department for Armstrong Flooring. Defendants also knew that the distributors were acquiring far more Armstrong Flooring inventory than they could sell in 2018 and 2019. Moreover, Defendants actively concealed from investors that their sales channel was flooded with Armstrong Flooring inventory even though Maier admitted in 2018 that Defendants knew the quantity of inventory being

---

[1] Capitalized terms not otherwise defined are defined in the Complaint.

bought.  Later, Defendant McWilliams also revealed, that during the Class Period, Defendants expected overbuying in 2018 "to impact first quarter [2019] performance and it did." ¶ 11

Compounding the issues in the residential sales channel was that commercial and national accounts –touted as key revenue and growth drivers – were not growing or being properly serviced.  Contrary to Defendants' statements that the Go-To-Market strategy "has allowed us to allocate more of our marketing and sales efforts on commercial and national accounts" – they did not so allocate resources. In fact, a principle reason Defendants Vermette belatedly identified as why the Company was performing poorly in 2019 was because Defendants kept a staff of only two people to service and market to thousands of commercial and national accounts.

Investors reacted negatively when they learned they were misled about the Go-To-Market Strategy's failure for all aspects of Armstrong Flooring's sales: residential, commercial, and national.  As a result of Defendants' disclosures, investors suffered damages as Armstrong Flooring's stock price fell approximately 85% between March 6, 2019 through March 3, 2020.

Defendants seek to dismiss the Complaint arguing that that it does not plead falsity, scienter, and loss causation.  But each argument fails when analyzing the allegations and the admissions made by Defendants about their knowledge of the facts at the time of each misleading statement.  In fact, Individual Defendants, as senior management, participated in the fraud from the beginning of the Class

-2-

Period.[2]  But notably, Defendant Maier, took full advantage of his knowledge of the Go-To-Market Strategy failures by leaving the Company and collecting his bonus before the market learned that overselling in 2018 and marketing failures sabotaged 2019 financial results.   The remaining Individual Defendants were left to deal with the problems at Armstrong Flooring and falsely told investors all was under control until the last day of the Class Period.

A propensity to cover-up for the Company seems to have continued.  During the investigation of this action, former Armstrong Flooring employees have been advised that they should not provide information concerning actions observed during the Class Period under the potential threat of legal recourse.  Nevertheless, Defendants' admissions and the facts known to date as alleged in the Complaint, are enough to form a basis for this cause of action.  Accordingly, the motions to dismiss should be denied and this action should proceed to discovery.

---

[2] This Omnibus Opposition responds to all motions at ECF Nos. 67 (motion to dismiss filed by Defendant Armstrong Flooring, Michel Vermette, Larry McWilliams, and Donald Rice), 70 (motion to dismiss filed by Defendant Ronald Ford), 72 (motion to dismiss filed by Defendant Donald Maier), and 81 (motion to dismiss filed by Defendant Douglas Bingham). Each Defendant asserts similar arguments seeking dismissal.  One notable exception is the time periods for which each Defendant is liable, the parsing of which is unwarranted.

Case No. 2:19-cv-09840-CAS

LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS' MOTIONS TO DISMISS

## STATEMENT OF FACTS[3]

Immediately prior to the Class Period of March 6, 2018 through March 3, 2020, the Company was not meeting its financial benchmarks, which resulted in substantial cuts to executive bonus compensation. ¶ 13.   Then in January 2018, Defendants instituted a new Go-To-Market Strategy, whereby Armstrong Flooring would rely on its distributors to market and sell its residential products.  ¶ 6, 145. Defendants also represented that the Go-To-Market Strategy would cut costs and allow the Company to invest in servicing and growing revenue from commercial and national accounts.  ¶ 44.  The Company indicated that servicing national and commercial accounts was key to substantially increasing profits. ¶¶ 44, 59.

Analysts focused on the Go-To-Market Strategy and questioned Defendants about its progress, and the effects it was having on the Company and on its customers.  ¶¶ 62, 74, 78, 81,112.  Throughout the Class Period, the Individual Defendants represented to shareholders that the Go-To-Market Strategy was being successfully implemented and that the Company was reinvesting the savings from its Go-To-Market Strategy into servicing its commercial and national accounts.  ¶¶ 57-63; 64-69; 90.

---

[3] *See generally* the Complaint for a full recitation of the applicable facts.

LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS' MOTIONS TO DISMISS

**Defendants Cannibalize 2019 Sales and Fail to Invest in Commercial and National Accounts**

In 2018, distributors began purchasing large quantities of Armstrong Flooring near the time of reports concerning potential tariffs on goods from China. ¶ 10. Defendants were aware that its distributors were purchasing more inventory than the Distributors could sell in a year. ¶ 11.  Defendant Maier told investors that they knew the amount of buying, but would not tell investors the exact quantities that distributors were buying.  ¶ 51.  The inventory sold into the distribution channel hobbled Armstrong Flooring's ability to sell any additional inventory to distributors throughout 2019, as the excess inventory needed to be worked down for months.  ¶ 49.  This excess inventory would cost the Company sales in future quarters and ultimately force Armstrong Flooring to halve its 2019 projections. ¶ 56.   Even worse, Defendants did not invest in national and commercial accounts, leaving a staff of two to service thousands of accounts.

**The Market Learns the Truth**

On March 5, 2019 the Company revealed that there were substantially elevated inventory levels in the distributor channel, which contributed to the Company's decrease in net sales. ¶ 157.  Two months later, the Company revealed that the "elevated inventory levels in the channel" which it hoped to be worked down in 2019.  ¶ 158.   Then, on November 5, 2019, Armstrong Flooring revealed that the Company was not growing and that the Defendants had pushed more inventory into the channel in 2018 than distributors could sell in a year.  ¶ 159.

The price of Armstrong Flooring securities fell even more on March 3, 2020,

when Defendants revealed that for the past year, Defendants had not invested in a key revenue driver and purpose of the Go-To-Market Strategy:  marketing for national and commercial accounts. ¶ 160.

## ARGUMENT

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must consider the complaint in its entirety, "accept all factual allegations…as true," and construe them in the light most favorable to the plaintiffs.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).   The Ninth Circuit has cautioned that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).   Thus, at the pleading stage, a plaintiff "need only allege 'enough facts to state a claim for relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

To state a claim pursuant to Section 10(b) of the Exchange Act, plaintiffs must plead: (i) a material misrepresentation or omission, (ii) scienter, (iii) a connection between the material misrepresentation or omission and the purchase or sale of a security; (iv) reliance, (v) economic loss, and (vi) loss causation. *Schueneman v, Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016).   Here, Defendants contest falsity, scienter, and loss causation.  Defendants' arguments fail

on each count.[4]

## I. The Complaint Pleads Actionable Misstatements and Omissions

### A. Defendants' Misleading Statements about the Go-To-Market Strategy Are Actionable

Plaintiff adequately alleges that Defendants misled investors about the Go-To-Market Strategy.  Specifically, Defendants made material misstatements and omissions of material fact regarding Armstrong Flooring's:  (i) reallocation of marketing and sales efforts towards commercial and national accounts (*see e.g.*, ¶¶ 68, 84, 99); (ii) distributors' ability to execute on the Go-To-Market Strategy (*see e.g.*, ¶¶ 90, 99); and (iii) transition to the Go-To-Market Strategy (*See e.g.*, ¶ 113).

First, Defendants made misstatements about Armstrong Flooring's investments in marketing and sales for the Company's commercial and national accounts.  For example, on November 6, 2018, Defendant Maier stated: "[a]s previously announced, in the third quarter, we began to allocate more of our marketing spend to commercial and national accounts[.]" ¶ 90; *see also* ¶ 99 ("in 2018 we completed our go-to-market pivot, ***which has allowed us to allocate more of our marketing and sales efforts on commercial and national accounts***[.]")

---

[4] Defendants also argue that the Amended Complaint is a "puzzle pleading." *See* Defendants Motion to Dismiss (ECF No. 67) ("Mot.") at 9. Contrary to the Defendants' contention, the Amended Complaint alleges the "who, what, when, where, how and why" of every material misstatement and omission, including the reasons why the Defendants conduct was misleading. *Henning v. Orient Paper, Inc.*, No. CV 10-5887-VBF (AJWx), 2011 WL 2909322, at *2 (C.D. Cal. July 20, 2011).  Courts have repeatedly found the Complaint's style of pleading permissible. *See e.g., Flynn v. Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 WL 3360676, at *9 (C.D. Cal. June 9, 2016); *Abdo v. Fitzsimmons*, No. 17-CV-00851-EDL, 2017 WL 6994539, at *7 (N.D. Cal. Nov. 3, 2017).

These statements were false and misleading because Armstrong Flooring had made no meaningful investments in servicing their commercial and national accounts. Defendant Vermette on the last day of the Class Period admitted that business throughout the Class Period suffered because: "We had 2 people calling on hundreds of large builders and contractors. We had one person calling on commercial national accounts. We had one person dedicated to calling 13,000 independent retailers." ¶ 127. Indeed, courts have upheld similar allegations concerning the failure to allocate corporate resources in analogous circumstances. In *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1041 (N.D. Cal. 2018) the plaintiffs alleged that RH led the market to believe that it made "meaningful inventory investments in RH Modern" despite the fact that RH failed to order necessary inventory for the launch in a timely manner. *Id.* at 1040.

