PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
ZACHARY M. FAIGEN (SBN 294716)
zack.faigen@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:   (213) 687-5600

ROBERT A. FUMERTON (*pro hac vice*)
robert.fumerton@skadden.com
CHRISTOPHER R. FREDMONSKI (*pro hac vice*)
christopher.fredmonski@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone:   (212) 735-3000
Facsimile:   (212) 735-2000

Attorneys for Defendants Armstrong Flooring, Inc.,
Michel Vermette, Larry McWilliams and Dominic Rice

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL CHUPA, Individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>          v.<br><br>ARMSTRONG FLOORING, INC., MICHEL VERMETTE, DONALD MAIER, LARRY McWILLIAMS, DOUGLAS BINGHAM, DOMINIC RICE, and RONALD FORD,<br><br>                              Defendants. | CASE NO.: 2:19-cv-09840 CAS (MRWx)<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>The Honorable Christina A. Snyder<br><br>Hearing Date:      December 7, 2020<br>Hearing Time:      10:00 a.m.<br>Courtroom:          8D |

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

I.   PRELIMINARY STATEMENT .................................................................1

II.  ARGUMENT..............................................................................................2

     A.   Plaintiff Fails to Plead an Actionable Misstatement or Omission. .......2

          1.   The AC Relies on Improper Puzzle Pleading. ...........................2

          2.   Plaintiff Fails to Allege a Misrepresentation or Omission Concerning the "Go-to-Market" Strategy....................................4

          3.   Plaintiff Fails to Allege a Misrepresentation or Omission Concerning Distributor Inventory Levels or Buying Behavior. .6

          4.   Many of the Challenged Statements Are Inactionable Puffery. .8

          5.   Armstrong's Forward-Looking Statements Are Protected by the PSLRA's Safe Harbor Provision. ............................................10

     B.   Plaintiff Fails to Plead Scienter.........................................................15

          1.   Plaintiff Fails to Plead Any "Specific Contemporaneous Statements or Conditions That Demonstrate" Scienter. ...........15

          2.   Plaintiff Does Not Plead Corporate Scienter. .........................17

          3.   Plaintiff Does Not Plead Any Plausible Motive to Commit Fraud. ......................................................................................21

          4.   Plaintiff Should Not Be Excused from Pleading Scienter........23

          5.   Viewed Holistically, Plaintiff Fails to Adequately Plead Scienter......................................................................................24

     C.   Plaintiff Fails to Plead Loss Causation. .............................................24

III. CONCLUSION.........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adam v. Silicon Valley Bancshares*,
   No. C 93-20399 RMW (EAI),
   1994 WL 374314 (N.D. Cal. Apr. 18, 1994) ..................................................... 24

*Anshen v. Facebook*,
   No. 2:17-cv-00679-SVW-AGR,
   2017 WL 5635021 (C.D. Cal. Oct. 4, 2017) ..................................................... 19

*In re Apple Inc. Securities Litigation*,
   No. 19-cv-02033-YGR,
   2020 WL 2857397 (N.D. Cal. June 2, 2020) .................................................... 20

*Bodri v. GoPro, Inc.*,
   252 F. Supp. 3d 912 (N.D. Cal. 2017) .............................................................. 21

*Bolling v. Dendreon Corp.*,
   No. C13-0872JLR,
   2014 WL 2533323 (W.D. Wash. June 5, 2014) ................................................ 20

*Brendon v. Allegiant Travel Co.*,
   412 F. Supp. 3d 1244 (D. Nev. 2019) ............................................................... 21

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002) ....................................................................... 5, 16

*Browning v. Amyris, Inc.*,
   No. 13-cv-02209-WHO,
   2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ................................................. 19

*Carbajal v. HSBC Bank USA, N.A.*,
   No. CV16-9297 PSG (FFM),
   2017 WL 7806586 (C.D. Cal. May 16, 2017) ................................... 2, 10, 11, 25

*In re CellCyte Genetics Securities Litigation*,
   No. C08-0047RSL,
   2009 WL 3103892 (W.D. Wash. Sept. 24, 2009) ............................................ 23

*City of Miami General Employees' & Sanitation
   Employees' Retirement Trust v. RH, Inc.*,
   302 F. Supp. 3d 1028 (N.D. Cal. 2018) .............................................................. 5

*City of Royal Oak Retirement System v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ............................................................ 20

*In re Cutera Securities Litigation*,
   610 F.3d 1103 (9th Cir. 2010) .......................................................... 9, 11, 12, 14

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

*In re Downey Securities Litigation*,
  No. CV 08-3261-JFW (RZx),
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ........................................................ 23

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019)................................................................ 21, 22

*In re Extreme Networks, Inc. Securities Litigation*,
  No. 15-cv-04883-BLF,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ........................................................ 6

*Gammel v. Hewlett-Packard Co.*,
  905 F. Supp. 2d 1052 (C.D. Cal. 2012)........................................................ 13, 19, 20

*Glazer Capital Management, LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ................................................................................ 18

*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ................................................................................ 12

*In re JDS Uniphase Corp. Securities Litigation*,
  238 F. Supp. 2d 1127 (N.D. Cal. 2002)................................................................ 23

*Jenkins v. County of Riverside*,
  398 F.3d 1093 (9th Cir. 2005) ........................................................................ 11, 25

*Jui-Yang Hong v. Extreme Networks, Inc.*,
  No. 15-cv-04883-BLF,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017)........................................................ 20

*Kirola v. City & County of San Francisco*,
  860 F.3d 1164 (9th Cir. 2017) ............................................................................ 24

*Lloyd v. CVB Financial Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .............................................................................. 9

*Lorely Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
  797 F.3d 160 (2d Cir. 2015) ................................................................................ 17

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................................ 18

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ............................................................................ 21

*New Orleans Employees Retirement System v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011)............................................................................ 21

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ....................................................... 2, 15, 21, 22 23, 24

*Nozak v. Northern Dynasty Minerals Ltd.*,
  804 F. App'x 732 (9th Cir. 2020)......................................................................... 17

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

*In re Nuvelo, Inc., Securities Litigation*,
No. C 07-4056 VRW,
2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) ........................................................ 13

*In re NVIDIA Corp. Securities Litigation*,
768 F.3d 1046 (9th Cir. 2014) ...................................................................... 17, 18

*Oklahoma Firefighters Pension & Retirement System v. Ixia*,
No. CV 13-08440 MMM (SHx),
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ...................................................... 20

*Philco Investments, Ltd. v. Martin*,
No. C 10-02785 CRB,
2011 WL 500694 (N.D. Cal. Feb. 9, 2011) ......................................................... 16

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ........................................................... 12, 13, 16

*In re Rackable Systems, Inc. Securities Litigation*,
No. C 09-0222 CW,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010)....................................................... 19

*Rezvani v. Jones*,
No. 2:18-cv-06244-CAS (Ex),
2018 WL 6680568 (C.D. Cal. Dec. 17, 2018)..................................................... 15

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
697 F.3d 869 (9th Cir. 2012) ........................................................................... 1

*Roberts v. Zuora, Inc.*,
No. 19-cv-03422-SI,
2020 WL 2042244 (N.D. Cal. Apr. 28, 2020)...................................................... 6

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ..................................................................... 15, 17

*Schneider v. California Department of Corrections*,
151 F.3d 1194 (9th Cir. 1998) ......................................................................... 6

*SG Cowen Securities Corp. v. U.S. District
Court for the Northern District of California*,
189 F.3d 909 (9th Cir. 1999) ......................................................................... 24