Second, Defendants misrepresented the abilities of the Company's distributors to execute the Go-To-Market Strategy. For example, Maier told investors that Armstrong Flooring was "working very closely with [its] distributors" and that there was "good progress" on the Go-To-Market Strategy. ¶ 79. These statements, however, were misleading because Maier and Vermette knew Armstrong Flooring's distributors were incapable of executing on this strategy as they were given roles for which the Company was better suited. *See* ¶ 128. Statements relating to key corporate strategies are actionable when, as here, Defendants do not have a reasonable basis to believe the strategy will succeeded due

LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS' MOTIONS TO DISMISS

to undisclosed facts learned from closely working with the distributors. *See Roberts v. Zuora, Inc.*, No. 19-CV-03422-SI, 2020 WL 2042244, at *9-*10 (N.D. Cal. Apr. 28, 2020) (finding statements regarding product integrations and growth strategy were actionable when plaintiffs alleged that defendants lacked a reasonable basis to believe in the success of the integrations).

Third, Defendants also misrepresented Armstrong Flooring's transition to its Go-To-Market Strategy. *See, e.g.*, ¶ 99 (Maier stated that "[o]n the residential side, the transition has been smooth, and our distributors are in a position to provide the merchandising support for their retail customers, customized to their local needs"). Likewise, Defendant Rice stated that the "transition has gone very smoothly, and we're very satisfied with the progress we're making there." ¶ 113.  In reality, the transition was going anything but smoothly as the Company's distributors were being pushed into taking on substantially more responsibility, which they could not manage. *See In re Extreme Networks, Inc. Sec., Litig.*, No. 15-CV-04883-BLF, 2018 WL 1411129, at *17-8 (N.D. Cal. Mar. 21, 2018) (upholding allegations that defendants' statements that an integration was "on track" and "ahead of plan" were misleading because the plaintiff alleged that the "dust had not settled from the integration," and the company was still going through "a period of adjustment.").

## B.   Defendants Misled Investors Regarding Armstrong Flooring's Distributor Inventory Levels and Buying Behavior

Defendants misled investors about Armstrong Flooring's distributor inventory levels and buying behavior.  Defendants, including Defendants Maier, Ford[5] and Bingham represented that Armstrong Flooring's distributors only carried inventory "as needed to meet local or rapid delivery requirements." *See* ¶¶ 70, 101.  But Armstrong Flooring's distributors were not purchasing inventory on an "as needed" basis; rather, they had substantially stocked up on inventory in advance of proposed tariffs and could not sell those goods. ¶ 109.

Defendants' statements about Armstrong Flooring's inventory buildup in the residential channel were also misleading.  Defendant McWilliams stated on August 6, 2019, that the Company's customers had "continued to reduce inventory from elevated levels in previous quarters," which "represented the tail end of demand pull-forward into 2018, ahead of the initial wave of tariffs on Chinese imports implemented late last year." ¶ 117.  On the same call, Defendant Bingham stated that "[i]n the distributor channel, we believe the customers have largely worked down unusually high levels of inventory purchased ahead of tariffs on Chinese imports last year." ¶ 118.[6]  When the Company later disclosed its negative FY2019

---

[5] Plaintiff agrees with Defendant Ford that he signed the 2017 10-K, during the Class Period, which contained an identical statement to the 2018 10-K, and not the 2018 10-K.

[6] *See Murphy v. Precision Castparts Corp.*, No. 3:16-CV-00521-SB, 2017 WL 3084274, at *11-12 (D. Or. June 27, 2017), (finding the statement "as we go into Q4, Q1 … that de-stocking goes away and [demand] comes back to the normal

-10-

outlook, analysts immediately recognized Defendants misled investors. Analysts noted the magnitude of the inventory issue and that it was unbelievable that guidance was so far off given "you [Armstrong Flooring] were five weeks through the third quarter and you're cutting guidance by a significant amount[.]" ¶¶ 122, 123.