*In re Silicon Graphics Inc. Securities Litigation*,
183 F.3d 970 (9th Cir. 1999) ..................................................................... 15, 24

*In re Stitch Fix, Inc. Securities Litigation*,
No. 18-cv-06208-JD,
2020 WL 5847506 (N.D. Cal. Sept. 30 2020)...................................................... 4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................ 15, 17

*In re Vantive Corp. Securities Litigation*,
283 F.3d 1079 (9th Cir. 2002) ........................................................................ 17

iv

*In re Volkswagen "Clean Diesel" Marketing,*
    *Sales Practices, & Products Liability Litigation,*
      MDL No. 2672 CRB (JSC),
      2017 WL 3058563 (N.D. Cal. July 19, 2017) ...................................................... 19

*Xu v. ChinaCache International Holdings Ltd.,*
      No. 2:15-cv-7952-CAS (RAOx),
      2016 WL 4370030 (C.D. Cal. Aug. 15, 2016) ...................................................... 10

*Xu v. ChinaCache International Holdings Ltd.,*
      No. 2:15-cv-7952-CAS (RAOx),
      2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ..................................................... 9, 10, 12

*Zucco Partners, LLC v. Digimarc Corp.,*
      552 F.3d 981 (9th Cir. 2009) .................................................................. 19, 22, 25

**Statutes**

15 U.S.C. § 78u-5(c)(1) ...................................................................................... 14

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

## I.      **<u>PRELIMINARY STATEMENT</u>**[1]

Plaintiff's Opposition brief does not address, much less rebut, the dispositive bases on which Defendants moved to dismiss. Instead, Plaintiff merely repeats the same conclusory allegations that rendered the AC deficient in the first place, as if mere repetition can overcome the AC's dispositive flaws. As a result, the Opposition only highlights—rather than cures—Plaintiff's failure to state a claim for securities fraud.

On the very first page of the Opposition, Plaintiff states that Armstrong embarked on a "go-to-market" strategy whereby the Company shifted some of its in-house marketing duties to its distributors even though, according to Plaintiff, Defendants "knew that their distributors were not equipped" to take on those duties. (Opp. at 1.) Plaintiff asserts that Defendants "concealed" purported "fatal flaws" in the strategy "from day one." (*Id.*) But Plaintiff does not point to a single particularized allegation from the 188-paragraph AC to support that conclusory assertion. Plaintiff does not explain how or why Defendants "knew" that Armstrong's distributors were unable to take on these marketing duties. Nor does Plaintiff identify what "fatal flaws" Defendants purportedly "concealed," or even what data or information Defendants possessed that could have led them to conclude that Armstrong's distributors were so ill-equipped. The PSLRA requires far more. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 877 (9th Cir. 2012). The unsupported conclusions that Plaintiff proffers are woefully insufficient.

Plaintiff also repeats his assertion that "Defendants actively concealed from investors" that Armstrong's distributors purchased excess inventory in the third quarter of 2018 ahead of anticipated price increases due to U.S. tariffs on China. (Opp. at 1.) As shown in the Motion, however, Armstrong disclosed distributors' "higher than normal inventory levels" in ***every single quarterly SEC filing*** starting in Q3 2018 and continuing until that inventory had been worked down in the second half of 2019. (*See* Mot. at 5-7, 9-10.) Rather than confront those disclosures—all of which are properly before the Court

---

[1] Capitalized and defined terms herein have the same meaning as in Defendants' Motion to Dismiss (ECF No. 67 (the "Motion")). All emphases are added and internal citations and quotations are omitted unless otherwise stated.

(*see* Defs.' unopposed Request for Incorporation by Reference and Judicial Notice (ECF No. 68, "RJN"))—Plaintiff simply ignores them. In the Ninth Circuit, ignoring a dispositive argument in a motion to dismiss constitutes a concession that warrants dismissal with prejudice. *See, e.g.*, *Carbajal v. HSBC Bank USA, N.A.*, 2017 WL 7806586, at *6 (C.D. Cal. May 16, 2017) (dismissing claim "without leave to amend" when "Plaintiff fail[ed] to address [an] issue in her opposition," and "thus effectively conced[ed] the argument").

Particularly problematic, Plaintiff never addresses the glaring, foundational problem that permeates this entire case: his theory of fraud makes no sense. The Opposition does not even mention the Ninth Circuit's recent decision in *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), much less attempt to explain why that case does not compel dismissal here. Plaintiff's theory that three consecutive CEOs, two consecutive CFOs and one Chief Product Officer all decided to lead Armstrong down a knowing path of failure and fraud for no reason or benefit whatsoever invites the Court "to check [its] disbelief at the door." *Endologix*, 962 F.3d at 415. The Court should decline that invitation.

For these reasons, as well as those below and in the Motion, the Court should dismiss the AC with prejudice.

## II.    ARGUMENT

### A.    Plaintiff Fails to Plead an Actionable Misstatement or Omission.

#### 1.    The AC Relies on Improper Puzzle Pleading.

Plaintiff denies that the AC constitutes improper puzzle pleading and insists that "[c]ourts have repeatedly found the Complaint's style of pleading permissible." (Opp. at 7 n.4.) Plaintiff then cites two cases in which *those* courts found *those* complaints were not puzzle pleading. (*Id.*) But Plaintiff does not even attempt to compare the AC to those complaints, or offer any affirmative argument as to why the AC is properly pled. Nor could he, as the AC presents paradigmatic puzzle pleading. The following block quote is representative of Plaintiff's attempt to plead falsity:

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

Third quarter net sales improved led by 7% growth in our Resilient segment, which more than offset lower Wood segment sales. ***We generated significant volume growth in Luxury Vinyl Tile ("LVT") as well as higher selling prices across many product categories, reflecting our 2018 pricing actions in response to inflationary pressure. On this momentum, Adjusted EBITDA improved by 17% and margin by 140 basis points year-over-year, augmented by productivity gains and cost saving actions. These results are a reflection of continued execution of our strategic priorities. We are seeing more consistent progress in our top and bottom line performance. We plan to continue investing in growth categories, pricing in line with inflation and targeting cost efficiencies to further improve our margin and returns in 2018 and beyond.***

(AC ¶ 87 (emphasis in AC).) Plaintiff asserts that those statements were false or misleading because: (i) "Defendants knew or recklessly disregarded that the oversell of inventory to distributors would limit future sales for 2019, that the 'go-to-market strategy' was fatally flawed"; (ii) "[t]he distributors did not and could not take on the added responsibilities of marketing and merchandising for Armstrong"; and (iii) "Defendants did not increase their investment in servicing national retail or commercial accounts and only assigned one sales person to each division to coordinate with hundreds of accounts." (*Id.* ¶ 88.) But the block quote Plaintiff copied from Armstrong's third quarter 2018 earnings release does not even mention (i) distributor inventory levels, (ii) the "go-to-market" strategy or distributor capabilities, or (iii) investment in servicing national retail or commercial accounts. Thus, Plaintiff has left it for Defendants and the Court to figure out which statements Plaintiff is actually challenging and how those statements can possibly be misleading. Courts routinely dismiss securities fraud complaints that employ this pleading tactic because it violates the PSLRA's particularity requirement. (*See* Mot. at 9 n.6 (collecting cases).)

3

### 2.   Plaintiff Fails to Allege a Misrepresentation or Omission Concerning the "Go-to-Market" Strategy.

Plaintiff insists that the AC "adequately alleges that Defendants misled investors about the Go-To-Market Strategy." (Opp. at 7.) Plaintiff is wrong.