Defendants argue that their distributors' inventory buildup was disclosed to investors. Mot. at 9. But Defendants failed to disclose that their distributors were no longer purchasing inventory on an "as needed" basis as the Armstrong Flooring had represented to investors. In addition, according to Defendants, this over-buying was the result solely of pre-tariff buying by distributors. That misses the point – Armstrong Flooring's distributors were buying inventory well in excess of their needs and no longer carrying the amount of inventory required to meet their immediate needs. Armstrong Flooring did not disclose to investors that distributors would warehouse inventory for over a year had fundamentally changed and failed to correct its false representations.

### C.   Defendants' Argument That the Alleged Statements Constitute Puffery Fails

Defendants argue that the statements concerning their Go-To Market strategy are puffery. The statements Defendants call puffery, however, were material to investors as they go to the heart of the Go-To Market strategy and were empirically verifiable. *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1257 (D. Nev. 2019) ("Statements by a company that are capable of objective verification are not rates" was actionable), *report and recommendation adopted,* No. 3:16-cv-00521-SB, 2017 WL 3610523 (D. Or. Aug. 22, 2017).

-11-

puffery and can constitute material misrepresentations.") [7]

Here, the challenged statements are objectively verifiable and thus, not puffery. For example, Defendant Maier stated that the Company "began to allocate more of our marketing spend to commercial and national accounts." ¶¶ 90, 99.[8] These statements are easily objectively verifiable by comparing the marketing spend from previous quarters and monitoring the speed at which the Go-To Market strategy was hitting its milestones. Additionally, Defendants' statements regarding their distributors' capabilities and the success of the Company's Go-To Market Strategy were also verifiable using metrics and benchmarks.[9] As a result,

---

[7] Moreover, it is improper to determine puffery issues on a motion to dismiss, as "determining whether a given statement is material entail[s] fact-intensive assessments that are more properly left to the jury. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).

[8] Defendants reliance on *In re XM Satellite Radio Holdings Securities Litigation*, 479 F. Supp. 2d 165, 180 (D.D.C. 2007) and *Amalgamated Bank v. Coca-Cola Co.*, No. Civ.A. 1:05-CV-1226, 2006 WL 281973, at *7-8 (N.D. Ga. Sept. 29, 2006), *aff'd sub nom. Selbst v. Coca-Cola Co.*, 262 F. App'x 177 (11th Cir. 2008) is misplaced, especially in light of the statement made in ¶ 90. Indeed, the statements made in the *XM Satellite Radio Holdings* case were focused on the Company's pursuit of a business plan designed to increase subscribers while reducing its acquisition costs – which is very different from the Defendants representation that they were allocating more of their marketing spend towards national accounts. Similarly, Defendants reliance on *Amalgamated Bank* is misplaced as the statements alleged to be false and misleading in *Amalgamated Bank* were focused on vague assertions that the company had solid improvements in marketing whereas the defendants in the present case made a definitive statement that they were allocating more resources towards marketing to national accounts when in fact they were not.

[9] Defendants other cited cases fare no better because they only contained general statements of corporate optimism that are not present here. *See In re Nimble Storage, Inc., Sec. Litig.*, 756 F. App'x 779, 780 (9th Cir. 2019) *(*statement prefaced

-12-

Defendants' citation to *Xu v. ChinaCache Int'l Holdings Ltd.*, No. CV15-07952-CAS(RAOx), 2017 WL 114401, at *8 (C.D. Cal. Jan. 9, 2017) is not analogous as the puffing statements there were mere claims touting enhanced services.

### D.     The Safe Harbor Does Not Insulate Defendants from Liability

The PSLRA' safe harbor bars liability for forward-looking statements that would otherwise violate § 10(b) only where those statements are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i); *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304-JVS(MLGx), 2011 WL 2669217, at *9 (C.D. Cal. June 17, 2011).

Significantly, "the safe harbor is dependent on what the defendant knows at the time of the statement; cautionary language is meaningful only when it discloses the known risks of the statement's falsity and statements are forward-looking only if they are not false when made." *In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 306 (S.D.N.Y. 2014); *Todd v. STAAR Surgical*, No. CV-14-05263-MWF-RZ, 2016 WL 6699284, at *10-11 (C.D. Cal. July 20, 2016) ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made").  Here, the safe harbor protects none of Defendants'

---

with "I think" a classic opinion lead-in)*; City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063-64 (N.D. Cal. 2012) (statement of "good underlying market fundamentals, strong balance sheet, and a solid operating model")*; Xu v. Chinacache Int'l Holdings Ltd.*, No. 2:15-07952-CAS (RAOx), 2016 WL 4370030, at *7 (C.D. Cal. Aug. 15, 2016) *("ChinaCache I")* (statement regarding a migration that was "on track" to be completed in the future).

misstatements.[10]