First, Plaintiff asserts that "Defendants" misled investors when Mr. Maier stated on November 6, 2018 that Armstrong had begun "to allocate more of [its] marketing spend to commercial and national accounts." (*Id.* (quoting AC ¶ 90).) But Plaintiff does not allege in the AC nor cite in the Opposition any facts or data showing that Armstrong did *not* increase its marketing spend for those two accounts. Rather, the sole basis for Plaintiff's assertion is Mr. Vermette's statement ***17 months later*** that, as of March 2020, Armstrong was utilizing four individuals to call on various builders, contractors, national accounts and independent retailers. (*Id.* at 8 (citing AC ¶ 127).) That statement in March 2020 does not show the falsity of Mr. Maier's statement in November 2018 for multiple reasons. To begin, Mr. Vermette's statement concerned the situation as it existed in March 2020. It said nothing about the Company's marketing spend as of November 2018, which was the subject of Mr. Maier's statement. Moreover, the two statements are not even directed to the same subject matter. Mr. Maier in 2018 stated that Armstrong was allocating more money to its "marketing spend." Mr. Vermette in 2020 spoke only of the number of sales people calling on certain accounts—a specific and narrow slice of Armstrong's marketing spend. Thus, Mr. Vermette's narrow statement about sales callers could not possibly have shown that Mr. Maier's far broader statement about overall marketing spend was false. *See In re Stitch Fix, Inc. Sec. Litig.*, 2020 WL 5847506, at *4 (N.D. Cal. Sept. 30 2020) (holding defendant's statement that "[w]e continue to make strategic and measured marketing investments" was not misleading just because defendant had halted spending on national television advertising, reasoning that national TV advertising was only one segment of defendant's marketing spending). Finally, even if Mr. Vermette's 2020 statement about sales callers was relevant to Mr. Maier's 2018 statement about overall marketing spend (it is not), Plaintiff admits that the proper way to measure whether spending increased,

4

decreased, or stayed the same is "by comparing the marketing spend from previous quarters." (Opp. at 12.) Neither the AC nor the Opposition performs any such comparison. Rather, Plaintiff takes one statement about sales callers from March 2020 and concludes without particularized facts or points of comparison that overall marketing spend did not increase as Mr. Maier stated two years earlier in 2018.[2]

Second, Plaintiff argues that "Defendants misrepresented the abilities of the Company's distributors" when Mr. Maier said that Armstrong "was 'working very closely with its distributors' and that there was 'good progress' on the Go-To-Market Strategy" because Defendants "knew [Armstrong's] distributors were incapable of executing on this strategy." (Opp. at 8 (quoting AC ¶ 79).) To begin, stating that Armstrong was working closely with distributors and making good progress on transitioning certain marketing duties to them does not say anything about the distributors' capabilities of ultimately executing on the strategy. Thus, those statements could not possibly have been misleading for the reason Plaintiff claims; they are silent on the topic of distributors' capabilities. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (an omission must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists"). Further, working "closely" with distributors and making "good progress" is classic puffery. (*See* Mot. at 15 (citing cases); *infra* Part II.A.4.) Most importantly, Plaintiff's assertion that Defendants "knew [Armstrong's] distributors were incapable of executing on this strategy" is purely conclusory. Plaintiff never explains how Defendants would have known that distributors were incapable of taking on marketing

---

[2] Plaintiff's citation to *City of Miami General Employees' & Sanitation Employees' Retirement Trust v. RH, Inc.*, 302 F. Supp. 3d 1028 (N.D. Cal. 2018) (Opp. at 8), is inapposite. In that case, the defendant company, RH, stated that inventory "was up 24%," and that it expected inventory to continue growing "given the inventory investments in RH Modern," an RH brand. *Id.* at 1039. Relying on multiple confidential witnesses, the plaintiffs alleged particularized facts showing the defendants actually had *not* invested in RH Modern inventory and that RH's inventory growth was due to non-RH Modern segments of the business. *Id.* at 1040. Here, Plaintiff alleges no particularized facts showing *anything* about Armstrong's overall marketing spend on commercial and national accounts, much less that Armstrong did not increase its overall marketing spend, as Plaintiff asserts in conclusory fashion.

5

duties or what information Defendants possessed that would have led them to so conclude.[3]

Third, Plaintiff summarily contends that Armstrong's "transition" to the "go-to-market" strategy did not go "smoothly." (Opp. at 9.) But this conclusory assertion—which Plaintiff raises for the first time in the Opposition[4]—is not supported by any factual allegations in the AC. In fact, the AC alleges just the opposite, claiming that the Company *did* transition to the "go-to-market" strategy, but that distributors were unable to capably manage their new responsibilities post-transition. (*See, e.g.*, AC ¶ 114.)[5]

In any event, the statement that the Company's transition to the "go-to-market" strategy went "smoothly" is not an "empirically verifiable" statement (*see* Opp. at 11), and is therefore inactionable puffery. (*See* Mot. at 15 (citing cases); *infra* Part II.A.4.)

### 3.    Plaintiff Fails to Allege a Misrepresentation or Omission Concerning Distributor Inventory Levels or Buying Behavior.

Plaintiff claims that Armstrong "misled investors" regarding "distributor inventory levels and buying behavior." (Opp. at 10.) Plaintiff's theory is both internally contradictory and contrary to the allegations in the AC. It fails as a matter of law.

Plaintiff makes two arguments regarding distributor inventory levels. First, Plaintiff claims that Defendants concealed that distributors had "substantially stocked up on inventory in advance of proposed tariffs." (*Id.*) Second, Plaintiff claims that Defendants'

---

[3] Plaintiff's citation to *Roberts v. Zuora, Inc.*, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) (Opp. at 9), does not help him. In that case, the plaintiff alleged "with particularity" that the defendants' positive statements regarding integration were "contradicted" by then-existing conditions by citing the "failures" of two projects, the "problems" customers "experienced when they tried to implement both products," and "significant issues" relating to "integrations problems." *Id.* at *9. Here, Plaintiff alleges zero facts showing any issues with distributors at the time Defendants made the challenged statements.

[4] The Ninth Circuit does not permit plaintiffs to amend their complaint through a motion to dismiss opposition brief. *See Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

[5] For that reason, Plaintiff's reliance on *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018), is misplaced. There, the court found that the plaintiff adequately alleged that the defendant's statement that integration remained "ahead of plan" was misleading because confidential witnesses contradicted that assertion, including one who claimed there was "no integration plan *at all*." *Id.* at *17-18 (emphasis in original). Here, Plaintiff does not allege that the transition of marketing duties to distributors did not occur, or even that it did not occur in the time frame or the manner Defendants said.

statements "about Armstrong Flooring's inventory buildup in the residential channel were also misleading." (*Id.*) Those two theories cannot coexist; they are irreconcilable. If, as Plaintiff claims, Armstrong made misleading statements about distributor inventory buildup, then, by that very argument, Armstrong did not conceal the fact of the buildup itself. Plaintiff cannot have it both ways.[6]

The truth is, Defendants did not make any misstatements regarding inventory levels or distributor buying behavior, as the AC shows. Starting in the third quarter of 2018 (*i.e.*, the first quarter in which distributors allegedly began overstocking on inventory), Armstrong disclosed distributors' elevated buying levels ***every quarter*** until inventory levels returned to normal:

- **Third quarter 2018**: "[W]e do believe that our distributors appropriately took advantage of the fact that they could buy ahead of the 10% tariff." (AC ¶ 143; *see also* Ex. 4 at 22-23 ("***Higher than normal inventory levels at distributors*** could impact sales in the fourth quarter, as could continued uncertainty around tariffs from products imported from China."));[7]

- **Fourth quarter/FY 2018:** "Lower volumes . . . were impacted by ***elevated inventory levels in the distributor channel*** due to significant customer purchases in the third quarter of 2018 ahead of . . . higher anticipated U.S. tariffs." (AC ¶ 93; *see also* Ex. 6 at 2 (projecting that growth would be "heavily weighted to the second half as the overall market improves and ***elevated inventory levels in the channel*** are worked down"));

- **First quarter 2019:** "[F]irst quarter results were challenged by several dynamics," including "[d]emand pull forward into 2018 that has kept ***distributor inventory at elevated levels*** since year-end." (AC ¶ 108; *see also id.* ¶ 110 (stating earnings would be "weighted towards the second half of 2019 as the market strengthens and ***elevated inventory levels in the channel*** are worked down"));

---

[6] These conflicting theories appear to be a relic of the "channel stuffing" theory pled by the named plaintiff and abandoned by Plaintiff in the AC. (*See* Mot. at 7 & n.4.)

[7] Exhibits are attached to the Declaration of Zachary M. Faigen (ECF No. 68-1).

- **Second quarter 2019:** "During the second quarter, our customers continued to *reduce inventory from elevated levels in previous quarters*." (AC ¶ 117; *see also* Ex. 9 at 1 ("Inventory levels in the distributor channel decreased sequentially compared to the first quarter 2019 but remained moderately elevated at the end of the quarter.")).

Thus, Plaintiff's assertion that Armstrong somehow concealed elevated inventories in the distributor channel is belied by Plaintiff's own allegations, as well as the public documents and SEC filings that Plaintiff agrees are subject to judicial notice.

Finally, Plaintiff highlights statements from Mr. McWilliams and Mr. Bingham following the second quarter of 2019 in which they indicated that Armstrong "'believe[s] the [distributors] have largely worked down unusually high levels of inventory purchased ahead of tariffs on Chinese imports last year.'" (Opp. at 10 (quoting AC ¶ 118).) Plaintiff appears to argue that those statements were misleading because Armstrong lowered its earnings forecast three months later at the end of the third quarter of 2019. (*Id.* at 10-11.) But lowering its forecast months later does not show that Armstrong's distributors had ***not*** "largely worked down unusually high levels of inventory" by the end of second quarter 2019, or that Armstrong did not "believe" that to be the case. Rather, Plaintiff's own pleading reveals the reasons why Armstrong lowered its forecast, which had nothing to do with the prior year's inventory buildup—"unfavorable volumes and mix," "weaker performance by several distributors," "recent sales trends and cost pressures" and "a kind of sequential reduction in inventory in the distribution channel." (AC ¶¶ 120, 121, 124.) Thus, nothing Armstrong disclosed following the third quarter of 2019 could even arguably show that Defendants' statements after the second quarter were false when made.

### 4. Many of the Challenged Statements Are Inactionable Puffery.

As shown in the Motion (at 14-15), many of the statements Plaintiff challenges concerning the "go-to-market" strategy are inactionable puffery. Plaintiff responds that "it is improper to determine puffery issues on a motion to dismiss." (Opp. at 12 n.7.) That is a misrepresentation of controlling law. The Ninth Circuit routinely affirms dismissal at the

8

pleading stage based on puffery. *See, e.g.*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) ("The district court dismissed the claims based on these boasts, characterizing them as puffery. That decision was correct."); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Indeed, puffery is by definition a statement "upon which a reasonable consumer could not rely" and thus one that is immaterial and "non-actionable" as a matter of law. *Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *8 (C.D. Cal. Jan. 9, 2017) (Snyder, J.) ("*ChinaCache II*").

Plaintiff also argues that "the challenged statements are objectively verifiable and thus, not puffery." (Opp. at 12.) Plaintiff misunderstands which statements Defendants identified as puffery. As a result, Plaintiff fails to address Defendants' actual arguments and instead tries to defend statements that Defendants did ***not*** claim were puffery.

First, Plaintiff asserts that Mr. Maier's statement that Armstrong "began to allocate more of our marketing spend to commercial and national accounts" is not puffery. (*Id.* at 14 (quoting AC ¶ 90).) Defendants did not argue that that statement is puffery. (*See* Mot. at 14-15.) As explained *supra* Part II.A.2, that statement is not false or misleading because Plaintiff does not allege any particularized facts showing that Armstrong did not, in fact, allocate more of its marketing spend to those two account types. Plaintiff's argument regarding puffery is irrelevant and, as a result, his attempt to distinguish *In re XM Satellite Radio* and *Amalgamated Bank* on that basis (*see* Opp. at 12 n.8) is misplaced.

Second, Plaintiff argues that "Defendants' statements regarding their distributors' capabilities and the success of the Company's Go-To-Market Strategy were also verifiable using metrics and benchmarks." (*Id.* at 12.) But Plaintiff again does not specify which statements he is referring to, or what "metrics and benchmarks" can be used to verify them. In any event, as set forth in the Motion, Defendants' statements that the distributors are "very good" and "excellent," and that Armstrong was "focused on" and "look[ed] forward" to "aligning . . . with partners who are best positioned to support [its] growth strategy" are classic puffery, as numerous courts have held. (*See* Mot. at 14-15.) Plaintiff's feeble attempt in a footnote to distinguish those cases based on the conclusory assertion that the

9

statements in *those cases* involved "general statements of corporate optimism" but the statements here do not (Opp. at 12-13 n.9) falls flat.

Third, Plaintiff asserts without argument or analysis that this Court's decision in *ChinaCache II* "is not analogous" because the statements in that case simply "tout[ed] enhanced services." (Opp. at 12-13.) That is wrong. In *ChinaCache II*, this Court held that the phrase "on track in completing the migration" was not objectively verifiable and, thus, inactionable because "Plaintiff does not allege a timeline against which the 'on track' claim might be verified." *ChinaCache II*, 2017 WL 114401, at *6. Here, too, Plaintiff challenges Defendants' statement that the transition of duties in the "go-to-market" strategy was "on track" but does not allege a timeline against which the claim might be verified or even that the transition was somehow ***not*** on track. This Court's conclusion with respect to the "on track" statement in *ChinaCache II* is directly on point, ***as Plaintiff concedes in a footnote on the very same page of the Opposition***. (*See* Opp. at 12-13 n.9 (acknowledging that "statement regarding a migration that was 'on track' to be completed in the future" was a "general statement[] of corporate optimism" (citing *Xu v. ChinaCache Int'l Holdings Ltd.*, 2016 WL 4370030, at *7 (C.D. Cal. Aug. 15, 2016))).)

Finally, Plaintiff ignores the numerous other statements Defendants identified in the Motion as inactionable puffery. (*See* Mot. at 14-15.) Among others, Defendants argued and supplied case law showing that statements regarding "cost efficiencies" and that Armstrong was "making good progress" on and was "satisfied with the progress" of the "go-to-market" strategy are inactionable puffery. By failing to respond to these arguments, Plaintiff concedes them. *See, e.g.*, *Carbajal*, 2017 WL 7806586, at *6.