### 1. Alleged Misstatements That Are Not Forward-Looking Are Outside the Safe Harbor Protection

Defendants' numerous misrepresentations of present facts and past statements of fact are not protected under the safe harbor. *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). For example, the following misstatements are not forward looking: "[go-to-market pivot] has allowed us to allocate more of our marketing and sales efforts on commercial and national accounts ….. on the residential side the transition has been smooth…." ¶ 99; "[a]s previously announced, in the third quarter, we began to allocate more of our marketing spend to commercial and national accounts[.]" ¶ 90; "our distributors carry inventory as needed" ¶ 70; "strategic initiatives *are on track* to accelerate net sales growth"; "We are making good progress" ¶ 76; "we're increasing our focus on our commercial business …as well as national retailers …."; ¶ 79 "I would say the capabilities of our distributors are all very good. Some of them are excellent" ¶ 82; and "we are excited to focus more of our marketing spend on commercial and national accounts" ¶ 84; and "[distributors] are best positioned to support our

---

[10] Defendants rely on a variety of cases in support of their argument that these statements are protected by the safe harbor, but those cases are inapposite because they concerned future projections rather than past or present statements of fact which is what is alleged in the present case. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (the Court held that the vast majority of the defendants statements were protected by the PSLRA's safe harbor because they were focused on growth and revenue); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (an "earnings projection is by definition a forward-looking statement.")

growth strategy" ¶ 90. The safe harbor cannot apply to these statements.

### 2.   Defendants' Risk Language is Not Meaningful

Even for those misstatements that can be construed as forward-looking, Defendants' purported risk language is inadequate to render them harmless.[11]

Defendants only provided investors with the vaguest of cautionary language concerning statements alleged in the Complaint.  *See* Mot. at 11.  Specifically, the cautionary language the Defendants' rely on consists of: "we will be making forward-looking statements that involve risks and uncertainties" and that "[a]ctual outcomes may differ materially from those expected or implied[.]" This is not sufficient to advise investors that Defendants flooded the channel with inventory and did not invest in commercial and national accounts. *See In re Energy Recovery Inc. Sec. Litig.*, No. 15-CV-00265-EMC, 2016 WL 324150, at *18 (N.D. Cal. Jan. 27, 2016) (generic risk language does not protect the Defendants statements even if they were forward-looking); *see, also In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128, at *1 (E.D. Pa. Mar. 25, 2020) ("[b]ecause Defendants' boilerplate cautionary language accompanying their allegedly forward -looking statements to potential investors is unmeaningful, the PSLRA's "Safe Harbor" provision is inapplicable").

Moreover, Defendants' cited cautionary language regarding the Go-To-Market Strategy does not contain disclosures of "numerous business risks" (Mot. at

---

[11] Notably, as to statements that misrepresented past or present facts with representations about the future, the safe harbor does not protect the portion of the statement comprised of misrepresented past or present facts.  *See In re Quality Sys.*, 865 F.3d at 1150.

Case No. 2:19-cv-09840-CAS
LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS' MOTIONS TO DISMISS

16) that are directly related to Plaintiff's allegations as it does not address: (i) the Company's failure to allocate additional marketing resources to its commercial and national accounts; and (ii) distributors inability to execute on the Go-To-Market Strategy.

Thus, this cautionary language fails the safe harbor requirements and is inadequate to protect any of the Defendants statements. *Maverick Fund, L.D.C. v. First Solar, Inc.*, No. CV15-1156-PHX-DGC, 2018 WL 6181241, at *7-8 (D. Ariz. Nov. 27, 2018) (holding cautionary language that is not related to plaintiffs allegation cannot be used to insulate the defendants from liability).

### 3. The Defendants Made Their Statements With Actual Knowledge of Their Falsity.

If any forward-looking statement had an applicable warning, which they do not, the safe harbor would still be unavailable because Defendants had actual knowledge of the falsity of their forward-looking statements. *See* ¶¶ 47-69; 15 U.S.C. 78u-5(c)(1) (safe harbor provides no protection for statement made "with actual knowledge" of its falsity); *see In re STEC*, 2011 WL 2669217, at *10.