### 5.   Armstrong's Forward-Looking Statements Are Protected by the PSLRA's Safe Harbor Provision.

As explained in the Motion, Plaintiff challenges two categories of forward-looking statements that the PSLRA safe harbor immunizes from liability. First, Plaintiff challenges Defendants' predictions regarding when elevated distributor inventory levels might be worked down, and how those elevated levels might impact Armstrong's earnings and

10

growth in 2019. (*See* Mot. at 10-12.) Second, Plaintiff challenges Defendants' projections regarding the potential impact on Armstrong of the "go-to-market" strategy. (*Id.* at 15-17.)

In the Opposition, Plaintiff does not contest that the first category of forward-looking statements—predictions about the financial impact of elevated distributor levels—is protected by the PSLRA safe harbor. In fact, Plaintiff acknowledges that "an 'earnings projection is **by definition** a forward-looking statement.'" (Opp. at 14 n.10 (quoting *In re Cutera*, 610 F.3d at 1111).) By not even addressing these statements, Plaintiff concedes as a matter of law that all of the forward-looking statements identified in the Motion regarding the future impact of elevated distributor levels are inactionable. *See Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005); *Carbajal*, 2017 WL 7806586, at *6.

Having conceded the first category, Plaintiff focuses only on the second category, arguing that Defendants' predictions about the "go-to-market" strategy are not protected because (i) they are not forward-looking; (ii) the accompanying risk language was "not meaningful"; and (iii) Defendants **knew** their statements were false when made. (Opp. at 14-17.) Plaintiff is wrong on all three points.

(a) The Statements Plaintiff Challenges Are Forward-Looking.

Plaintiff lists nine statements that he claims are statements "of present facts and past statements of fact" that fall outside of the PSLRA's safe harbor. (*Id.* at 14.) But Defendants never argued that six of those nine statements were protected by the safe harbor. (*Compare* Opp. at 14-15, *with* Mot. at 15-17.) Plaintiff's arguments as to those six statements are irrelevant. Moreover, Plaintiff does not even attempt to address numerous forward-looking statements that Defendants did identify in the Motion, including Armstrong's plan to "reduce some of [its] [marketing] spending" and increase its "share of wallet" with distributors. (Mot. at 16.) Plaintiff thus concedes that those statements are immunized. *See Jenkins*, 398 F.3d at 1095 n.4.

The only three statements Plaintiff addresses that Defendants actually argued are protected by the safe harbor are: (i) "strategic initiatives are on track to accelerate net sales growth"; (ii) "we're increasing our focus on our commercial business"; and (iii) "we are

11

excited to focus more of our marketing spend on commercial and national accounts." (Opp. at 14 (citing AC ¶¶ 75, 79, 84).) All three statements are inactionable.

With respect to the first statement, this Court has already recognized that the phrase "on track" is "covered by the PSLRA safe harbor for forward-looking statements" where the phrase cannot "'meaningfully be distinguished from the future projection of which it was a part." *ChinaCache II*, 2017 WL 114401, at \*6 (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009)). Further, even if the phrase "on track" were not forward-looking (it is), Plaintiff does not allege what strategic initiatives were at issue in the statement, much less any particularized facts to show that those unidentified initiatives (only one of which was the "go-to-market" strategy) were ***not*** on track to accelerate net sales growth as of May 2018, when Mr. Maier made that statement.

With respect to the second and third statements about Armstrong "focusing more" on its commercial and national accounts, the Ninth Circuit has made clear that the safe harbor protects "plans and objectives of management for future operations"—like a plan to "focus more" on commercial and national accounts. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014).

(b)    Armstrong's Forward-Looking Statements Were Accompanied by Meaningful Cautionary Statements.

Plaintiff next asserts that the cautionary language that accompanied Armstrong's forward-looking statements was "inadequate." (Opp. at 15.) That, too, is incorrect.

As shown in the Motion, at the outset of every earnings call alleged in the AC, Armstrong (i) cautioned investors that "we will be making forward-looking statements that involve risks and uncertainties" and that "[a]ctual outcomes may differ materially from those expected or implied" and (ii) directed investors to the Company's SEC filings "[f]or a more detailed discussion of the risks and uncertainties that may affect Armstrong." (*See* Mot. at 11 (quoting Ex. 5 at 4; Ex. 8 at 4).) The Ninth Circuit in *Intuitive Surgical* held that virtually ***identical*** cautionary language was "sufficient" to qualify for safe harbor protection. *Intuitive Surgical*, 759 F.3d at 1059-60; *see also Cutera*, 610 F.3d at 1111.

12

Plaintiff does not even acknowledge *Intuitive Surgical*, never mind explain how Armstrong's cautionary language could be "inadequate" in light of that binding authority.

Instead, Plaintiff seeks to impose on Defendants—and all public companies—a new obligation to disclose a narrowly tailored risk factor addressed to every potential allegation in a securities fraud complaint, or else risk losing the protection of the safe harbor. That, of course, is not the law. As courts in the Ninth Circuit routinely hold, "the law does ***not*** require specification of the particular factor that ultimately renders the forward-looking statement incorrect." *In re Nuvelo, Inc., Sec. Litig.*, 2008 WL 5114325, at *16 (N.D. Cal. Dec. 4, 2008) (rejecting plaintiff's argument that the safe harbor should not apply because "none of these risk factors included the precise problem that went wrong"); *see also Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012) (holding that the safe harbor applied even though the cautionary statements "do not expressly refer to" the operating system at issue in the complaint).

Moreover, even if Plaintiff's view of the law were correct (it is not), the safe harbor still applies here because Armstrong's risk factors ***did*** address the specific issues alleged in the AC. In its SEC filings—to which Armstrong directed investors before every earnings call and in every earnings release—Armstrong warned that "loss, reduction, or fluctuation of sales" to distributors "could have a material adverse effect on our financial condition, liquidity or results of operations." (Ex. 7 at 7.) Similarly, Armstrong warned that its "cost saving initiatives"—one of which was the "go-to-market" strategy—"may not achieve expected savings in our operating costs or improved operating results" because the projected "benefits" of those initiatives are based on "estimates and assumptions [that] are subject to significant economic, competitive and other uncertainties, some of which are beyond our control." (*Id.* at 8.) In addition, Armstrong warned that any statements regarding its "plan[s]" for the future—which would necessarily include its "plan to use some of the savings to increase our investment in national retail and commercial accounts" (AC ¶ 72)—"are based on management's current expectations and beliefs and are subject to a number of factors that could lead to actual results materially different from those

13

described in the forward-looking statements" and "expressly disclaim[ed] any obligation to release publicly any updates" to "reflect any change in our expectations." (Ex. 4 at 1.) Thus, while the securities laws do not require the specificity that Plaintiff seeks to impose on Defendants, Armstrong's risk factors nevertheless satisfy Plaintiff's invented standard. Armstrong's cautionary language was robust and comprehensive, and thus fully insulates Defendants' forward-looking statements.

(c)   Plaintiff Fails to Allege That Defendants Made Any Forward-Looking Statement with Actual Knowledge of Falsity.

Finally, Plaintiff argues that even if Armstrong's forward-looking statements were accompanied by appropriate cautionary language (which they were), "the safe harbor would still be unavailable because Defendants had actual knowledge of the falsity of their forward-looking statements." (Opp. at 16.) That is another misstatement of law. Plaintiff has the standard exactly backwards. "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is *irrelevant*, and the statement is not actionable *regardless* of the plaintiff's showing of scienter." *Cutera*, 610 F.3d at 1112. Under the safe harbor, a defendant's actual knowledge of falsity is relevant only if there are "unidentified forward-looking statements or forward-looking statements lacking sufficient cautionary language." *Id.* at 1113 (quoting 15 U.S.C. § 78u-5(c)(1)).