Moreover, Defendants' reliance on *Rezvani v. Jones*, No. 2:18-CV-06244-CAS (Ex), 2018 WL 6680568 (C.D. Cal. Dec. 17, 2018) is flawed. In *Rezvani* the plaintiff failed to allege "actual knowledge" for the defendants' forward-looking statements. The plaintiff made a bald allegation that the Defendant "knew his representations to [plaintiff] were false when he made them," which did not suffice. 2018 WL 6680568, at *7. Here, Plaintiffs have alleged that the Defendants (i) admitted they knew the true facts underlying the false statements; (ii) were directly

-16-

involved implementing and supervising the Go-To Market strategy as reflected in calls with market analysts (¶ 79); (iii) knew the progress of the Go-To-Market Strategy effected Armstrong Flooring's core business; (iv) were motivated and seized on opportunities to commit fraud. ¶¶ 133-151; *see infra* Section II. These allegations show that Defendants had actual knowledge of the failures of the Go-To-Market Strategy.

## II.   The Allegations Support a Strong Inference of Scienter

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A plaintiff can sufficiently allege scienter by showing either: (1) strong circumstantial evidence of conscious misbehavior or recklessness; or (2) that defendants had motive and opportunity to commit fraud. *See, e.g.*, *In re Capstone Turbine Corp. Sec. Litig.*, No. CV 15-8914-DMG (RAOx), 2018 WL 836274, at *5 (C.D. Cal. Feb. 9, 2018). Significantly, "[t]he inquiry … is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. Although the inference of scienter "must be cogent and compelling," it "need not be irrefutable…or even the 'most plausible of competing inference[s],'" but "at least as likely as any plausible opposing inference." 551 U.S. at 308, 324, 328. Thus, a tie will go to the plaintiff. *Resh v. China Agritech, Inc.*, No. 2:14-CV-05083-RGK-PJW, 2019 WL 1055240, at *5 (C.D. Cal. Jan. 8, 2019).

### A.    Individual Defendants Knew the Underlying Facts Showing the Alleged Statements Were False and Misleading

Throughout the Class Period, the Individual Defendants knew and/or recklessly disregarded that while they assured investors that distributors purchased inventory as needed, and that the Go-To-Market Strategy was proceeding well – neither was true. Multiple responses by Defendants to analysts' questions during conference calls with investors demonstrate Defendants knew this. In particular, Defendants were aware they were flooding the sales channel with inventory well over customer demand, which was siphoning future sales from 2019. In fact, Defendant Maier told investors that Defendants were aware of the amounts distributors were buying "but [he] would not want to quantify that further for you [investors]" and "prefer[ed] not to provide quantification." ¶ 11 Defendant McWilliams later stated that overbuying in 2018 elevated distributors' inventories and admitted that Defendants "expected this dynamic to impact first quarter [2019] performance and it did [2019 suffered with poor sales]."

In addition, Defendants knew that though they told investors the cost savings from the Go-To-Market Strategy was allowing the Company to focus resources to drive growth with commercial and national customers, Armstrong Flooring did not invest in personnel to service or market to those accounts. Specifically, Defendant Maier told investors that Armstrong Flooring had "a realignment of our sales and marketing efforts to focus more heavily on commercial and national accounts in 2018." However, Maier and Defendants knew or recklessly disregarded that Armstrong Flooring only had one person calling on commercial national accounts

and one person calling on 13,000 independent retailers. ¶ 69. The Company later admitted that its failure to focus on sales and marketing for commercial accounts during the Class Period was a material reason why Armstrong Flooring's financial performance was below analysts' expectations.

Accordingly, Defendants' own statements show they knew or recklessly disregarded their misstatements and omissions would mislead investors.

### B.    The Complaint Shows Corporate Scienter

The Complaint shows that Defendants knew or recklessly disregarded that they were making material misstatements to investors on behalf of Armstrong Flooring. Specifically, Lead Plaintiff alleges that: (i) Defendants knew the negative issues with the Go-To Market Strategy because it was critical for Armstrong Flooring (*See* ¶¶ 65, 84); (ii) the Individual Defendants were knowledgeable about the issues with the Go-To-Market Strategy and repeatedly answered analyst questions regarding the Go-To-Market Strategy and distributor inventory (*See* ¶¶ 141-44); and (iii) the fraud directly affected Armstrong Flooring's core operations (*See* ¶¶ 137-40).

It is indisputable that the Go-To-Market Strategy was critical to the Company. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Products Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 3058563, at *10 (N.D. Cal. July 19, 2017) (noting that the importance of a strategy to a company is probative of scienter). Defendants viewed this strategy as a means to fundamentally transform the Company, claiming that the 'Go-To-Market Strategy' was a way to sell higher growth products in order to substantially increase profits. ¶ 59. It was Armstrong

Case No. 2:19-cv-09840-CAS

LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS'
MOTIONS TO DISMISS

Flooring's key to ending its lackluster financial performance by adjusting the Company's relationship with its distributors to which the Company sold 80% of its inventory. ¶ 39.   The progress and result of this strategy were well known by Defendants. Thus, it is undeniable that the Go-To-Market Strategy was crucial to the Company and its importance supports a strong inference of scienter.