Regardless, as shown in the Motion and *infra* Part III.B, Plaintiff does not plead particularized facts showing that any Individual Defendant had actual knowledge of the falsity of any alleged misstatement. In fact, the Opposition disclaims any effort or need to plead the specific knowledge of any specific Individual Defendant. (*See* Opp. at 3 n.2 (arguing that "parsing" "the time periods for which each Defendant is liable" is "unwarranted").) Thus, even if Defendants' forward-looking statements were not otherwise protected by the safe harbor, they are still inactionable because Plaintiff cannot—

14

REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

and does not try to—satisfy his burden to plead actual knowledge of falsity.[8]

## B. Plaintiff Fails to Plead Scienter.

Alleging scienter "is an exacting pleading obligation." *Endologix*, 962 F.3d at 414. Knowing he cannot meet that burden, Plaintiff attempts to lower the bar. Plaintiff asserts that he "can sufficiently allege scienter by showing either: (1) strong circumstantial evidence of conscious misbehavior or recklessness; or (2) that defendants had motive and opportunity to commit fraud." (Opp. at 17.) That is not the standard for pleading scienter in the Ninth Circuit. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) ("[F]acts showing mere recklessness or a motive to commit fraud and opportunity to do so . . . are ***not*** sufficient to establish a strong inference of deliberate recklessness."). Rather, Plaintiff must allege "specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). A complaint will survive dismissal only if "the inference of scienter" is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Plaintiff all but concedes in the Opposition that the AC fails to the meet this standard.

### 1. Plaintiff Fails to Plead Any "Specific Contemporaneous Statements or Conditions That Demonstrate" Scienter.

Plaintiff asserts without any particularized facts that "the Individual Defendants"—collectively, with no differentiation—"knew and/or recklessly disregarded that while they assured investors that distributors purchased inventory as needed, and that the Go-To-Market Strategy was proceeding well – neither was true." (Opp. at 18.) Plaintiff's

---

[8] Plaintiff attempts to distinguish this Court's decision in *Rezvani v. Jones*, 2018 WL 6680568 (C.D. Cal. Dec. 17, 2018), arguing that the plaintiff in that case "failed to allege 'actual knowledge' for the defendants" because he "made a bald allegation that the Defendant 'knew his representations to [plaintiff] were false when he made them,' which did not suffice." (Opp. at 16 (quoting *Rezvani*, 2018 WL 6680568, at *7).) That is ***precisely*** what Plaintiff has done here. While asserting the conclusion that Defendants collectively somehow "knew" that all of the challenged statements were false when made, Plaintiff does not identify ***any*** facts, data or information showing that ***any*** Defendant knew that ***any*** statement was false when made. *Rezvani* is directly on point, and fatal to Plaintiff's claim.

15

conclusory assertion does not satisfy the scienter pleading standard.

As an initial matter, Plaintiff cannot plead scienter because he again fails to distinguish between each Individual Defendant or plead facts showing what each Defendant knew, and when. As shown in the Motion, collective scienter pleading is not permitted. (*See* Mot. at 20 (collecting cases).) Plaintiff's failure to distinguish between Defendants is particularly problematic here, given that different Defendants were at the Company at different times. Declining to differentiate between Defendants in that circumstance renders Plaintiff's pleading almost nonsensical. For example, Plaintiff claims that all Defendants "knew" that the challenged statements from 2018 were false when made. But Mr. Vermette did not even join Armstrong until September 2019. Plaintiff does not attempt to explain how all Defendants could exhibit scienter for statements made when some of them were not at the Company. Instead, Plaintiff simply ignores this glaring hole in his pleading.

With respect to inventory levels, Plaintiff's argument again contradicts itself. Plaintiff claims that Mr. Maier "assured investors that distributors purchased inventory as needed," but then also claims that Mr. Maier told investors that distributors stocked up on inventory ahead of tariff-related price increases, only declining to "quantify" the amount of overbuying. (Opp. at 18 (quoting AC ¶ 11).)[9] Plaintiff's argument, thus, highlights the very disclosures that defeat the asserted theory of fraud. In truth, and as shown *supra* Part III.A.3, Armstrong disclosed distributors' elevated buying levels ***every quarter***, starting in the third quarter of 2018 when distributors first started overstocking their inventory, until late 2019 when inventory levels returned to normal. Plaintiff cannot show an intent to mislead when Plaintiff's argument reveals that Defendants disclosed the very information

---

[9] Simply declining to quantify the amount of distributor overbuying cannot itself provide a basis for liability. As the Ninth Circuit has repeatedly explained, the federal securities laws "prohibit ***only*** misleading and untrue statements, not statements that are incomplete." *Brody*, 280 F.3d at 1006 (emphasis in original); *see also Intuitive Surgical*, 759 F.3d at 1061 (affirming dismissal where plaintiff based its claim on defendant "not providing a more fulsome report"). Thus, that Plaintiff may have wanted Mr. Maier to quantify the amount of distributor overbuying is irrelevant. *See, e.g., Philco Invs., Ltd. v. Martin*, 2011 WL 500694, at *8 (N.D. Cal. Feb. 9, 2011) ("Though the release did not contain all of the detail Plaintiffs would have liked, it was not misleading.").

16

Plaintiff claims was fraudulently hidden. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (no scienter where complaint "raised no plausible inference of misrepresentation in the first place").

With respect to the "go-to-market" strategy, Plaintiff fails to plead scienter for the same reason he fails to plead falsity—he does not allege any particularized facts showing what information Defendants possessed or had access to that contradicted any challenged statement at the time the statement was made, as the Ninth Circuit requires. *See Ronconi*, 253 F.3d at 432. Absent such allegations, Plaintiff's argument is nothing more than impermissible fraud by hindsight: Because Armstrong's distributors ultimately did not successfully execute their new marketing duties, *all six* Defendants must have known from the beginning that the distributors would be unsuccessful. Similarly, Plaintiff concludes that because Armstrong's new CEO determined in March 2020 that the Company needed to employ additional sales people to call on certain accounts, *all six* Defendants must have willfully misled the market when they said two years earlier that the Company broadly intended to "focus more heavily on commercial and national accounts in 2018." (Opp. at 18 (quoting AC ¶ 67).) The PSLRA does not permit fraud-by-hindsight pleading. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002).

### 2.     Plaintiff Does Not Plead Corporate Scienter.

Plaintiff argues that the AC adequately alleges "corporate scienter" because (i) the "go-to-market" strategy was "critical" to Armstrong; (ii) the alleged frauds affected Armstrong's "core operations"; and (iii) some of the Individual Defendants fielded analyst questions regarding the "go-to-market" strategy and distributor inventory levels. (Opp. at 19.) None of those theories gives rise to an inference of scienter, much less a "strong" inference that is "cogent and at least as compelling as any opposing inference one could draw." *Tellabs*, 551 U.S. at 324.

At the outset, it bears emphasis that the Ninth Circuit "has not adopted the corporate scienter doctrine." *Nozak v. N. Dynasty Mins. Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020); *see also In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (same). Thus,

17

Plaintiff is asking this Court to create new law. The Court should decline Plaintiff's invitation. As the Ninth Circuit has explained, even in jurisdictions that have adopted the doctrine, courts will apply a "corporate scienter" theory only in "circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *NVIDIA*, 768 F.3d at 1063 (emphasis in original). The Ninth Circuit cited with approval the Seventh Circuit's example of a misrepresentation so obvious and egregious that the "corporate scienter" doctrine might apply:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)).