The Individual Defendants also demonstrated their knowledge about issues concerning the Go-To-Market Strategy during conference calls with investors. Individual Defendants fielded multiple questions from analysts regarding the Go-To-Market Strategy and the distributors' excess inventory.   ¶¶ 62, 78, 81, 112, 131. The Individual Defendants demonstrated they were closely supervising the strategy, which strongly supports their knowledge of issues with its implementation. ¶79 (Defendant Maier: "We've been working very closely with our distributors."). *See, also New Orleans Emp. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 & n.3 (2d Cir. 2011) (analysts' inquiries about inventory probative of defendants' knowledge about inventory).

The Individual Defendants responsibilities at Armstrong Flooring also support an inference of knowledge of issues with the Go-To-Market Strategy. The Individual Defendants occupied the highest positions at the Company.  Defendant Maier, McWilliams and Vermette all occupied the CEO office. Defendant Ford and Bingham were the Company's CFOs.   These positions gave the Individual Defendants access to information that alerted them to the falsity of their misstatements.  Accordingly it is inconceivable that Defendants were unaware of the

facts showing the statement and omissions were misleading These allegations support a strong inference of scienter.[12]  *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019).[13]

### C.    Defendants' Had a Motive and Opportunity to Commit Fraud

Defendants also had the motive and opportunity to commit the fraud alleged, which is probative of scienter.  *In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 343 (N.D. Cal. 2000).  Motive allegations can strengthen allegations of conscious misbehavior and recklessness.  *See Tellabs*, 551 U.S. at 323.

Here, Defendant Maier was uniquely motivated to misrepresent Armstrong Flooring's prospects.  Leading investors to believe that the Go-To-Market Strategy was working and that sales projections were sustainable directly benefited Maier.  Maier received a substantial bonus upon departure – especially when compared to his 2017 bonus compensation of zero when the Company did not meet 2017 financial benchmarks. ¶ 13.  Indeed, Maier strategically left the Company prior to the end of 2019, likely because the overselling of inventory in 2018 and the failure

___

[12] Defendants arguments that the alleged misstatements cannot support a strong inference of scienter under a core operations theory fails.  Lead Plaintiff has adequately pleaded that the Go-To-Market Strategy was so critically important to Armstrong Flooring and that this strategy was material to shareholders and the Company which supports a strong inference of scienter. *See Brendon*, 412 F. Supp. 3d at 1261.

[13] Defendants reliance on *Oklahoma Firefighters Pension & Retirement System v. Ixia*, No. CV 13-08440 MMM (SHx), 2015 WL 1775221, at *30 (C.D. Cal. Apr. 14, 2015) is unavailing.  In *Oklahoma Firefighters* the business segment where the fraud arose only accounted for less than 20% of the Company's revenue.  Here, a material portion of Armstrong Flooring's revenue was dependent on the Go-To-Market Strategy. ¶ 138.

to invest in marketing to commercial and national accounts doomed Armstrong Flooring's financial performance for 2019.

Defendants were also motivated to commit fraud as they stood to receive substantial compensation from their special retention time-based restricted stock units ("RSUs"), which they received in connection with the shift to the Go-To-Market Strategy. *McKesson Corp.*, 411 F. Supp. 3d at 603 (Particularized allegations regarding the correlation between financial results and stock options or cash bonuses are necessary to plead a sufficiently strong correlation). The RSUs grants were specifically intended to retain the Company's talent during the shift caused by the new Go-To-Market Strategy. ¶ 145. The Company specifically stated that as it was shifting its "residential marketing and merchandizing responsibilities to [its] distributors while focusing [Armstrong Flooring's] resources to drive growth with national retail and commercial customers." *Id.* These RSUs entitled Defendants Maier and Rice to receive a grant equal to double their base salary while Defendant Ford received a smaller RSU grant. ¶ 146. These allegations are sufficient to demonstrate that the Defendants possessed a powerful motive to commit fraud. *See e.g.*, *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016).

### D. Circumstances Surrounding Lead Plaintiff's Investigation Indicate Scienter

While investigating this action, Lead Counsel learned that "former Armstrong Flooring employees who became employed by AHF, LLC were required to sign non-disclosure agreements that AHF, LLC's counsel advised prevents former

Armstrong Flooring employees from cooperating with Lead Plaintiff's investigation into fraudulent acts observed while at Armstrong Flooring." ¶ 34. This stonewalling shows the devices employed to conceal the fraud and creates a strong inference that Defendants knowingly hid the truth from investors. Considering the agreement's intended effect with all other allegations in the Complaint, Lead Plaintiff adequately pled scienter for the misleading statements.