This case is nothing like the General Motors example. Plaintiff does not allege any contemporaneous facts that any Individual Defendant knew or should have known that would have rendered any challenged statement "dramatically false" when made. *NVIDIA*, 768 F.3d at 1063. Indeed, Plaintiff's theory does not even relate to alleged false statements about then-existing conditions, as in the General Motors example. Rather, Plaintiff's theory is that because the "go-to-market" strategy (and, apparently, distributor inventory levels) were "critical" to Armstrong, the Company should have been able to accurately predict how the "go-to-market" strategy would perform and how inventory levels would affect the Company in the future, and any *in*accurate projections must have been knowingly false when made. That theory is classic fraud by hindsight and finds no support in the law. "Endorsing Plaintiffs' claim on these allegations would allow a securities fraud claim to proceed against any company that made a mistake relating to an important portion of its business, because the plaintiff could always allege, in hindsight, that the company's

18

talented employees must have known about the issue." *Anshen v. Facebook*, 2017 WL 5635021, at *3 (C.D. Cal. Oct. 4, 2017). For that reason, every court to consider Plaintiff's theory of scienter has rejected it. *See Browning v. Amyris, Inc.*, 2014 WL 1285175, at *16 (N.D. Cal. Mar. 24, 2014) ("No authority charges company management with knowledge approaching precognition, and this is not one of those 'rare cases' in which it would be 'absurd' for the defendants to be unaware of some fact critical to their business."); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *5 (N.D. Cal. Jan. 13, 2010) ("Plaintiffs assert that, because risks materialized later in the quarter, risks which caused Rackable to fall short of its projections, Defendants must have known that the projections were false at the time that they made them. Yet, Plaintiffs cannot simply rely on a 'fraud by hindsight' theory . . . .").

Nor can Plaintiff rely on the "core operations" doctrine. As explained in the Motion, cases where a "core operations inference" will be "sufficient under the PSLRA" are "exceedingly rare." *Gammel*, 905 F. Supp. 2d at 1077. That is because the plaintiff must (1) allege particularized facts showing that "the defendant had actual access to the disputed information"; and (2) show that "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009). As explained throughout this Reply and in the Motion, Plaintiff does not identify any "disputed information" to which Defendants had "actual access" that rendered any challenged statement false when made. For that reason, Plaintiff's reliance on *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*, 2017 WL 3058563 (N.D. Cal. July 19, 2017) (cited Opp. at 19), is entirely misplaced. In that case, the plaintiff alleged particularized facts showing that Volkswagen's CEO had been repeatedly warned that the company was using "an illegal defeat device" to pass emissions tests. *Id.* at *10. Thus, the plaintiff adequately pleaded that the CEO acted with scienter when he later assured the market that the company was not using such a device. *Id.*

Here, unlike in *Volkswagen*, Plaintiff does not allege or identify any facts Defendants

19

knew that would have rendered false the Company's projections about either the "go-to-market" strategy or the impact of elevated distributor levels. Absent such allegations, Plaintiff cannot establish scienter under a core operations theory. *See Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *22 (N.D. Cal. Apr. 27, 2017) ("Plaintiffs have not identified what relevant *fact* is of such prominence that it would be absurd to suggest that the Individual Defendants were unaware of it.") (emphasis in original); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1068-69 (N.D. Cal. 2012) (rejecting core operations theory because the allegations "come nowhere close to identifying 'hard numbers' or specific admissions of Defendants that they knew of the allegedly undisclosed information, such as Juniper's slumping sales and product compatibility issues"); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *24 (N.D. Cal. June 2, 2020) (rejecting core operations theory even where it was established that alleged misstatement concerned business segment that "was highly important to the company" because "there is simply no evidence that either [individual defendant] received information about" the alleged problem); *see also Gammel*, 905 F. Supp. 2d at 1079 ("[M]ere speculation regarding what Defendants must have known is not an adequate substitute for allegations purporting to show what Defendants actually knew.").[10]

Finally, Plaintiff argues that Defendants must have made knowingly false statements simply because analysts asked questions about the "go-to-market" strategy and distributor inventory levels. Plaintiff ignores that "it does not demonstrate scienter to point out that analysts asked questions about a topic." *Bolling v. Dendreon Corp.*, 2014 WL 2533323, at

---

[10] Plaintiff also has not met his threshold burden to establish that the alleged misstatements concern a "core" operation. Courts "have generally required that the operation in question constitute nearly all of a company's business." *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *30 (C.D. Cal. Apr. 14, 2015). Here, Plaintiff concedes that the "go-to-market" strategy involved only Armstrong's residential products (AC ¶ 6) and, as shown in the Motion (at 21-22), Armstrong's residential business comprises only 40% of its net sales. Plaintiff's only response is to note that the business segment in *Ixia* comprised only 20% of the company's revenue. (Opp. at 21 n.13.) Of course, the court in *Ixia* rejected the core operations theory, and Plaintiff cites no cases applying the doctrine when the operation comprised less than half of the company's business. Plaintiff also does not explain how a distributor's inventory level is a "core operation" of Armstrong.

*14 (W.D. Wash. June 5, 2014); (*see* Mot. at 22-23). Even the one unreported, out-of-circuit case Plaintiff cites makes that clear. *See New Orleans Emp. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (finding scienter because the complaint "not only alleges that [the individual defendants] received information about the" subject of the alleged misstatement, "but also explains why [they] would have been alert to [that] information").[11]

### 3.    Plaintiff Does Not Plead Any Plausible Motive to Commit Fraud.

Plaintiff claims "Defendants" had a "motive" to commit fraud. (Opp. at 21.) But Plaintiff only even hypothesizes a motive for three of the six Individual Defendants. (*See id.* at 21-22.) Thus, Plaintiff concedes that, even under his theory, half of the Defendants had no motivation whatsoever to mislead the market. The "PSLRA neither allows nor requires [courts] to check [their] disbelief at the door." *Endologix*, 962 F.3d at 415.

Given Plaintiff's flawed theory, it should come as no surprise that the "motivation" he invents for three of the Defendants cannot withstand even superficial scrutiny. Plaintiff argues that Mr. Maier was motivated to commit fraud because he received "time-based" stock grants ("RSUs") and "a substantial bonus upon departure" in the middle of the class period. (Opp. at 21, 22.) Plaintiff further argues that receiving RSUs also motivated Mr. Rice to commit fraud, and that Mr. Ford was motivated by an even "smaller RSU grant." (*Id.* at 22.)

Plaintiff's theory lacks "[any] basis in logic or common experience" and fails as a

---

[11] Plaintiff repeats the boilerplate allegation that Defendants acted with scienter due to their "high[] positions at the Company" and therefore must have had "access to information that alerted them to the falsity of their misstatements." (Opp. at 20.) Courts routinely reject that generic allegation that usually appears in an initial placeholder complaint but rarely survives to the lead plaintiff's consolidated complaint. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 932 (N.D. Cal. 2017) ("[T]he allegations must consist of more than generalities about management's access to data."). In the two cases Plaintiff cites, the courts found scienter because, unlike here, the complaint identified what reports and information the defendants possessed. *See Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019) (finding "particularized allegations" showing the defendants "knew of the airline's maintenance issues"); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601-02 (N.D. Cal. 2019) (complaint alleged "intimate knowledge" of alleged wrongdoing).

matter of law. *Endologix*, 962 F.3d at 408. As Plaintiff's own case explains, a plaintiff must plead "[p]articularized allegations regarding the correlation between" the subject of the alleged misstatements and the "stock options or cash bonuses" that the defendant stood to receive by misleading the market. *McKesson*, 411 F. Supp. 3d at 603. To support an inference of scienter, the correlation must be "strong." *Zucco Partners*, 552 F.3d at 1004.