Moreover, courts in this circuit have held that defendants cannot use agreements to prevent former employees from voluntarily participating in investigations into wrongdoing. *See In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1137–38 (N.D. Cal. 2002). Whether or not concealing information from former Armstrong Flooring employees caused undue prejudice to Lead Plaintiff will not be known until the resolution of these motions. If Defendants' motions are granted however, the PSLRA permits Lead Plaintiff to move the Court to lift the stay of discovery in connection with amending the Complaint. 15 U.S.C. § 78u-4(b)(3)(B).

## III.   The Complaint Adequately Pleads Loss Causation

In order to "prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to 'the very facts about which the defendant lied.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019). Loss causation "is met by showing a corrective disclosure revealed a false statement and was then followed by a stock price decline." *Nguyen v. Radient Pharm. Corp.*, 946

F. Supp. 2d 1025, 1040 (C.D. Cal. 2013). "A plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in order to establish loss causation." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). Further, "loss causation is rarely grounds to dismiss a complaint." *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, No. CV 11-2768 PSG (SSx), 2012 WL 12893520, at *7 (C.D. Cal. Feb. 16, 2012).

Plaintiff has sufficiently alleged that the Company's corrective disclosures on March 5, 2019, May 3, 2019, November 5, 2019, and March 3, 2020 were the direct and proximate causes of the decline in price of Armstrong Flooring securities and that Plaintiff and the Class suffered economic loss as a result of these declines. *See* ¶¶ 157 (revealed substantially elevated inventory levels in the distributor channel); ¶ 158 (revealed that there continued to be elevated inventory levels in the channel); ¶ 159 (revealed that the Company was not growing and that there was more inventory than was needed); ¶ 160 (revealed pervasive operational inefficiencies, no investment in marketing, and distributor issues).

Defendants are wrong to assert that the Lead Plaintiff cannot plead loss causation because he did not purchase any stock before May 7, 2019. The fraud was not fully revealed until March 3, 2020. ¶ 127. Additionally, it is well-established that a class representative is not required to have individual standing for all claims asserted by the class. *Adam v. Silicon Valley Bancshares*, No. C. 93-20399 RMW (EAI), 1994 WL 374314, at *5 n.1 (N.D. Cal. Apr. 18, 1994); *see, also Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1176 (9th Cir. 2017). Requiring a

class plaintiff to purchase on the last day of the class period is contrary to the law in this Circuit, and requiring such would make class actions untenable.

## IV.     The Complaint Sufficiently Alleges That the Individual Defendants Violated Section 20(a)

To state a claim under Section 20(a) of the Exchange Act, a plaintiff must allege a predicate violation of Section 10(b).  *Bruce v. Suntech Power Holdings Co. Ltd.*, 64 F. Supp. 3d 1365, 1377 (N.D. Cal. 2014).  The complaint, as demonstrated above, sufficiently pleads a violation of Section 10(b).  Thus, the Individual Defendants are liable under Section 20(a).

## CONCLUSION

For the foregoing reasons, the Court should deny all motions to dismiss in their entirety.[14]

Dated:  October 1, 2020                              Respectfully submitted,


**THE WAGNER FIRM**
  By     /s/Avi Wagner
   Avi Wagner (Cal Bar. No. 226688)
  1925 Century Park East, Suite 2100
  Los Angeles, CA 90067
  Telephone: 310-491-7949
  Facsimile: 310-694-3967


**BERNSTEIN LIEBHARD LLP**
  Stanley D. Bernstein (*pro hac vice* forthcoming)
  Michael S. Bigin (*pro hac vice* forthcoming)

---

[14] If the Court grants any part of the motion, leave to amend should be granted.

Laurence J. Hasson (admitted *pro hac vice*)
Matthew E. Guarnero (*pro hac vice* forthcoming)
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email: bernstein@bernlieb.com
bigin@bernlieb.com
lhasson@bernlieb.com
mguarnero@bernlieb.com

*Counsel for Lead Plaintiff and Lead Counsel for Proposed Class*

Case No. 2:19-cv-09840-CAS

LEAD PLAINTIFF'S OMNIBUS MEMO. OF LAW IN OPPOS. TO THE DEFENDANTS' MOTIONS TO DISMISS

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On October 1, 2020, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 1, 2020, at Los Angeles, California.

*s/ Avi Wagner*
Avi Wagner