Here, Plaintiff does not plead ***any*** correlation between the alleged misstatements and the RSU grants and severance package (for one Defendant) that he claims motivated Defendants to mislead the market. Plaintiff alleges that Defendants made knowing misstatements regarding (i) the future success of the "go-to-market" strategy, and (ii) the future financial impact of elevated distributor inventory levels. But Plaintiff does not (and can never) explain how those alleged misstatements led to Defendants receiving the RSU grants or increased amounts of money. As explained in the Motion, and as Plaintiff concedes, the stock grants were "time-based" and intended to keep Armstrong's top executives at the Company. (*See* Mot. at 23; Opp. at 22.) These defendants did not receive any additional compensation from making allegedly inaccurate, rosy projections about the "go-to-market" strategy or inventory levels. Defendants received their compensation due solely to the passage of time. Any RSUs, thus, could not provide any motivation for Defendants to make any purported misstatements at issue.

Plaintiff also does not explain any correlation between the alleged misstatements and Mr. Maier's severance package. While Plaintiff asserts that "Maier received a substantial bonus upon departure – especially when compared to his 2017 bonus compensation of zero" (Opp. at 21), Plaintiff does not explain how making the alleged misstatements at issue in this case in any way impacted the amount of Mr. Maier's bonus when he left. The Ninth Circuit requires particularized allegations showing a "strong correlation" between the alleged misstatement and the compensation the defendant received. *Zucco Partners*, 552 F.3d at 1004. Contrary to Plaintiff's position, simply because Plaintiff alleges a misstatement and also alleges that one Defendant received a bonus does not mean that one led to the other, particularly without legally sufficient allegations pleading as much.

Finally, Plaintiff simply ignores that *no* Defendant sold any Armstrong stock during the entire class period. Thus, Defendants had no motivation to make any misstatements that would artificially inflate the price of Armstrong's stock. As courts in this District and throughout the Ninth Circuit have held, the absence of stock sales negates any inference of scienter. *See, e.g.*, *In re Downey Sec. Litig.*, 2009 WL 2767670, at *13-14 (C.D. Cal. Aug. 21, 2009) (collecting cases).

### 4. Plaintiff Should Not Be Excused from Pleading Scienter.

In a clear concession that the AC fails to plead scienter, Plaintiff spends a page of his Opposition proffering an excuse for why the AC lacks the particularized allegations the PSLRA requires. Plaintiff states that counsel for a third-party entity—who is not before this Court—advised its employees not to cooperate with Plaintiff's attorney's investigation. (Opp. at 22-23.) Plaintiff then argues that Plaintiff's inability to get employees of that non-party company to cooperate with his lawyers somehow shows Defendants' scienter here. "The theory does not make a whole lot of sense." *Endologix*, 962 F.3d at 415. Tellingly, Plaintiff does not cite a single case in which a court found scienter on this basis. In the one case Plaintiff does cite—in which in the word "scienter" does not appear once—the defendant who was before the court attempted to prevent non-parties from talking to the plaintiff's lawyers. *See In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127 (N.D. Cal. 2002). Here, Plaintiff does not and cannot claim that Defendants or Defendants' counsel have prevented any non-party from speaking to Plaintiff or his lawyers.

That Plaintiff has failed to plead the elements of his claim is a reason to *dismiss* this case, not a basis to *sustain* a facially insufficient complaint. After the PSLRA, "Plaintiff can no longer file a claim and hope that discovery will provide the necessary proof." *In re CellCyte Genetics Sec. Litig.*, 2009 WL 3103892, at *3 n.2 (W.D. Wash. Sept. 24, 2009). As the Ninth Circuit has repeatedly recognized, the PSLRA was enacted to deter these very

23

types of "fishing expeditions." *Silicon Graphics*, 183 F.3d at 988.[12]

### 5.    Viewed Holistically, Plaintiff Fails to Adequately Plead Scienter.

Plaintiff's theory of securities fraud is that three consecutive CEOs, two consecutive CFOs and one Chief Product Officer all decided to lead Armstrong down a knowing path of failure for no reason or benefit whatsoever. Plaintiff offers no plausible rebuttal to that fundamental, foundational flaw in his pleading. Plaintiff's theory of fraud does not make sense, and the Ninth Circuit is clear that courts should use their common sense, "logic" and "common experience" to weed out the very cases that the PSLRA was designed to foreclose. *Endologix*, 962 F.3d at 408.

### C.    Plaintiff Fails to Plead Loss Causation.

Plaintiff did not purchase any Armstrong stock until after the first two alleged corrective disclosures. Therefore, as a matter of both law and logic, he cannot plead loss causation with respect to those two alleged stock drops. (*See* Mot. at 25 (colleting cases).) In Opposition, Plaintiff insists he can plead loss causation with a respect to a loss he did not suffer, but cites no cases to support that paradoxical position.[13] Nor could he. If Plaintiff did not own stock on March 5, 2019 or May 3, 2019, then any disclosure by Defendants or stock drop on those dates could not have caused any loss for Plaintiff.

In addition, as shown in the Motion, the alleged disclosure on November 5, 2019 did not reveal any new information to the market, and Plaintiff fails to adequately plead that the alleged disclosure on March 3, 2020 caused the alleged stock drop that day. (*See* Mot. at 25.) Plaintiff does not respond to either argument in his Opposition, and therefore

---

[12] Plaintiff asserts that he will "move the Court to lift the stay of discovery in connection with amending the Complaint," again conceding that the current AC must be dismissed. (Opp. at 23.) The Ninth Circuit has already held that, "as a matter of law, failure to muster facts sufficient to meet the [PSLRA's] pleading requirements cannot constitute the requisite 'undue prejudice' to the plaintiff justifying a lift of the discovery stay." *SG Cowen Sec. Corp. v. U.S. Dist. Court for the N. Dist. of Cal.*, 189 F.3d 909, 913 (9th Cir. 1999).
[13] The two cases Plaintiff cites are class certification cases that address whether the plaintiff has standing to pursue the claims on behalf of the class and whether the plaintiff satisfies the typicality requirement of FRCP 23(a). (*See* Opp. at 24 (citing *Adam v. Silicon Valley Bancshares*, 1994 WL 374314 (N.D. Cal. Apr. 18, 1994), and *Kirola v. City & County of San Francisco*, 860 F.3d 1164 (9th Cir. 2017)).)

24

concedes the point. *See Jenkins*, 398 F.3d at 1095 n.4; *Carbajal*, 2017 WL 7806586, at *6. The Court should dismiss the AC with prejudice for the separate and independent reason that Plaintiff fails to plead loss causation.[14]

## III.    <u>CONCLUSION</u>

For these reasons and those in the Motion, the Court should dismiss the AC with prejudice.

DATED:      November 2, 2020

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:      */s/  Peter B. Morrison*
                Peter B. Morrison

Attorneys for Defendants Armstrong Flooring, Inc.,
Michel Vermette, Larry McWilliams and Dominic Rice

---

[14] As stated in the Motion, because Plaintiff fails to state a claim under Section 10(b), his Section 20(a) claim also fails. *See Zucco Partners*, 552 F.3d at 990.

25